Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
406-324-8011
bishop@westernlaw.org

Michael A. Kauffman
DRAKE LAW FIRM, P.C.
111 North Last Chance Gulch
Suite 3J, Arcade Building
Helena, MT 59601
406-495-8080
michael@drakemt.com

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, a public land organization; MONTANA CHAPTER BACKCOUNTRY HUNTERS AND ANGLERS, a non-profit organization; ENHANCING MONTANA'S WILDLIFE AND HABITAT, a public outreach organization; SKYLINE SPORTSMEN'S ASSOCIATION, a non-profit organization, | No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |
| Plaintiffs, | |
| vs. | |

1

MARY ERICKSON, in her official
capacity as Forest Supervisor for the
Custer Gallatin National Forest;
LEANNE MARTEN, in her official
capacity as Regional Forester,
Region One, for the U.S. Forest
Service; VICKI CHRISTIANSEN, in
her official capacity as chief of the
U.S. Forest Service; THE UNITED
STATES FOREST SERVICE, a
federal agency; THE UNITED
STATES DEPARTMENT OF
AGRICULTURE, a federal
department,

       Federal-Defendants.

# INTRODUCTION

1.     Friends of the Crazy Mountains, the Montana Chapter of

Backcountry Hunters and Anglers, Enhancing Montana's Wildlife and

Habitat, and the Skyline Sportsmen's Association (collectively

"Plaintiffs"), bring this civil action for declaratory and injunctive relief

against Federal-Defendants ("the U.S. Forest Service" or "the Service")

pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et*

*seq.*, for violations of the National Environmental Policy Act ("NEPA"),

42 U.S.C. § 4321 *et seq.*, and the National Forest Management Act

("NFMA"), 16 U.S.C. § 1600 *et seq.*

2

2.     Plaintiffs challenge the Service's: (a) decision to relinquish public access rights on two National Forest System trails on the west-side of the Crazy Mountains in the Custer Gallatin National Forest ("Gallatin National Forest") – the Porcupine Lowline trail (No. 267) and the Elk Creek trail (No. 195); and (b) decision to forgo completing a new NEPA analysis for a proposed trail "re-route" for the two west-side trails. Plaintiffs also challenge the Service's decision and related failure to properly manage and protect public access rights on these two west-side trails, as well as two additional trails on the east-side of the Crazy Mountains – the East Trunk trail (No. 115/136) and Sweet Grass trail (No. 122) (the "four trails" or "four National Forest System trails").

//



3.      These four National Forest System trails were established in the Crazy Mountains in the late 1800s and early 1900s. Since then, they have been managed, maintained and used by Service employees for official and administrative purposes. The four trails have also been used by Plaintiffs and other members of the public for commercial and/or recreational activities.

4.      *Every* visitor map prepared for the Crazy Mountains depicts the four trails as National Forest System trails open to the public. The location and use of the four trails were also discussed, analyzed, and vetted with the public during preparation of the 1986 Gallatin National Forest Land and Resource Management Plan ("forest plan") and, more

recently, during preparation of the 2006 Gallatin Travel Management Plan ("travel plan"). The Service's 2006 travel plan also includes specific direction for how these four National Forest System trails are to be managed and maintained by the Service and direction for when and how the trails can be used by commercial outfitters, permittees, and members of the public.

5. Despite this fact, over the years, some local landowners and/or their agents have taken steps to obstruct Plaintiffs and other members of the public's ability to access and use the four trails. These efforts have recently intensified. Plaintiffs and members of the public are now confronted with locked gates and barbed wire on the trails. They also routinely encounter intimidating "private property," "no trespassing," and "no forest service access" signs at trailheads and along the four trails. In some areas, the public is also asked to sign in and request landowner permission before using the four trails. Making matters worse, the National Forest System trail signs, markers, and blazes on four trails are often covered up, torn down, damaged and/or removed. Some portions of the four trails are also now difficult to follow due to efforts by landowners cover up and obliterate the trails.

6.    For Plaintiffs and members of the public, it is increasingly becoming more difficult and burdensome for them to use the four National Forest System trails which, in some instances, provide the only public access to our National Forest lands in the Crazy Mountains.

7.    Consistent with the Service's direction and policy – including its own regulations, forest plan, travel plan and guidance – the Service previously took steps to properly manage, maintain, and protect public access rights on these four National Forest System trails. The Service informed the public of its public access rights, took steps to improve and maintain the trails in accordance with its travel plan, removed the landowners' illegal and misleading signs and fencing, took the issue of illegal obstruction directly up with the landowners, and replaced and repaired National Forest System trail signs and markers and facilities, as needed.

8.    In 2017, however, the Service decided to stop managing the four trails as National Forest System trails. The Service decided to allow the landowners' attempted obstructions (i.e., gates, fencing, and signs) to remain in place and devote its time and energy into prolonged negotiations designed to find "mutual agreement" with the landowners.

6

9.      These negotiations – which began in 2017 – are rarely noticed and generally closed to the public, including Plaintiffs. And during these prolonged negotiations, the Service has decided to abandon its previous efforts to use, manage, and maintain the four trails as National Forest System trails. The Service no longer maintains and monitors the trails. Nor does the Service takes steps to repair and replace National Forest System trail signs and markers for the four trails. The Service is also tolerating the landowners' illegal gates, fencing, "no trespassing" signs and obstruction efforts. The Service has also stopped informing the public about its public access rights on the four National Forest System trails.

10.      At issue in this case is the Service's 2018 decision to abandon or "relinquish" public access rights and build a new "re-route" trail on portions of the Porcupine Lowline trail and Elk Creek trail. This decision emerged from the Service's prolonged negotiations with the landowners and was made in the absence of completing a NEPA analysis and without ensuring compliance with its forest plan or travel plan as required by NFMA. Plaintiffs are also challenging the Service's related decision and failure to properly manage and maintain the four

trails for their designated and "emphasized" uses under the 2006 travel plan and related failure to protect and defend public access rights on the four trails. Since 2017, the Service has effectively abandoned its responsibility to manage the four trails for public access.

11.    On February 13, 2019, Plaintiffs sent the Service a "notice of intent to sue" letter detailing its concerns, outlining the alleged legal violations, and requesting an in-person meeting to discuss the situation. Plaintiffs' notice letter was aimed at avoiding litigation and resolving these disputes out of court.

12.    The Service never responded in writing to Plaintiffs' letter. Nor did the Service accept Plaintiffs' offer to meet in person to discuss these issues with Service officials. The Service also refused Plaintiffs' request to start managing the four trails as National Forest System trails by removing illegal signs, gates, and fencing and restoring National Forest trail markers.

13.    Wherefore, Plaintiffs – a coalition of organizations dedicated to ensuring public access to public lands in the Crazy Mountains – are compelled to file this civil action for declaratory and injunctive relief.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 704.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

16.     Plaintiffs have exhausted all available administrative remedies. Plaintiffs have Article III standing to pursue this civil action.

17.     There is a present and actual controversy between the Parties.

18.     This matter is ripe for judicial review.

19.     Final agency action subject to judicial review exists pursuant to 5 U.S.C. §§ 702, 704, and 706.

20.     This Court has authority to issue the relief requested under 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 702 and 706.

## PARTIES

21.     Plaintiff, FRIENDS OF THE CRAZY MOUNTAINS ("Friends"), is an organization dedicated to "lending a public hand to our public lands" and protecting public access to our public, National Forest System lands in the Crazy Mountains. Friends and its supporters engage in trail work and maintenance on National Forest System trails in the Crazy Mountains, including the four trails at issue

in this complaint. Friends also works closely with and watchdogs County, State, and Federal agencies who have jurisdiction over the Crazy Mountains. The organization was formed over concerns about how public access on public trails was being obstructed by private landowners and their agents. Friends brings this action on behalf of itself, its members, and its supporters.

22.    Plaintiff, MONTANA BACKCOUNTRY HUNTERS AND ANGLERS ("Backcountry Hunters") is a non-profit organization headquartered in Missoula, Montana. Backcountry Hunters is an informed and engaged group of Montana hunters and anglers who value public access to public lands and the challenge, peace and solitude that occurs with a quiet-use backcountry experience. Backcountry Hunters values the wild lands, wildlife and fish that make Montana a special place to live and worthy of the title "Last Best Place." Backcountry Hunters works across our diverse public lands, from grasslands to mountain peaks. Backcountry Hunters strives to protect large parcels of backcountry fish and wildlife habitat, as well as the opportunity for traditional non-motorized hunting and fishing experiences. This includes protecting recreational and hunting opportunities for the

public and on public trails and public lands in the Crazy Mountains. As

Montana sportsmen and women, Backcountry Hunters recognizes that

standing up for these threatened resources, values and public access

now is the only way our kids will have the same opportunities in the

future. Backcountry Hunters brings this action on behalf of itself, its

members, and its supporters.

23.    Plaintiff, ENHANCING MONTANA'S WILDLIFE AND

HABITAT ("EMWH"), is an organization that advocates for Montana

citizen's right to public participation and right to know. EMWH works

to empower the public with information and ensure transparency and

accountability at all levels of government. EMWH is also dedicated to

protecting public access to public lands and waters, ensuring

management decisions are in the public interest and utilizing the best

available science, and protecting and "enhancing" Montana's wildlife

and habitat. EMWH brings this action on behalf of itself, its members,

and its supporters.

24.    Plaintiff, SKYLINE SPORTSMEN'S ASSOCIATION, is a

non-profit organization headquartered in Butte, Montana. The Skyline

Sportsmen Association was founded in 1958 and is dedicated to

11

representing the interests of Montana resident sportsmen. The Skyline
Sportsmen's Association works to maintain and further hunting and
fishing opportunities, including public access to public land and waters
in Montana. The organization routinely contributes funds and labor to
wildlife research, wildlife management, habitat enhancement, and
public access projects to lands and waters. The Skyline Sportsmen's
Association brings this action on behalf of itself, its members, and its
supporters.

25.    Friends of the Crazy Mountains, Backcountry Hunters,
EMWH, and the Skyline Sportsmen's Association (collectively
"Plaintiffs") are committed to protecting public access rights on
National Forest System trails in the Crazy Mountains and ensuring
Service compliance with federal law, including its own forest plan and
travel plan.

26.    Plaintiffs live near and use the Crazy Mountains for
commercial and recreational purposes, including the four National
Forest System trails at issue in this case. Plaintiffs routinely use and
visit and have specific plans to return to the Crazy Mountains and the
four trails soon to hike, hunt, track wildlife, and recreate in the Crazy

Mountains. Plaintiffs use the four trails in accordance with the Service's visitor maps for the Crazy Mountains and the Service's 2006 travel plan. Plaintiffs routinely contact Service personnel about using the four National Forest System trails. Plaintiffs also volunteer their time and energy, assist in trail maintenance efforts, and work with the Service to improve public access to public lands in the Crazy Mountains and intend to continue this work in the near future.

27.    Plaintiffs are committed to ensuring the Service complies with its own direction and policy and properly manages, maintains, and protects public access on the four trails. Plaintiffs are committed to ensuring the Service complies with NEPA and NFMA. Plaintiffs are committed to ensuring the Service takes a hard look at the environmental consequences of its decisions and explore a reasonable range of alternatives as required by NEPA.

28.    Plaintiffs' interests in using and accessing the Crazy Mountains on the four trails has been and continue to be adversely affected by the Service's actions and/or inactions as described in this complaint.

29.     Plaintiffs have, among other interests, aesthetic, professional, commercial, recreational, and personal interests in the four trails at issue and ensuring public access to public lands in the Crazy Mountains. Plaintiffs have an interest in making sure public officials comply with their own direction and policy and plans (forest and travel) and take a hard look at all impacts and alternatives before making important and significant decisions that affect public resources.

30.     Plaintiffs are adversely affected by the Service actions and/or inactions, especially in the absence of full NEPA, NFMA, forest plan, and travel plan compliance. Plaintiffs have also suffered procedural injury by the Service's failure to comply with NEPA and ensure compliance with NFMA.

31.     Plaintiffs have not been compelled to participate in this lawsuit. The Service has disregarded (or ignored) Plaintiffs' comments, correspondence, and notice of intent letter.

32.     If this Court issues the relief requested, the harm to Plaintiffs' interests will be alleviated and/or lessened.

33.     Defendant MARY ERICKSON is sued in her official capacity as the Forest Supervisor for the Gallatin National Forest. Ms. Erickson

14

is the agency official responsible for the actions and/or inactions challenged in this complaint.

34.    Defendant LEANNE MARTEN is sued in her official capacity as Regional Director for the Service, Region One. As Regional Director, Ms. Marten is the agency official responsible for the actions and/or inactions challenged in this complaint.

35.    Defendant VICKI CHRISTIANSEN is sued in her official capacity as Chief of the Service. As Chief, Ms. Christiansen is the agency official responsible for the actions and/or inactions challenged in this complaint.

36.    Defendant the UNITED STATES FOREST SERVICE ("the Service") is a federal agency within the United States Department of the Agriculture. The Service is responsible for agency actions and/or inactions challenged herein.

37.    Defendant the UNITED STATES DEPARTMENT OF AGRICULTURE is a federal department responsible for applying and implementing the federal laws and regulations at issue in this complaint.

## BACKGROUND

*The Crazy Mountains*

38.   The Crazy Mountains in south-central Montana are an igneous rock formation forged about 50 million years ago.

39.   The indigenous people of the Northern Plains have a strong connection to the Crazy Mountains.

40.   The Apsaalooke (Crow) Nation call the Crazy Mountains Awaxaaippia, meaning "high landscape that is jagged or rough and have a bad reputation or omen." At least four prominent chiefs of the Crow Tribe fasted on the Crazy Mountains, and the prophetic "dreams" received affected Crow National policies towards "American" government. Vision quest and fasting bed structures have been located on three prominent peaks within the Crazies and other sites have been found along the flanks of these high peaks that may be related to this traditional cultural practice. These practices continue today.

41.   The Crow Tribe considers the Crazy Mountains a traditional cultural landscape and has proposed the mountains for nomination to the National Register of Historic Places

*Current land ownership on the Crazy Mountains and Gallatin National Forest*

42.    The current boundaries of the Gallatin National Forest and the intermingled "checkerboard" public and private land pattern within the Crazy Mountains are the product of federal laws and actions originating with the U.S. Constitution. The Property Clause in the U.S. Constitution states that "Congress shall have the power to dispose of and make all needful rules and regulations respecting the Territory or other property belonging to the United States." U.S. Const. art. IV, § 3.

43.    Most of the federal, "public domain" lands in the present-day Gallatin National Forest, Crazy Mountains, and throughout Montana originated from the Louisiana Purchase in 1803. Montana became a state in 1889.

44.    In 1891, Congress passed the "Forest Reserve Act" to give the President of the United States the authority to set aside forest reserves from the land in the "public domain." The Forest Reserve Act emerged from a growing recognition about the need to protect lands from increased exploitation and indiscriminate grazing and logging.

45.    The "Crazy Mountains Forest Reserve" was established by Presidential Proclamation on August 10, 1906 by Theodore Roosevelt. 34 Stat. 3224 (August 10, 1906).

46.    President Roosevelt set aside the Crazy Mountains for "the use and benefit of the people." 34 Stat. 3224 (August 10, 1906). The Receipts Act of 1907 changed the name of "forest reserves" to "National Forests."

47.    In 1912, the Crazy Mountains National Forest and nearby Yellowstone National Forest were combined to form the Absaroka National Forest. In 1931, the Madison National Forest lands near West Yellowstone were added to the Gallatin National Forest.

48.    In 1945, the Absaroka National Forest lands – including the Crazy Mountains – merged into a single "Gallatin National Forest."

49.    The Gallatin National Forest includes a number of "checkerboard" lands. These lands emgered from the Uniteds States' policy – in the late 1800s and early 1900s – to settle and develop the American West, raise revenue, and dispose of large amounts of land held in the "public domain." These actions and laws, including land grants to the states, the homestead acts, mining laws, and land grants to the railroads created the "checkerboard" landownership pattern within and near the present-day Gallatin National Forest.

50.    Within the present-day Gallatin National Forest boundary, Congress granted an estimated 113,020-acres of "checkerboard" public lands to the Northern Pacific Railway Company. The Northern Pacific Railway received the odd-numbered sections of public land and the federal government reserved the even-numbered sections.

51.    The Northern Pacific Railway sections of land were located in all five of the Gallatin National Forest's mountain ranges, including the Crazy Mountains (more than 50,000 acres).

52.    Throughout the 1900s, ownership of most of the original Northern Pacific Railway lands transferred to various entities, such as miners, investors, homesteaders, stockgrowers and other private ownership. By 1940, the Northern Pacific Railway Company sold all of its landholdings in and around the Crazy Mountains. When the Northern Pacific Railway transferred title of its odd-numbered sections of land to subsequent entities, the deed often expressly reserved "an easement in the public" for "any public roads heretofore laid out or established, and now existing over and across any part of the premises."

53.    When the Gallatin National Forest was established in 1945,

approximately 400,000 acres of intermingled and "checkerboard"

private lands existed within the National Forest boundary.

54.    Many of the roads and trails on the Gallatin National Forest

in 1945 were originally built and established in the late 1800s and early

1900s. The four National Forest System trails in the Crazy Mountains

at issue in this case date back to these early years.

55.    The original National Forest maps for the Crazy Mountains

show a well-developed trail system into the interior of the Crazy

Mountains and along the Crazy Mountains' periphery. This includes but

is not limited to maps from 1925, 1930 and 1937. These maps depict the

four National Forest System trails at issue in this case as part of this

trail system. The four trails are part of a larger trail system that

encircles the Crazy Mountains. These four trails were connected by a

number of Service ranger and guard stations which are depicted on

these early maps.

### *The Porcupine Lowline trail and Elk Creek trail*

56.    The Porcupine Lowline trail is a century (or more) old trail that runs along the west-side and in the foothills of the Crazy Mountains. The trail is designated on Forest Service maps as Trail 267, and is approximately 11 miles long.

57.    The Porcupine Lowline trail was used by turn-of-the-last-century forest rangers who were stationed in the Ibex, Porcupine, and other historic guard stations that encircled the Crazy Mountains. The Porcupine Lowline trail has been and continues to be used by the public for recreational purposes. Up until recently, the trail was also managed and maintained and used by the Service for official purposes.

58.    The Elk Creek trail is a century (or more) trail that runs from the Porcupine Lowline trail east to the saddle before Campfire Lake.

59.    The Elk Creek trail is designated as Trail 195 on Forest Service Maps, and is approximately 6 miles long.

### *The East Trunk trail and Sweet Grass trail*

60.    The East Trunk trail runs from Big Timber Canyon Road, north to the Sweet Grass trail and is approximately 13 miles in length.

61.    The East Trunk trail was historically known as "Trail 115" but today is considered "Trail 136."

62.    The East Trunk trail is a century old trail that was part of the lowline trail system that circumnavigated the Crazy Mountains and connected historic Service guard stations (many of which are now rental cabins). The East Trunk trail is shown on Service maps of the area dating back to 1925. A Service ranger station (and later a Service guard station) once existed upon the East Trunk trail at its juncture in Big Timber Canyon which is now the Big Timber Canyon Picnic Area. Historically, forest rangers rode their work hitches on this trail system, administering public lands grazing allotments to private ranchers, managing mineral activity, putting up timber sales, fighting fire, and maintaining public access for hiking, hunting and fishing.

63.    The Sweet Grass trail runs from Sweet Grass Road (currently called "Rein Lane") and is approximately 10 miles in length. The Sweet Grass trail is designated on Forest Service Maps as Trail 122, and it provides access to National Forest lands further into the Sweet Grass Creek drainage. The Sweet Grass trail predates Forest Reservation, private land patenting, and land grants to the railroads.

The Sweet Grass trail is accessible from the west by National Forest System trails. The Sweet Grass trail is accessible from the southeast from the East Trunk trail. The Sweet Grass trail is accessible from the east by county road and begins at a designated trailhead.

64.     The trailhead for the Sweet Grass trail is located on private property in Section 2 (Township 4 North, Range 12 East). The Service has a "trailhead agreement" with the private landowners at this location. Pursuant to the agreement, the Service has a lock on a gate that crosses the road on their property and has built a facility (with an associated National Forest System sign) to allow for public access of pack and saddle stock and backpackers around the gate. The Service also constructed an unloading facility for the public at the trailhead and installed Service signs about use of the Sweet Grass trail. The Service trailhead has been noted and marked on every visitor map to the Crazy Mountains since at least 1984.

65.     Since the early 1900s, these four trails – the Porcupine Lowline trail, Elk Creek trail, East Trunk trail, and Sweet grass trail – have been maintained, signed, managed and used by the Service for administrative and official purposes.

66.     Since the early 1900s, these four trails have been used by the public for commercial (logging, grazing, wildlife tracking and photography) and recreational activities, including hunting, fishing, hiking, snowshoeing, and/or skiing. In many cases, these four National Forest System trails provide the only public access to certain portions of public lands in the Crazy Mountains.

67.     Some sections of the four trails that cross private land in the Crazy Mountains are also covered by recorded (written) easements from the railroad grants deeds to the private landowners. Recorded (written) easements cannot by extinguished by non-use, abandonment, or reverse adverse use.

68.     Section 15 (within Township 4 North and Range 10 East) includes a written easement in the public for the Porcupine Lowline trail and Elk Creek trail.

69.     Section 35 (within Township 4 North and Range 10 East) and Section 11 (within Township 3 North and Range 10 East) include a written easement in the public for the Porcupine Lowline trail.

70.     Sections 7and 9 (within Township 4 North and Range 12 East) include a written easement in the public for the Sweet Grass trail.

24

71.    Sections 1, 13 and 25 (within Township 4 North and Range 12 East) include a written easement in the public for the East Trunk trail.

72.    The Service asserts it also has a "prescriptive easement" (on behalf of the public) on the four trails in the Crazy Mountains. Once established, title to an easement acquired by prescription is as effective as though it was evidenced by a recorded (written) deed.

**The Service's 1986 Gallatin Forest Plan**

73.    In 1986, the Gallatin National Forest published its first forest plan. The forest plan guides natural resource management activities and establishes management standards for the Gallatin National Forest, including the Crazy Mountains.

74.    When preparing the forest plan, the Service noted that ensuring public access to public lands was the third most important issue identified. The Service noted that portions of the Crazy Mountains are in most need for improved public access.

75.    The goals of the forest plan include providing "a broad spectrum of recreational opportunities," providing "additional access to

National Forest lands," and providing a "road and trail management program that is responsive to resource needs."

76.   The forest plan includes a "forest travel map" that displays the various recreational opportunities and restrictions for all roads, trails, and areas in the Gallatin National Forest, including the Crazy Mountains. All four trails in the Crazy Mountains are depicted as National Forest System trails open for recreation in the forest plan and on the forest plan's travel map.

77.   The forest plan states the existing opportunities "for recreational hunting will be maintained" on the Gallatin National Forest, including the Crazy Mountains.

78.   The forest plan states that "existing opportunities" for hunting will be maintained on the four trails in the Crazy Mountains.

79.   The forest plan states that providing "adequate public access to National Forest lands is of high priority" and that "[t]railhead or parking facilities will be built at the end of some roads" and "[r]ecreation trails will be provided to allow safe public access . . ."

80.    The forest plan states that recreational "opportunity guides, in the form of booklets, displays, signs, or handouts, will be compiled for the Forest and made available to the public."

81.    The forest plan states that "[s]igning will be provided to aid visitor information and national interpretation as appropriate for each recreational setting." The forest plan states that all "[f]orest roads and trails will be located, constructed, managed and maintained to meet management objectives."

82.    The forest plan states that "[r]oad and trail rights-of-way will be acquired across non-National Forest lands to assure adequate protection, administration, and utilization of National Forest resources."

83.    The forest plan states that it will "[d]efine National Forest interest on all existing system roads and trails and acquire necessary additional interests, as needed, to meet management objectives."

84.    The forest plan states that "[e]xisting roads and trails will be maintained consistent with management area goals."

85.   Each of the four trails in the Crazy Mountains were "existing" National Forest System trails at the time the forest plan was adopted.

86.   The Service identified the four trails as National Forest System trails in the forest plan and forest plan's travel map because it determined the public has an easement interest in the four trails.

87.   The landowners did not raise concerns or otherwise appeal the Service's depiction and identification of the four trails as National Forest System trails in the forest plan or forest plan's travel map. The landowners did not raise concerns or otherwise appeal the Service's determination that it had an easement interest in the four trails in the Crazy Mountains.

88.   Because the four trails in the Crazy Mountains were deemed National Forest System trails in the forest plan and identified as such on the travel map, they are subject to the Service's travel management regulations, 36 C.F.R. § 219.21 (1982).

89.   Following publication of the forest plan's travel map, all forest visitor maps subsequently issued for the Crazy Mountains show

the four National Forest System trails open for use and subject to forest plan and travel management regulations.

90.    Following adoption of the 1986 forest plan, the Service managed and maintained the four trails as National Forest System trails. Consistent with the forest plan, the four trails were signed and marked as National Forest System trails. Consistent with the forest plan, the four trails were routinely used by the public for commercial and recreational purposes, including hiking and hunting.

**The Service's 1993 direction and policy on public access**

91.    In 1993, the Service adopted an official policy for resolving disputes regarding National Forest System roads and trails identified on the forest plan's travel map that cross private lands. This policy was published in the Forest Service Manual (Region 1 Supplement), § 5460.3(9).

92.    The Service's policy directs the Service is to solve "road and trail title questions as soon as feasible."

93.    The Service's policy explains many of the "Region's system trails and a number of the system roads are not covered by recorded easements, and there is a growing movement by current landowners to

29

challenge continued National Forest use of these facilities." The Service's policy recommends the Service conduct a "status" review of these roads and trails, prepare affidavits in support of establishing and documenting a prescriptive right, and for support, document and review evidence, including information from: (a) retired Forest Service or other agency employees; (b) local citizens who have historic knowledge of the roads and trails; (c) historians and local historical publications; (d) vintage maps, photographs, and aerial photographs; (e) USGS records and plats; (f) Service records of capital investment expenditures, road and trail maintenance, grazing surveys and allotment management, plantations, land classification, and timber inventories; (g) Service scrapbooks; (h) County records; and (i) old newspapers.

94.    The Service's policy explains that whenever "an action or threat interferes with continued use and management of a road or trail and the Forest Service has not perfected title, the following actions need to be taken by the Forest Supervisor:" (a) evaluate the "status" evidence to determine "historic United States" investment, management, and maintenance, and use of the road or trail; (b) if supported by historical evidence, execute a "Statement of Interest;" (c) notify the private

landowner by certified mail that the United States has acquired an easement across the property; and (d) submit the recorded original Statement of Interest "to the Regional Office for the permanent files."

95.   In July, 1994, the Service issued a memorandum to its Forest Supervisors explaining that the "interests of the United States in the road and trail system must be protected." The memorandum explains that if use of a National Forest System road or trail is "being challenged," the landowner must be contacted and informed that the United States "claims an interest in the facility and that they are in trespass." The memorandum states that Forest Supervisors "should also require the removal of any obstacle within a reasonable time period. If the landowner refuses to comply, the Forest should remove the obstacle and inform the owner that you are protecting the interest of the United States in the system. If the landowner is persistent in blocking access, legal action must be taken against the party."

96.   The July, 1994 memorandum says in order to "protect the interests of the United States," Forest Supervisors should give "serious consideration" to filing a Statement of Interest on all trails and roads

"where the Forest Service does not have recorded easements but evidence indicates that a right can be established."

97.   In March, 1996, the Service's Regional Forester sent a letter to then Senator Conrad Burns explaining its policy of filing of Statements of Interest.

98.   In May, 1996, the Service issued a memorandum to all "Staff Directors and Forest Supervisors" regarding the use of Statements of Interest on historical access routes not covered by recorded easements. The Service said it needed to "be aggressive in protecting, acquiring, and maintaining public access to National Forests." The Service said if "landowners are unwilling to recognize the historical public use of these facilities and continued use is threatened, pursue filing Statements of Interests to document the public's interest."

99.   The Service drafted Statements of Interest for the four trails in the Crazy Mountains but never signed and filed the documents.

100.  In April, 2000, the Service issued a "briefing paper" raising concerns about the loss of public access on National Forest System roads and trails in the Gallatin National Forest and Crazy Mountains. The Service's briefing paper states that longstanding existing roads and

trails "that have historically provided public access to [National Forest System] lands are being closed by private landowners at an increase rate." The Service stated that it is "longstanding" Service policy to protect and maintain public access rights.

101.  In August, 2002, the Service issued an updated "briefing paper" on public access issues on the Gallatin National Forest. The Service said "it is critical" for the Forest to "continue to have a strong and consistent policy and presence in: (a) signing and maintaining our trail system across private lands; (b) defending historic access rights if challenged; and (c) perfecting trail across rights across private lands whenever that opportunity exists."

102.  In August, 2002, the Service stated that in a "situation where an existing [National Forest System] trail crosses private lands, and no deeded easement exists, it is very important for the Forest and District to: (1) protect and maintain historic evidence, including trail blazes, signs, maps, photos and maintenance records; (2) maintain and sign the trail on a regular basis, and keep records and photos of this maintenance; and (3) take prompt action in the event that landowners threaten or take action to close or obliterate the trail."

*The 2005 Travel Rule*

103.   In 2005, the Service adopted a travel management rule ("travel rule"). 70 Fed. Reg. 68,264 (November 9, 2005); 36 C.F.R. §§ 212, 251, 261, 295.

104.   The travel rule revised the Service's regulations regarding travel management on National Forest System lands. The travel rule required the Service to identify and designate all roads, trails, and areas open for use, including motorized use.

105.   The travel rule defines a National Forest road or trail as a "road or trail wholly or partially within or adjacent to and serving the National Forest System that the Forest Service determines is necessary for the protection, administration, and utilization of the National Forest System and the use and development of its resources." 36 C.F.R. § 212.1, 251.51.

106.   The travel rule directs the Service to only identify and designate a National Forest System road or trail if legal access to (and on) the road and trail exists. 36 C.F.R. § 212.55 (d). The Service must recognize all valid existing rights when designating National Forest System road and trails. *Id.*

34

107.   Pursuant to the travel rule, the Service can only designate a "National Forest System road or trail" after engaging in public review and comment and coordinating with all "appropriate Federal, State, county, and other local government entities." 36 C.F.R. § 212.53.

### *The 2006 Gallatin Travel Plan*

108.   In 2006, and in accordance with the travel rule, the Service issued a "record of decision" adopting a new Travel Management Plan for the Gallatin National Forest and Crazy Mountains. The Service also issued a related "detailed description" of the record of decision and Travel Management Plan (hereinafter collectively referred to as the "travel plan").

109.   The travel plan identifies and designates all National Forest System roads and trails in the Crazy Mountains.

110.   The four trails are identified as "National Forest System trails" in the travel plan.

111.   The travel plan removes and replaces most of the programmatic 1986 forest plan direction relevant to travel and replaces it with new direction, including route specific management direction,

from the travel plan. The 2006 travel plan is an amendment to the forest plan.

112.   The travel plan identifies and establishes opportunities for public recreation use and access using the Gallatin National Forest's road and trail system. For each National Forest System road and trail identified, the travel plan specifies the types of uses (and seasons of use) appropriate for each road and trail.

113.   The travel plan's purpose includes providing "for public access and recreation travel on the Gallatin National Forest considering both the quantity and quality of opportunities provided."

114.   The travel plan states that if the use of a National Forest System road or trail is identified as "Emphasized," the Service will manage the road or trail for that use.

115.   The travel plan designates all four trails in the Crazy Mountains for the "Emphasized" use of "hiking" "YEARLONG" and with "No Restrictions."

116.   In the travel plan, the Porcupine Lowline trail's emphasized uses include mountain biking, stock, and hiking yearlong and with no restrictions. The Elk Creek trail's emphasized uses include motorcycles

36

(closed September 15 to June 15) and mountain biking and hiking yearlong with no restrictions. The East Trunk trail's emphasized uses include stock and hiking yearlong with no restrictions. The Sweet Grass trail's emphasized uses include stock and hiking yearlong with no restrictions.

117.  The travel plan's "goals and objectives" establish direction that drives future activities and programs. The travel plan's "standards and guidelines" set sideboards within which future site-specific actions must take place.

118.  Goal-B in the travel plan is labeled "Access." Goal-B says the Service will "[p]rovide and maintain reasonable, legal access to Gallatin National Forest lands to provide for human use and enjoyment and to protect and manage Forest resources and values."

119.  Objective B-3 in the travel plan is labeled "Access Locations." Objective B-3 says the Service will "[o]btain and protect public and/or administrative access rights in locations as identified in . . . Table I-3." Table I-3 in the travel plan lists the Porcupine Lowline trail, Elk Creek trail, East Trunk trail, and Sweet Grass trail as trails where the Service needs to "perfect" trail access across private in-holdings. The

travel plan explains that "perfecting" easement rights on these National Forest System trails could take many forms, from quieting title to a pre-existing easement to a new grant to document the historic public use.

120.  Guideline B-5 in the travel plan is entitled "Protect Existing Access Rights." Guideline B-5 says in "situations where continued use of an historical road or trail access route is challenged or closed, take actions necessary to protect the existing access rights to [National Forest System] lands, and to protect the jurisdictional status of roads and trails in cooperation with area counties."

121.  Goal D in the travel plan is to manage a "system of roads and trails and associated use" consistent with the forest plan. Objective D-3 says the Service will develop and maintain a road and trail system to be consistent with Goal D.

122.  The Service said that while it would have these objectives and guidelines on public access "regardless of whether they're stated in the [travel plan], including them as programmatic direction" has the added benefits of alerting landowners and the public of areas where access is desired, provides a foundation for pursuing access when the opportunity arises, provides a foundation for site-specific access

38

proposals, and gives the Service "direction to protect existing access rights . . ."

123.   The Service said the travel plan includes the necessary guidance "to ensure protection of valid existing rights."

124.    In approving the travel plan, the Service explained that "[a]ccess to public land has been an increasingly controversial issue . . . Reasonable access has been and has the potential to be blocked for a variety of reasons including ownership changes, subdivision of ranches, and just a landowner's desire for exclusive use."

125.   The travel plan states that the Service will "protect existing access rights" on National Forest System trails. The Serviced said the travel plan "gives [it] direction to protect existing access rights."

126.   The travel plan states the Service will provide and maintain public access in National Forest System roads and trails. The travel plan states that the Service will protect public and/or administrative access rights on specific trails, including the Porcupine Lowline trail, Elk Creek trail, East Trunk trail, and Sweet Grass trail.

127. When commenting on the draft travel plan, landowners questioned whether the four trails are properly considered National Forest System trails.

128. In commenting on the draft travel plan, one landowner said he was "opposed to any use of [the Porcupine Lowline trail] which crosses [his] families' private land. . ." Another landowner said the Service has no easement for the Sweet Grass trail to cross private land in Section 7 and join with the road in Section 2.

129. In response to comments from landowners on the Porcupine Lowline trail and Elk Creek trail, the Service said it "asserts that the Forest and the public has enjoyed a right to use this National Forest Trail for many decades for the prescribed uses. While recorded (written) easements don't exist for all segments of the trail (some do on other private lands along this trail) the Forest asserts the right to continue to use this route for public and administrative uses." The Service stated that, consistent with the travel rule, it does not (and will not) designate National Forest System roads and trails unless there is legal access on and to it. 70 Fed. Reg. 68264 (November 9, 2005)

40

130.  The Service's travel plan identifies and includes the four trails as National Forest System trails because the Service documented and determined that the public has an "easement interest" in these four trails. The Service's travel plan determined an easement interest in the four trails existed due to: (a) open and notorious, adverse, continuous and uninterrupted historic and ongoing use of the trails (for more than 5 years); (b) the Services' historic and ongoing maintenance and administrative use of the trails; and (c) the existence of recorded (written) easements to the public from the railroad grants of some portions of these trails.

131.  The travel plan's identification of all four trails as National Forest System trails in the Crazy Mountains only occurred after taking into account existing pubic access use and rights and whether legal access to and on the four trails existed.

132.  The travel plan's identification of all four trails as National Forest System trails in the Crazy Mountains was only made after extensive analysis, public review and comment, and coordination with Federal, State, county, and other local governmental entities.

41

133.   On October 30, 2006, the Service issued a final record of decision approving a final travel plan for the Gallatin National Forest and Crazy Mountains. The travel plan has not been revised or amended since it was adopted in 2006.

134.   Some landowners and organizations appealed the Service's decision to adopt the 2006 travel plan. The landowners' appeal points included the allegation that the Service (and the public) has no easement interest in the four trails. The landowners said the Service cannot "create property interests for itself by depicting a trail on a map or discussing an alleged trail in a traveling planning document, nor can the Forest Service legally exert rights that have never existed."

135.   The Service responded to the landowners' appeal by noting that the travel plan record does not include a "complete laundry list" of all legal rights on each road or trail but that the Service chose to only identify those road and trails "that it believes there are sufficient rights, either perfected or historic, to rightfully show the designated public or administrative uses."

136.   In 2007, some of the landowners joined a lawsuit filed by Citizens for Balanced Use against the Service for its approval of the

travel plan. *See Citizens for Balanced Use v. Heath*, 07-cv-0059-BLG-DWM (D. Mont. 2007) consolidated with *Montana Wilderness Association (MWA) v. McAllister,* 07-cv-0039-M-DWM (D. Mont. 2007). In its thirteenth claim for relief in its "second amended complaint," the plaintiffs asserted that that the travel plan map's depiction of National Forest System trails across private land "for which no easement across private land had been obtained" violated the landowners rights and caused conflict between the public users of such trails and the landowners. *See MWA*, 07-cv-0039-M-DMW (Doc. 43-1). The plaintiffs alleged violations of the travel rule which only authorizes the Service to designate National Forest System road and trails for which it has legal access. 36 C.F.R. § 212.55(d).

137.  In 2007, the plaintiffs (and landowners) in *Citizens for Balanced Use* moved for a preliminary injunction to prevent the Service from depicting the National Forest System trails across private land segments where "no easement" exists. The plaintiffs supported this allegation with declarations from some of the landowners.

138.  On November 16, 2007, the Service filed a response with supporting declarations and explained that the Service "has easement

rights on the trails in question" and that it is "perfectly within its rights" to reflect the trails on the travel plan maps. *MWA*, 07-cv-00039-DWM (Doc. 48-2 at 8). For support, the Service relied on a sworn declaration from Robert Dennee, the Lands Program Manager for the Gallatin National Forest and one of the authors of the travel plan.

139.  Mr. Dennee's sworn declaration explains that the Service has an "easement interest" in the National Forest System roads and trails depicted on the travel plan map. Mr. Dennee's sworn declaration explains that in "situation where continued use of a historic road or trail access route is challenged or closed, Forest Service direction and policy is . . . to take actions necessary to protect existing access rights to [National Forest System] lands." Mr. Dennee's statements in his sworn declaration are consistent with Service direction in the forest plan and travel plan and Service policy.

140.  In defending the travel plan, the Service explained that the National Forest System roads and trails depicted in the travel plan "were established in the late 1800s and early 1900s" and since that time "have been maintained, signed, managed and used for Forest Service management purposes and recreational activities."

44

141.   In defending the travel plan, the Service said it "is the Forest Service's position that the United States, on behalf of the public, has an easement interest in these roads and trails due to the historic and ongoing public and administrative use and maintenance. The public is the beneficiary of this right of access and the Forest Service defends and maintains that right."

142.   In defending the travel plan, the Service said that in the Gallatin National Forest, the Service chose to identify "the Porcupine-Lowline trail system, as well as several other trail systems crossing private lands, because the Forest Service believes the United States has an 'easement interest' in this trail system."

143.   In defending the travel plan, the Service said it has "a responsibility" to manage the trail system in the Gallatin National Forest and Crazy Mountains "under the Forest's Travel Management Plan." Mr. Dennee's sworn declaration also stated that the Service "has a responsibility to manage the trail system under the Forest's Travel Management Plan."

144.   On November 26, 2007, the Court denied the plaintiffs' request for a preliminary injunction. *MWA*, 07-cv-00039-DWM (Doc.

45

53). The Court agreed with the Service and held that the "mere fact that a landowner disputes the presence of a prescriptive easement on his or her property does not mean that the landowner is legally correct, and [the plaintiffs] point[] to no authority for its apparent proposition that the Forest Service should simply abandon use rights previously acquired by the public." *Id.* at Doc. 53 at 26. The plaintiffs chose not to pursue this claim further on summary judgment.

145.  On September 30, 2008, the Court entered its final judgment in the Service's favor on this public access claim. *MWA v. McAllister*, 2008 WL 11348231, *17 (D. Mont. 2008). In so doing, the Court effectively upheld the Service's position that it has an "easement interest" in the National Forest System roads and trails identified in the travel plan and depicted on the Service's travel plan maps.

### The 2009 Forest-wide roads and trails improvement work

146.  In February, 2009 the Service released an environmental assessment ("EA") for the Gallatin National Forest's road and trail improvement projects.

147.  The February, 2009 EA discloses "the potential environmental consequences" of improvement work on certain National

Forest System roads and trails identified in the travel plan. The travel plan specified the types of uses allowed and managed for on all National Forest System roads and trails. The improvement work discussed in the EA "is designed to provide adequate facilities" to accommodate such uses.

148.  In the February, 2009 EA, the Service mentions the potential for improvement work on the Porcupine Lowline trail to "correspond with final rights-of-way." The Service said some portions of the trail could be shifted onto National Forest lands and that some portions of the trail that pass through private lands need to be "remarked and reconstructed." The Service said that under the decision in the travel plan, the Porcupine Lowline trail is "to provide opportunities for motorcycle, mountain bike, stock and foot use."

149.  The proposed improvement work for the Porcupine Lowline trail discussed in the 2009 EA involved 5.2 miles of new trail construction "for motorcycle and non-motorized use," 2.6 miles of trail reconstruction on the existing trail (which crossed private sections), and 3.0 miles of maintenance on existing trails. No further details are provided in the EA. No environmental analysis is provided for the

proposed improvement work on the Porcupine Lowline trail in the EA.
No alternatives analysis is provided for the proposed improvement work
on the Porcupine Lowline trail in the EA.

150.  In response to comments on the Service's February, 2009
EA, including the proposed improvement work on the Porcupine
Lowline trail, the Service said it would not begin any on-the-ground
work until "any applicable authorizations are in place." The Service said
it intends "to continue to maintain the [Porcupine Lowline trail] for
existing uses as it has in the past until a relocation resolution
agreement has been reached."

151.  In April, 2009, the Service issued a decision notice for its
roads and trails improvement work. The Service's decision includes
certain road and trail improvement projects deemed "necessary and
desirable to fulfill the objectives of the [travel plan]." The Service's
April, 2009 decision adopts the potential trail improvement work for the
Porcupine Lowline trail.

### *Public use and Service maintenance on the four trails in the Crazy Mountains*

152.   Consistent with the 2006 travel plan, Plaintiffs and other members of the public have used and continue to routinely use the four trails for hiking, hunting, fishing, and other recreational and commercial pursuits. Commercial outfitters and permittees also use the four trails.

153.   Since adoption of the 2006 travel plan, Plaintiffs and other members of the public have used the four trails every year. This includes using the four trails for recreational purpose, i.e., hiking in the summer, hunting in the fall, and/or skiing and snowshoeing in the winter and commercial purposes. Plaintiffs used the four trails and continue to use the four trails without asking for permission to do so from local landowners and despite their efforts to obstruct such use (see below).

154.   Plaintiffs and the public's use of the four trails has been and continues to be open and notorious. Plaintiffs' and the public's use of the four trails has been and continues to be continuous and uninterrupted. Plaintiffs' and the public's use of the four trails is adverse. Plaintiffs and the public have not abandoned the four trails.

49

155.  Since adoption of the 2006 travel plan (and up until the summer of 2017), the Service took an active role in managing and maintaining the four trails. This included repairing and replacing trail facilities, signs, markers, and blazes. This included clearing the trails and maintaining the trails for public access. This included removing illegal barriers to and on the four trails and removing all misleading and illegal signs. This included informing the Plaintiffs and other members of the public that it has access rights on the four National Forest System trails and need not ask for permission.

156.  Since adoption of the 2006 travel plan (and up until the summer of 2017), the Service used the trails for administrative and official purposes.

*Landowner's efforts to obstruct public access on the four trails*

157.  On the Porcupine Lowline trail and Elk Creek trail, the landowners have attempted to obstruct public access with gates, as depicted by this 2017 photo:



158.  On the Porcupine Lowline trail and Elk Creek trail, the landowners and/or their agents have installed "private property," "no forest service access" and "no trespassing" signs.



159.  On the Porcupine Lowline trail and Elk Creek trail, the landowners and/or their agents removed National Forest System trail markers at the trailhead and on the trail. The landowners and/or their agents removed the Service's "welcome to your National Forest" signs

51

on the trail and at the trailhead. The National Forest System signs directing public to stay on the trails were also torn down.

160.   On the Porcupine Lowline trail and Elk Creek trail, the National Forest System trail blazes were torn down. On the Porcupine Lowline trail and Elk Creek trail, portions of the trail are covered by brush piles and are now obliterated and difficult for Plaintiffs and members of the public to follow.

161.   On the East Trunk trail, the landowners and/ or their agents installed "no trespassing signs," "smile you're on camera signs," and other signs meant to intimidate forest users and Service employees.

//





162.  On the East Trunk trail, the landowners and/or their agents installed single stands of barbed wire rigged across the trail that, according to Service reports, "would appear to have been meant as some sort of surprise booby trap." One such wire was of a blue color and difficult to see in certain light.

163.  At the trailhead to the East Trunk trail, the landowners and/or their agents put up a locked gate to try and restrict access to the trail.

54

164.  On the East Trunk trail, landowners and/or their agents removed the National Forest System trail signs and blazes. On the East Trunk trail, landowners and/or their agents removed all National Forest System signs and markings at the trailhead.

165.  On the Sweet Grass trail, the landowners and/or their agents removed the National Forest System signs and information at the trailhead about allowable uses of the Sweet Grass trail that had been placed by the Service as per the 2006 travel plan. On the Sweet Grass trail, the landowners and/or their agents insist that members of the public first obtain permission and "sign in" prior to being allowed to use the trail. The landowners and/or their agents have installed a sign at the trailhead that attempts to mislead the public to believe that the Sweet Grass trail is not a National Forest System trail:



166.   The landowners' and/or their agents' efforts to obstruct Plaintiffs and other members of the public's use of the four trails by installing gates, fencing, and gratuitous permission signs has been and remains ineffective.

167.   Plaintiffs and other members of the public still use the four National Forest System trails (as depicted on all visitor maps), ignore the landowner's signs, bypass the illegal gates, and use the four trails as they and other members of the public always have. The four trails are also used by commercial outfitters and permittees.

168.   Plaintiffs plan to continue to recreate in the Crazy Mountains and use the four trails in the future (despite the landowners' efforts). Neither Plaintiffs nor the public have abandoned their right to use the four trails. Plaintiffs' use of the four trails is adverse and not at the pleasure or permission of the landowners.

169.   Plaintiffs use the four trails when they desire to do so and have not and do not seek permission from landowners.

***The Service's response to the landowners' efforts to obstruct public access on the four trails***.

170.  The Service has been and remains aware of the landowners' past and continued efforts to obstruct public access on the four National Forest System trails in the Crazy Mountains.

171.  Plaintiffs and other members of the public have submitted and continue to submit numerous complaints to the Service about the landowners' efforts to obstruct public access on the four trails.

### The two west-side trails

172.  The Service is aware of the landowners' efforts to obstruct public access on the two west-side trails: the Porcupine Lowline trail and Elk Creek trail.

173.  On November 19, 2009, the Service issued a letter to the landowner about several "Keep Out" and "Trail Closed" signs that were posted on the Porcupine Lowline trail. The Service noted the presence of an illegal "locked gate" placed on the trail near the Porcupine cabin. The Service requested the landowner remove all such signs and gates and any and all impediments to public access on the National Forest System trail.

174.  In 2009, the Service stated its intention to improve trail marking and signing along the entire trail route.

175.  From 2009 to 2013, the Service managed and maintained the Porcupine Lowline trail and Elk Creek trail. The Service installed and repaired Service signs and removed illegal fencing and signs.

176.  In March, 2013, the Service informed its staff not to sign in or ask for permission to use the Porcupine Lowline trail and Elk Creek trail because they are public National Forest System trails.

177.  In March, 2013, the Service wrote the Park County Sheriff to document and complain about efforts from local landowners to block public access on the Porcupine Lowline trail and Elk Creek trail. The Service informed the Sheriff of the "public's legal right to use the trail at will (without requesting permission from any landowner)" and noted that no citizen should be "mistakenly held subject to trespass complaints" for using the public trail.

178.  In May, 2013, the Service wrote the landowners regarding illegal efforts to block public access on the Porcupine Lowline trail and Elk Creek trail. The Service said it is "receiving regular complaints about the locked gates across the public right of way" and is "documenting each such complaint by requesting citizens to put their complaint in writing." The Service also said that unless changes are

made, it will refer the matter to Law Enforcement and Investigations and/or the Office of General Counsel.

179.  In June, 2013, the Service met with representatives for the landowners about their efforts to illegally block public access on the Porcupine Lowline trail and Elk Creek trail.

180.  The Service's notes from the June, 2013 meeting state that the landowners were upset about the 2006 travel plan and its depiction of the trails as open for public access and open for motorized use.

181.  The Service's meeting notes from the June, 2013 meeting state that it was after the 2006 travel plan decision that the landowners decided to "shut off access" and put up a gate. The Service's meeting notes state that despite the locked gates, members of the public still use the trails and "simply go around the fences and gates now to access the area." The Service said that if resolution of the illegal access was not resolved, the Service "would be forced to advocate for adversarial measures." The Service's meeting notes state that the landowners would consult with their attorneys and get back to them.

182.   In July, 2013, a landowner sent a Freedom of Information Act ("FOIA") request for the Service's "file" on the Porcupine Lowline trail.

183.   In July, 2013, a landowner contacted the Service and said that while they will discuss options for "re-opening" the Elk Creek trail they will not agree to "open" the Porcupine Lowline trail and would not remove the locked gates, fencing, and signs.

184.   In July, 2013, the Service said in an internal e-mail that the landowners' actions and attempts to block public access on the Porcupine Lowline trail must be addressed and that the Service needs to do more to protect the public's interest, including filing Statements of Interest.

185.   In July, 2013, the Service sent a letter to the Park County Commissioners documenting the "numerous calls and complaints of locked gates and fences" on the Porcupine Lowline trail and the Elk Creek trail. The Service reaffirmed its position that these trails are "legal public rights-of-way" and that the behavior of the landowners in the region "robs all other citizens of their birthright to access their American public lands system."

60

186.  In August, 2013, a private landowner wrote the Service about the Porcupine Lowline trail and the Elk Creek trail. The landowner complained about public use of the trail, including the use of motorcycles on the trail and their gates being left open. The landowner also complained about trespass off of the trail.

187.  In August, 2013, the Service drafted a response to the private landowner. The Service acknowledged that the landowner has a permit from the Service to graze cattle on National Forest lands in the Crazy Mountains. The Service acknowledged that the landowner leases his land (which abuts National Forest lands) to a private hunting club. The Service said it appreciated the landowner's acknowledgment of the "longstanding public Trail blazes" on the Porcupine Lowline trail and the Elk Creek trail, which have existed for decades and are depicted in photographs on file with the Service. The Service said the landowners' removal of Service signage and blazes marking the trails is a deliberate and adverse attempt to "stymie public use and taxpayer-supported Government Trail maintenance." The Service said that any "trespass" off of the trails and onto private property is "facilitated by [the landowners] destruction of Government signage."

61

188.  In August, 2013, the Service wrote the landowners and told them that if they (and their lessees) would voluntarily remove the illegal gates and obstruction on the Porcupine Lowline trail and the Elk Creek trail, the Service "would be willing to GPS the precise Trail locations, re-sign them, and discuss any maintenance and signage that would reasonably serve to deter trespass." The Service said that if the landowners remove their illegal gates on the Porcupine Lowline trail and the Elk Creek trail, the Service would "overlook [their] destruction of Government property and simply replace all signage and blazing at no cost or penalty." The Service said it would also "post letters discouraging trespass" off of the trails.

189.  In August, 2013, the Service said it was aware of and documented continued public use of the Porcupine Lowline trail and the Elk Creek trail despite the presence of locked gates.

190.  In August, 2013, the Service said it has and continues to send Service employees across the Porcupine Lowline trail and the Elk Creek trail to "maintain them and observe use patterns." The Service said it routinely informs members of the public that a "legally valid

public trail easements exist" for the Porcupine Lowline trail and the Elk Creek trail.

191.  In January, 2014 an attorney informed the Service that she was representing a landowner over access "disputes" on the Porcupine Lowline trail and Elk Creek trail.

192.  In June, 2014, a landowner sent an e-mail to the Service saying that he is going to leave the "gates locked" and only allow public access on the Porcupine Lowline trail and Elk Creek trail "on a permissive basis."

193.  In June, 2014, the Service responded to a landowner e-mail by noting that the Service "has a LEGAL property interest" in the Porcupine Lowline trail and the Elk Creek trail and that "to the extent [the landowners] are either preventing access with your locked gate or selectively letting people through, [the Service] construes this as an illegal act . . . not dissimilar from putting a gate across I-90 and selectively allowing or dis-allowing passage through the gate."

194.  In June, 2014, the Service said it had "exhausted all possibility of amicable resolution" and that the landowners and other stakeholders are "deliberately stretching out the discussion under

(prudent) advice of [their] counsel, knowing that there is a limited window of opportunity for the Government to protect these long-established public rights." The Service said the "notion that [it] can simply continue to 'work on this' indefinitely would constitute a failure to fulfill [its] obligations to the tax-paying American public."

195. In July, 2014, the Service, including the district ranger and the Forest Supervisor, visited the Porcupine Lowline trail and Elk Creek trail and observed the illegal locked gates across the trails and the removal of Service trail markers and signs (including signs that were replaced in 2013). The Service also observed motorcycle tracks on the trail. The Service has photo documentation of this trip.

196. From July to October, 2014, the Service received and documented numerous complaints from members of the public about efforts to obstruct public access on the Porcupine Lowline trail and Elk Creek trail.

197. In the summer of 2015, the Service and other volunteer members of the public made numerous (approximately six) trips on the Porcupine Lowline trail and Elk Creek trail and cleared downed trees, put up ribbons and re-painted old blazes on trees, and used a GPS

system to find and accurately locate the trails. The Service also posted "Welcome to Your National Forest" signs.



198.   In the summer and fall of 2015, Plaintiffs and other members of the public used the Porcupine Lowline trail and Elk Creek trail and sent complaints about the landowners' obstruction efforts to the Service.

199.   In June 28, 2016, the District Ranger for Service's Yellowstone Ranger District sent an internal e-mail to staff doing seasonal work in the Crazy Mountains. The District Ranger informed Service staff to "NEVER ask permission" to use and access National Forest System roads and trails depicted on Gallatin forest and travel

maps, including the two west-side trails (and other trails) in the Crazy Mountains. The District Ranger emphasized that "[w]hatever past [District Rangers] or colleagues have said. I am making it clear. DO NOT ASK permission and DO NOT ADVISE [the] public to ask permission. These are historic public access routes. By asking permission, one undermines public access rights and plays into their lawyers' trap of establishing a history of permissive access."

200.  This internal e-mail from the District Ranger was later posted publicly on a non-profit organizations' Facebook site. The public posting of this e-mail message generated opposition from landowners who sent objection letters to the Service, the Secretary of Agriculture, and Senator Steve Daines.

201.  In the summer of 2016, Plaintiffs and other members of the public used the Porcupine Lowline trail and Elk Creek trail and sent complaints about the landowners' obstruction efforts to the Service.

202.  On August 17, 2016, a private landowner presented the Service (including the District Ranger) with a copy of the Service's June 28, 2016 e-mail. The landowner asserted that he was "NOT trying to extinguish public access to public lands."

203.  In the fall of 2016, members of the public sent more complaints to the Service about the landowners' obstruction efforts on the Porcupine Lowline trail and Elk Creek trail. Members of the public also complained about "dismal" trail conditions and contacted the Service about increased trail maintenance. Members of the public also volunteered to help out with trail maintenance.

204.  In December, 2016, landowners wrote the Service (and cc'd the Regional Forester, Senator Tester, Senator Daines, and then Representative Zinke) urging the Agency to "reprimand" the District Ranger for the e-mail. The landowners also said they "believe that the access routes" described by the District Ranger – which included the Porcupine Lowline trail and Elk Creek trail – "were never Forest Service 'public' access routes."

205.  In January, 2017, landowners (through the Montana Farm Bureau Federation) wrote Senator Daines and attached a copy of the Facebook post that included the District Ranger's e-mail.

206.  In January, 2017, landowners asked Senator Daines to "investigate whether the Forest Service" and the District Ranger "acted appropriately" and what recourse landowners in the Crazy Mountains

have "in stopping what [they] see as a broad over-reach of the District Ranger's authority . . ."

207.  In April, 2017, the Service began meeting with a private "working group" composed of landowners, stockgrowers, the Montana Department of Natural Resources and Conservation, and other private interest individuals and organizations.

208.  In May, 2017, Senator Daines drafted a letter to the Service requesting information on its policy "for disputed access points near the Crazy Mountains." Senator Daines requested answers to four specific questions, recognized the importance of access to public lands, and stressed the importance of protecting "private property rights" and working "with willing landowners" in facilitating access. Senator Daines concluded his letter by emphasizing that "[p]rivate property rights are of the utmost importance, and ensuring we equally respect all stakeholders involved will only serve to strengthen the reputation of [the Service]."

209.  On June 7, 2017, Rep. Pete Sessions (32nd District, Texas) drafted a letter to Secretary of Agriculture, Sonny Perdue requested that the Service issue a new directive precluding it from acquiring any

interests in land by prescription and "disavowing the use of so-called Statements of Interests." Rep. Sessions drafted the letter on behalf of his constituent who owns a ranch in Montana.

210.  On June 16, 2017, the Service's District Ranger for the Yellowstone District who authored the internal e-mail that was posted on a Facebook page was removed from his post.

211.  In the summer of 2017, the Service decided to avoid any confrontation with landowners and allow their obstruction efforts to continue (and remain in place).

212.  In the summer of 2017, the Service decided to no longer repudiate the landowners' efforts to obstruct public access on the Porcupine Lowline trail and Elk Creek trail as it had done in previous years.

213.  In the summer of 2017, the Service decided to no longer manage and maintain the Porcupine Lowline trail and Elk Creek trail as National Forest System trails.

214.  In the summer of 2017, the Service decided to no longer remove illegal gates or barriers across the trails and/or insist that the landowners do so.

69

215.   In the summer of 2017, the Service decided not to remove the illegal and misleading signs. The Service decided not to repair and reinstall National Forest System signs on the trails and at the trailheads.

216.   In the summer of 2017, the Service decided to explore prolonged negotiations with the landowners aimed at finding a "mutually agreeable" solution.

217.   On July 14, 2017, the Service responded to Senator Daines' May 26, 2017 letter. The Service said that despite the landowners' ongoing efforts to obstruct public access on the National Forest System trails, it was now seeking to work with the landowners to find a "mutually agreeable" solution to the access disputes on the trails.

218.   In July, 2017, the Service arranged a meeting with a small private "working group" including landowners and others to discuss public access issues in the Crazy Mountains. The meeting was not open to the public and was by invite only.

219.   On July 31, 2017, Plaintiffs contacted the Service via e-mail about illegal landowner obstruction on the Porcupine Lowline trail. This included the landowners' locked gate, attempts to cover up the trail

70

with brush piles, and the removal of all Service trail signs on the fence posts and trail markers. Photos of the landowners' obstruction were also provided. Plaintiffs formally requested that the Service "follow their own policy to maintain this trail, remove[] the lock on the gate, replace the signage and rock cairns for the public to be able to identify the trail." Plaintiffs also offered assistance to "maintain this and other trails" in the Crazy Mountains.

220. The Service never responded to this July, 2017 e-mail and other similar complaints from members of the public about obstruction on the Porcupine Lowline trail and Elk Creek after July, 2017.

221. On July 31, 2017 the Service said the public's "thoughts/photo on access" expressed in the July, 2017 e-mail will be placed in its "records." The Service did not otherwise respond to the complaints.

222. Since 2017, the Service no longer insists that the landowners remove the illegal gates or obstructions on the two west-side trails. Since 2017, the Service no longer takes steps to improve the two west-side trails. Since 2017, the Service no longer seeks to replace the National Forest trail markers, signs, and blazes on the two west-side

trails. The Service never revised and/or altered the landowners' grazing and/or Outfitter-Guide permits to operate on National Forest lands in response to the illegal actions on the Porcupine Lowline trail and Elk Creek trail.

223.  On August 10, 2017, the Service attended a select public access meeting in Livingston, Montana which included some Plaintiffs, to discuss public access in the Crazy Mountains and the removal of the Yellowstone District Ranger.

224.  In August, 2017, the Service attended another meeting with the private "working group" to discuss public access issues with the landowners and other parties invited to the meeting.

225.  In October, 2017, the District Ranger for the Yellowstone District was restored to his position after the completion of an internal Service investigation.

226.  In the fall of 2017, Plaintiffs and other members of the public used the Porcupine Lowline trail and Elk Creek trail and sent complaints about the landowners' obstruction efforts to the Service.

227.  In January, 2018, a select "working group" meeting was organized for the Service and landowners to discuss and pitch a new trail proposal for the Porcupine Lowline trail and Elk Creek trail.

228.  On March 1, 2018, and following its discussions with the "working group," the Service initiated 30-day public scoping period under NEPA for a proposed "Porcupine Ibex Trail" project involving the Porcupine Lowline trail and Elk Creek trail on the west-side of the Crazy Mountains (hereinafter "west-side trail project").

229.  The west-side trail project includes four parts: (1) the construction of approximately eight miles of new trail that is principally located on National Forest lands between the existing Porcupine Lowline trail and the Elk Creek trail; (2) securing a new "permanent easement" where the new trail will cross a small section of private land; (3) closure and "rehabilitation" work on the existing Porcupine Lowline trail and Elk Creek trail; and (4) relinquishing or abandoning the public's easement interest on the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

73

230.  The Service's scoping notice for the west-side trail project included a "public scoping packet." This public scoping packet included a "Frequently Asked Questions" document explaining the purpose and need of the action and the various components of the project.

231.  In the public scoping packet for the west-side trail project, the Service announced its preliminary plans to prepare a categorical exclusion or "CE" for the trail project. The Service said it remained open to evaluating the scoping comments received to determine whether preparation of an environmental assessment ("EA") or environmental impact statement ("EIS") is required.

232.  Plaintiffs and other members of the public submitted timely comments during the 30-day scoping period on the west-side trail project.

233.  During the scoping period, Plaintiffs and members of the public raised various concerns about the west-side trail project. Plaintiffs and members of the public also held a public meeting about the proposed project which was attended by 85 people. The Service was invited to attend and speak at the meeting but declined.

234. During the scoping process, Plaintiffs and members of the public raised concerns about the environmental impacts (direct, indirect, and cumulative) and costs associated with cutting and building a new eight mile trail across high-mountain streams and within forested, big game habitat.

235. During the scoping period, Plaintiffs and members of the public raised concerns about alternatives to building the new trail, including alternative locations. Plaintiffs and members of the public raised concerns about the need to evaluate a "no action" alternative that explores whether the action is even necessary given the public's existing access right to use the Porcupine Lowline trail and Elk Creek trail due to recorded easements from the railroad grants (on certain sections of private lands), a long history of prescriptive use of the trails by the public, and the Service's recognition of the trails as National Forest System trails in the 2006 travel plan.

236. During the scoping period, Plaintiffs and members of the public raised concerns about whether issuing merely a "CE" for the west-side trail project was appropriate given the potential impacts and controversy surrounding the project (members of the public requested a

more robust analysis of impacts and alternatives in an EA or EIS). Plaintiffs and members of the public raised concerns about the landowners' illegal gate, obstruction tactics, and decision to block public access on the Porcupine Lowline trail and Elk Creek trail and whether the Service's new trail project would be rewarding this illegal behavior.

237.  During the scoping period, Plaintiffs and members of the public raised concerns whether the Service has the authority to "relinquish" the public's existing access rights on the Porcupine Lowline trail and Elk Creek trail. Plaintiffs and members of the public raised concerns whether the Service's decision is consistent with the 2006 travel plan and 1986 forest plan.

238.  During the scoping process, Plaintiffs and members of the public raised concerns and issues regarding the Service's mismanagement of other National Forest System trails in the Crazy Mountains that cross private land sections, including the Sweet Grass trail and East Trunk trail.

239.  On March 18, 2018, and in response to scoping comments already received, the Service issued a public "update" on its west-side trail project.

240. The Service's March 18, 2018 update included an "updated" version of its "Frequently Asked Question" document. In this document the Service explained the purpose and need of the west-side trail project, discussed the four parts of the project, and explained that if a decision to approve the west-side trail project is "approved," the "new trail, layout and design work" could begin in 2019.

241. In the Service's March 18, 2018 "update" on the west-side trail project, the Service explained that no decision on the "level of environmental analysis and associated decision document" had been made, except to claim that this is a type of action that does not normally require an EIS. The Service stated that if "the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," it will prepare an EA in accordance with NEPA.

242. In the summer of 2018, Plaintiffs and other members of the public used the Porcupine Lowline trail and Elk Creek trail and sent complaints about the landowners' obstruction efforts to the Service.

243. On August 13, 2018, the Service's website listed the proposed west-side trail project's status as "canceled." No detailed

77

information as to why the NEPA process for the west-side trail project (or west-side trail project itself) was canceled was provided.

244.  On August 15, 2018, the Service released a letter to the public. The letter notified the public that the Service had not "canceled" the west-side trail project but decided to cancel the NEPA process and proceed with the trail project in the absence of any additional environmental analysis. The Service said it would not prepare a CE and decision memo, EA and decision notice, or EIS and record of decision for the west-side trail project.

245.  In the August 15, 2018 letter, the Service stated it would not prepare a NEPA analysis for the west-side trail project because it was purportedly already covered by "two past environmental analyses," including the 2006 EIS for the travel plan and a 2009 Forest-wide EA for the Gallatin's Road and Trail Improvement Projects ("2009 Forest-wide EA").

246.  On August 21, 2018, the Service confirmed in writing that the west-side trail project was moving forward (it was not "canceled") and that no further NEPA analysis would be completed because the

Service determined it was already covered by the 2006 EIS for the travel plan and 2009 Forest-wide EA.

247.  On April 3, 2019, the Service issued a "project update" for the west-side trail project. The Service said it has "continued specialist, layout and design, easement work, and final consultation work" for the project. The Service said phase one of the proposed trail re-route is planned for the "summer/fall 2019" and will not begin "before July 16th to provide resource concerns." The Service said it "continues to work to secure and finalize all easements needed to implement the project."

248.  The Service is no longer insisting that landowners remove the illegal gates or obstructions on the Porcupine Lowline trail and Elk Creek trail. The Service stopped installing new trail signs or markers for the Porcupine Lowline trail and Elk Creek trail.

249.  The Service is no longer managing or maintaining the Porcupine Lowline trail and Elk Creek trail as a National Forest System trail. The Service is not protecting public access on the Porcupine Lowline trail and Elk Creek trail.

250.  The Porcupine Lowline trail and Elk Creek trail remain obstructed by landowners and/or their agents.

*The two east-side trails*

251. The Service is aware of the landowners' efforts to obstruct public access on the two east-side trails: the East Trunk trail and the Sweet Grass trail.

252. In 1990, the Service conducted an extensive inventory and survey of the East Trunk trail and Sweet Grass trail.

253. In 1995, landowners started insisting that the public (and Service personnel) first obtain permission and sign in prior to using the Sweet Grass trail. This happened most summers. The Service pushed back and requested they not do this. The Service also installed signs at the trailhead informing the public about use of the National Forest System trail.

254. From 1995-2001 the Service received numerous complaints from the public about landowners' obstruction efforts at the trailhead to the Sweet Grass trail.

255. In 2001, a Service report notes that landowners prevented public access to the Sweet Grass trail and threatened Service employees.

256.  In 2001, landowners were asked to review a draft sign to be used at all Crazy Mountain trailheads on the Gallatin National Forest. The sign was created to better inform the public about public access and private property rights in the Crazy Mountains. Landowners threatened to sue the Service if the sign was published. The landowners claimed the sign "misrepresented" public access on the Sweet Grass trail.

257.  In 2002, the Service published a "briefing paper" on the Sweet Grass trail and public access issues. The 2002 briefing paper documents the landowners' illegal efforts to obstruct, interrupt, and block public access on the Sweet Grass trail.

258.  In 2006, landowners submitted comments on the draft travel plan. The landowners said the Service has no easement for the Sweet Grass trail to cross private land in Section 7 and join with the road in Section 2. The Service disputed the statements and said it has a "the right to continue to use this route for public and administrative uses." The Service said the public and agency "has enjoyed the right to use this National Forest trail . . . for many decades."

259.  From 2006-2015, the Service received numerous complaints about landowner efforts to obstruct, interrupt, and block public access on the Sweet Grass trail and East Trunk trail. The public submitted numerous complaints to the Service during this time.

260.  On September 24, 2015, a member of the public sent a hand written note to Senator Daines complaining about landowner efforts to obstruct public access on the East Trunk trail and Sweet Grass trail. The individual said he was "looking for a place to hunt" and found the East Trunk trail on his map but then noticed that the "landowner has taken and put a padlock on the gate" to the trail. The individual contacted the Service about the illegal obstruction. The individual also noted that the "trailhead at Sweet Grass" has also been "shutdown" and that the public "need[s] help opening these accesses up. They continue to be shut out more land every year." Senator Daines contacted the Service about the complaint.

261.  On October 2, 2015, the Service sent a letter to Senator Steve Daines stating that is aware of an "illegally blocked access point" on the East Trunk trail and aware of access disputes and landowner obstruction on the Sweet Grass trail. The Service said the East Trunk

trail is part of the Lowline trail system in the Crazy Mountains that provides one of the few access points to the east side of the Crazy Mountains and is a "historic trail that dates back a century or more." The Service said it holds an "unperfected prescriptive easement rights" on this trail system "as well as up Sweet Grass Creek to the north based on a history of maintenance with public funds and historic and continued administrative use."

262.   In April, 2016, the Service sent a letter to the landowners' attorney and referenced numerous complaints "over the last six months" about "blocked access" on the East Trunk trail from "Montana public lands sportsmen and women."

263.   In April, 2016, the Service said it was aware of a "locked gate across" the East Trunk trail and had been told by members of the public that landowners installed a "trail camera" on the trail "to intimidate users and ultimately extinguish public access rights that date back many decades." The Service said it had "reports of ATV patrolling and intimidation of hikers and hunters" by private landowners. The Service said it was provided information that

landowners are asserting that the public may only use the East Trunk trail "by paying an $800 fee."

264.  In April, 2016, the Service informed the landowners that the "the public has every right to the continued use and enjoyment of [the East Trunk trail] (subject to travel plan restrictions) as has always been the case." The Service said the landowners' efforts to "adversely extinguish public use have not been successful."

265.  In June, 2016, the District Ranger for Service's Yellowstone Ranger District sent an internal e-mail to staff doing seasonal work in the Crazy Mountains. The District Ranger told Service staff to "NEVER ask permission" to use and access National Forest System roads and trails depicted on Gallatin forest and travel maps, including the two west-side trails (and other trails) in the Crazy Mountains. The District Ranger emphasized that "[w]hatever past [District Rangers] or colleagues have said. I am making it clear. DO NOT ASK permission and DO NOT ADVISE [the] public to ask permission. These are historic public access routes. By asking permission, one undermines public access rights and plays into their lawyers' trap of establishing a history of permissive access." This internal e-mail message was later posted

publicly on a non-profit organizations' Facebook site. The public posting of this e-mail message generated opposition from landowners who, in turn, sent objection letters to the Service, Secretary of Agriculture, and Senator Steve Daines.

266.  On July 25, 2016, Service personnel, along with four volunteers, spent a day maintaining the East Trunk trail.

//



267.  The Service's report from the July 25, 2016 maintenance day on the East Trunk trail notes the presence of "new no trespassing signs, 'smile you're on camera signs,' and other signs meant to intimidate forest users and [Service] employees."

268.  The Service's report from the July 25, 2016 maintenance day on the East Trunk trail notes that Service officials "removed the aforementioned signs" and removed "single stands of barbed wire rigged across the trail that would appear to have been meant as some sort of surprise booby trap. One such wire was of a blue color and difficult to see in certain light." The Service report says it replaced the Service's trail blazes in the meadow (which had been knocked down) and flagged the trail tread. The Service removed "rocks, logs, and branches from the trail prism."

269.  In July, 2016, the Service drafted a proposal and "trail sign plan" to install new Service trail signs and markers for the East Trunk trail.

270.  In the summer of 2016, Plaintiffs and other members of the public used the East Trunk trail and Sweet Grass trail. In the summer of 2016, the Service received numerous complaints about landowner

efforts to obstruct, interrupt, and block public access on the Sweet

Grass trail and East Trunk trail.

271.  In August, 2016, a private landowner contacted the Service

(and District Ranger) about the Sweet Grass Creek trail. The landowner

said he was "NOT trying to extinguish public access to public lands."

The Service said that putting locked gates across century old roads like

Sweet Grass Creek and putting up signs along the road and trails

stating that all access was "permissive" is an effort to extinguish public

access rights to public lands.

272.  In December, 2016, landowners wrote the Service (and cc'd

the Regional Forester, Senator Tester, Senator Daines, and then

Representative Zinke) urging the Agency to "reprimand" the District

Ranger for the June, 2016 e-mail. The landowners also said the they

"believe that the access routes" described by the District Ranger –

which included east side trails – "were never Forest Service 'public'

access routes."

273.  In January, 2017, landowners (through the Montana Farm

Bureau Federation) wrote Senator Daines and attached a copy of the

Facebook post that included the District Ranger's seasonal help

directions e-mail. The landowners asked Senator Daines to "investigate whether the Forest Service" and the District Ranger "acted appropriately" and what recourse landowners in the Crazy Mountains have "in stopping what [they] see as a broad over-reach of the District Ranger's authority . . ."

274.  In May, 2017, Senator Daines drafted a letter to the Service Chief requesting information from the Service on its policy "for disputed access points near the Crazy Mountains." Senator Daines requested answers to four specific questions, recognized the importance of access to public lands, and stressed the importance of protecting "private property rights" and working "with willing landowners" in facilitating access. Senator Daines concluded his letter by emphasizing that "[p]rivate property rights are of the utmost importance, and ensuring we equally respect all stakeholders involved will only serve to strengthen the reputation of [the Service]."

275.  On June 7, 2017, Rep. Pete Sessions (32nd District, Texas) drafted a letter to Secretary of Agriculture, Sonny Perdue requested that the Service issue a new directive precluding it from acquiring any interests in land by prescription and "disavowing the use of so-called

Statements of Interests." Rep. Sessions drafted the letter on behalf of his constituent who owns a ranch in Montana.

276.  On June 16, 2017, the Service's District Ranger for the Yellowstone District who authored the e-mail (posted by the organization on their Facebook page) was removed.

277.  In the summer of 2017, the Service stopped pushing back on the landowners' efforts to obstruct the East Trunk trail and Sweet Grass trail. The Service decided to no longer repudiate the landowners' efforts to obstruct public access on the East Trunk trail and Sweet Grass trail as it had done in previous years.

278.  In the summer of 2017, the Service decided to no longer manage and maintain the East Trunk trail and Sweet Grass trail as National Forest System trails.

279.  In the summer of 2017, the Service decided to no longer remove illegal gates or barriers across the trails and/or insist that the landowners do so on the East Trunk trail and Sweet Grass trail. The Service decided not to remove the illegal signs. The Service decided not to repair and/or reinstall National Forest System signs on the trails and at the trailheads.

280.  In the summer of 2017, the Service decided to explore prolonged negotiations with the landowners aimed at finding a "mutually agreeable" solution.

281.  On July 14, 2017 the Service responded to Senator Daines' May 26, 2017 letter. The Service said it was now seeking to work with the landowners to find a "mutually agreeable" solution to the access disputes on the East Trunk trail and Sweet Grass trail.

282.  In July, 2017, the Service announced in a letter to Senator Steve Daines that the Forest Supervisor, U.S. Department of Justice attorneys, and private landowners were meeting to find a "mutually agreeable" solution to the public access dispute on the East Trunk trail.

283.  In the summer of 2017, Plaintiffs and other members of the public used the East Trunk trail and Sweet Grass trail. Plaintiffs and other members of the public did so despite efforts from the landowners to obstruct public access. Plaintiffs and other members of the public did not ask for permission.

284.  In the summer of 2017, the Service received numerous complaints about landowner efforts to obstruct, interrupt, and block public access on the Sweet Grass trail and East Trunk trail.

285.  In September, 2017, the Service reaffirmed that the East Trunk trail is a public National Forest System trail open for public access and that illegal obstruction of the trail was still occurring. The Service said, however, that it was now attempting to "resolve the access issues" related to the trail "to the satisfaction [of] all involved."

286.  In the summer of 2018, the Service received numerous complaints about landowner efforts to obstruct, interrupt, and block public access on the Sweet Grass trail and East Trunk trail.

287.  In 2019, the Service said it was developing a "comprehensive proposal" for public access on the east-side of the Crazy Mountains including on the East Trunk trail and Sweet Grass trail.

288.  In 2019, the Service said it was having "constructive conversations" with the east-side landowners. The Service said any such discussions and outcomes from them needs to "meet everyone's interests" and will "take time."

289.  In 2019, the Service announced its decision to hire a third-party consultant to "put together a proposal" and engage in conversations with landowners about public access on the East Trunk trail and Sweet Grass trail.

91

290.  The Service did not install new trail signs and/or markers for the East Trunk trail or Sweet Grass trail. The Service never finalized its "trail sign plan" from July, 2016. The Service's July, 2016 "trail sign plan" for the East Trunk trail was never implemented.

291.  The Service did not replace the removed and/or damaged National Forest trail markers, signs, and blazes on the East Trunk trail or Sweet Grass trail. The Service did not revise and/or alter the landowners' grazing and/or commercial permits to operate on National Forest lands in response to the illegal actions on the two east-side trails.

292.  The east-side trail "discussions" with the landowners are not open to the public. The east-side trail "discussions" are not open to Plaintiffs.

293.  The landowners and/or their agents continue their efforts to obstruct public access on East Trunk trail and Sweet Grass trail during the Service's "discussions" with the landowners.

294.  Since 2017, the Service is no longer managing or maintaining the East Trunk trail and Sweet Grass trail. The Service is

not protecting public access on the East Trunk trail and Sweet Grass trail.

295.  The East Trunk trail and Sweet Grass trail remain obstructed by landowners and/or their agents.

### *Plaintiffs' February, 2019 letter to the Service*

296.  On February 13, 2019, Plaintiffs sent the Service a notice of intent to sue letter. Plaintiffs' letter outlined their interest in the four trails and concerns over the landowners' efforts to obstruct public access and the Service's failure to properly manage and maintain the trails as National Forest System trails.

297.  Plaintiffs' February 13, 2019 letter put the Service on notice of various legal violations concerning is decisions about the four trails. This included NEPA violations and NFMA violations pertaining to the Service's non-compliance with its own direction and policy and 2006 travel plan.

298.  Plaintiffs' February 13, 2019 letter concluded by informing the Service that it would "welcome the opportunity to meet and discuss these issues" with the Agency.

299.  The Service never provided a written response to Plaintiffs' notice letter. The Service did not agree to meet and discuss the issues raised in the notice letter with Plaintiffs.

## FIRST CAUSE OF ACTION
### (Violation of NEPA – west-side trail project)

300.  Plaintiffs incorporate all preceding paragraphs.

301.  NEPA requires to Service to carefully analyze and consider the environmental impacts of (and alternatives to) its decisions before they are made and before actions are taken. NEPA's "purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action." 40 C.F.R. §1500.1(c).

302.  The NEPA process begins with "scoping" which is required for all proposed Service actions. 36 C.F.R. § 220.4(e)(1). Scoping involves soliciting public review and comment on a proposed action early on and in order to determine "the scope of the issues to be addressed and for identifying the significant issues related to the proposed action." 40 C.F.R. §1501.7.

303.  NEPA's scoping process assists the Service in determining whether the proposed action: (1) qualifies for a categorical exclusion CE and the issuance of a "decision memo" pursuant to the Service's regulations and policy (Forest Service Handbook ("FSH") 1909.15); (2) qualifies for preparation of an EA and the issuance of a "decision notice" to carefully evaluate the "significance" of the effects of the proposed

action; or (3) qualifies for preparation of a more robust environmental impact statement EIS and issuance of a "record or decision."

304. On March 1, 2018, the Service initiated 30-day public scoping under NEPA for its west-side trail project for the Porcupine Lowline trail and Elk Creek trail.

305. Plaintiffs and other members of the public submitted timely comments during the 30-day scoping period.

306. On August 15, 2018, the Service released a letter notifying the public that it decided to cancel the NEPA process and proceed with the west-side trail project in the absence of any additional environmental analysis. The Service said it would not prepare a CE, EA, or EIS for the west-side trail project. The Service stated it would not prepare a NEPA analysis because the west-side trail project was purportedly already covered by "two past environmental analyses," including the 2006 EIS for the travel plan and the 2009 Forest-wide EA.

307. The west-side trail project is not discussed, disclosed, or analyzed in the 2006 EIS for the travel plan. The 2006 EIS for the travel plan does not analyze the direct, indirect, and cumulative effects of the west-side trail project. The 2006 EIS for the travel plan does not

analyze a reasonable range of alternatives to the west-side trail project. In the 2006 decision approving the travel plan, the Service stated that any future construction of new National Forest System roads or trails "will require a new NEPA analysis and period for public comments and concerns."

308.  The west-side trail project is not discussed, disclosed, or analyzed in the 2009 Forest-wide EA. The 2009 Forest-wide EA does not analyze the direct, indirect, and cumulative effects of the west-side trail project. The 2009 Forest-wide EA does not analyze a reasonable range of alternatives to the west-side trail project.

309.  The Service's determination that the west-side trail project is already addressed and analyzed in the 2006 EIS for the travel plan and/or 2009 Forest-wide EA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

310.  The Service's decision and/or failure to complete an environmental analysis (CE, EA, or EIS) for the west-side trail project as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action

unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## SECOND CAUSE OF ACTION
### (No authority to relinquish public access rights)

311.  Plaintiffs incorporate all preceding paragraphs.

312.  On August 15, 2018, the Service decided to proceed with the west-side trail project.

313.  A component of the west-side trail project is the relinquishment of the public's "easement interest" on the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in section 15 (within Township 4 North and Range 10 East).

314.  The public has an easement interest to use the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

315.  The public has an easement interest to use the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East) based on its open and notorious, continuous and uninterrupted, and adverse historic and ongoing use of the trails (for more than five years).

316.   The Service previously stated and determined that the public has easement interest to use the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

317.   The Service previously stated that the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East) has been maintained, signed, managed and used for Service management purposes and recreational activities since the late 1800s and early 1900s. The Service previously stated that the public's easement interest in the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East) is due to historic and ongoing public and administrative use and maintenance. The public has not abandoned its easement interest to use the current Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

318.   The public has a recorded (written) easement from the railroad grants to use the Porcupine Lowline trail in Sections 15, 27, 35

and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

319.  The Service's position that it has the authority to relinquish the public's easement interests and existing access rights on the current Porcupine-Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

320.  The Service has no authority to "relinquish" the public's easement interest and existing access rights to use the current Porcupine-Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East).

321.  The Service's decision to relinquish the public's existing access rights or "easement interest" on the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East) is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law" and/or constitutes "agency action unlawfully withheld or

unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## THIRD CAUSE OF ACTION
### (Violation of NFMA – failure to manage and maintain the four trails for their designated and "emphasized" uses)

322.   Plaintiffs incorporate all preceding paragraphs.

323.   Pursuant to NFMA, all resource decisions, projects, and

actions and/or inactions must be consistent with the forest plan. 16

U.S.C. § 1604(i). The 2006 travel plan and record of decision approving

the travel plan is an amendment to the forest plan. The Service must

comply with obligations included (and commitments made) in its travel

plan and record of decision approving the travel plan. *Id.*; 40 C.F.R. §

1505.3.

324.   The travel rule directs the Service to manage and maintain

all National Forest System trails identified in the travel plan according

to their specific uses (and seasons of use). 36 C.F.R. §§ 212.50 to 212.57.

325.   The forest plan and travel plan identify all four trails in the

Crazy Mountains as National Forest System trails.

326.  The travel plan and record of decision approving the travel plan directs the Service to manage and maintain all National Forest System trails according to their specific uses (and seasons of use).

327.  The travel plan and record of decision approving the travel plan directs the Service to manage and maintain each National Forest System trail for their designated or "Emphasized" use. In the travel plan and record of decision approving the travel plan the Service commits itself to manage and maintain each National Forest System trail for their designated or "Emphasized" use.

328.  The travel plan and record of decision approving the travel plan identifies the four trails for the "Emphasized" use of "hiking" "YEARLONG" and with "No Restrictions." The Porcupine Lowline trail's emphasized uses include mountain biking, stock, and hiking yearlong and with no restrictions. The Elk Creek trail's emphasized uses include motorcycles (closed September 15 to June 15) and mountain biking and hiking yearlong with no restrictions. The East Trunk trail's emphasized uses include stock and hiking yearlong with no restrictions. The Sweet Grass trail's emphasized use includes stock and hiking yearlong with no restrictions.

329.  The Service is not managing and maintaining the four trails for their designated and "Emphasized" uses as required by the travel rule, travel plan, and record of decision approving the travel plan. The Service is not managing and maintaining the four trails for their designated and "Emphasized" uses as it committed to do in its travel plan and record of decision approving the travel plan.

330.  The Service is failing to manage and maintain the four trails for their designated and "Emphasized" uses.

331.  In 2017, the Service decided not to manage and maintain the four trails for their designated and "Emphasized" uses as required by the travel rule, travel plan, and record of decision approving the travel plan.

332.  The Service previously stated that, in accordance with its own direction and policy, the four National Forest System trails in the Crazy Mountains would be managed and maintained for their "Emphasized" uses as required by the travel rule and travel plan.

333.  In 2017, the Service changed its position. The Service decided to engage in prolonged negotiations with landowners and no longer manage and maintain the four trails for their designated and

Emphasized uses. The Service said it would only manage and maintain the four trails for their designated and "Emphasized" uses if it could reach a "mutual agreement" to do so with the landowners.

334.  The Service did not provide a reasonable explanation for its change in position in 2017. The Service did not explain how its actions and/or inactions with respect to the four trails in the Crazy Mountains complies with the travel rule and travel plan's direction to manage and maintain the four National Forest System trails for their designated and "Emphasized" uses.

335.  The Service's decision and/or failure to manage and maintain the four trails for their designated and "Emphasized" uses as required by the travel rule, travel plan (and forest plan), and record of decision approving the travel plan is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## FOURTH CAUSE OF ACTION
## (Violation of NFMA –failure to protect existing access rights)

336.   Plaintiffs incorporate all preceding paragraphs.

337.   Pursuant to the travel rule, the Service is required to recognize public access rights when designating and identifying all National Forest System roads and trails. 36 C.F.R. § 212.55(d).

338.   Pursuant to the travel rule, the "use of existing National Forest System roads and trails shall be permitted for all proper and lawful purposes subject to the rules and regulations governing the lands and the road or trails to be used." 36 C.F.R. § 212.6(c)

339.   The forest plan, travel plan, and record of decision approving the travel plan states that the Service will "protect existing access rights" on National Forest System trails, including the four trails in the Crazy Mountains.

340.   The forest plan, travel plan and record of decision approving the travel plan states the Service will provide and maintain public access to National Forest lands on National Forest System roads and trails.

341.   The travel plan and record of decision approving the travel plan states that the Service will protect public and/or administrative

105

access rights on specific trails, including the four trails in the Crazy Mountains.

342.  The travel plan and record of decision approving the travel plan states the Service will protect existing access rights on the Porcupine Lowline trail. The travel plan states the Service will protect existing access rights on the Elk Creek trail. The travel plan states the Service will protect existing access rights on the East Trunk trail. The travel plan states the Service will protect existing access rights on the Sweet Grass trail.

343.  The Service is not protecting existing access rights on the four National Forest System trails in the Crazy Mountains.

344.  The Service is failing to protect existing access rights on the four National Forest System trails.

345.  In 2017, the Service decided not to protect existing access rights on the four National Forest System trails.

346.  The Service previously stated that, in accordance with its own direction and policy, it would protect existing access rights on the four trails as required by the travel rule and travel plan.

347.   In 2017, the Service changed its position. The Service decided to no longer protect existing access rights on the four trails. The Service decided it would only protect existing access rights on the four trails if it could reach a "mutual agreement" to do so with the landowners. The Service did not provide a reasonable explanation for its change in position in 2017. The Service did not explain how its actions and/or inactions with respect to the four trails in the Crazy Mountains complies with the travel rule and travel plan's direction to protect existing access rights.

348.   The Service's decision and/or failure to protect existing access rights on the four National Forest System trails as required by the travel rule, travel plan (and forest plan), and record of decision approving the travel plan is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## FIFTH CAUSE OF ACTION
### (Violation of NFMA – failure to take action to resolve disputes)

349.   Plaintiffs incorporate all preceding paragraphs.

350.  Pursuant to the travel rule, the Chief of the Service is required "as promptly as feasible" to "obtain needed access" to National Forest lands in order to assure their effective protection, management and use. 36 C.F.R. § 212.6(a).

351.  The travel plan and record of decision approving the travel plan states that in situations "where continued use of an historical road or trail access route is challenged or closed, [the Service] will take actions necessary to protect the existing access rights to [National Forest System] lands, and to protect the jurisdictional status of roads and trails in cooperation with area counties."

352.  Consistent with the travel rule and travel plan, the Forest Service Manual ("FSM"), Region 1 Supplement ("policy") directs the Service is to solve "road and trail title questions as soon as feasible." FSM (Region 1 Supplement) at § 5460.3(9).

353.  The Service's policy directs the Service to conduct "status" reviews of these roads and trails, prepare affidavits in support of establishing and documenting a prescriptive right, and for support, document and review evidence, including information from: (a) retired Forest Service or other agency employees; (b) local citizens who have

historic knowledge of the roads and trails; (c) historians and local historical publications; (d) vintage maps, photographs, and aerial photographs; (e) USGS records and plats; (f) Service records of capital investment expenditures, road and trail maintenance, grazing surveys and allotment management, plantations, land classification, and timber inventories; (g) Service scrapbooks; (h) County records; and (i) old newspapers. FSM (Region 1 Supplement) at § 5460.3(9).

354.  The Service's policy explains that whenever "an action or threat interferes with continued use and management of a road or trail and the Forest Service has not perfected title, the following actions need to be taken by the Forest Supervisor:" (a) evaluate the "status" evidence to determine "historic United States" investment, management, and maintenance, and use of the road or trail; (b) if supported by historical evidence, execute a "Statement of Interest;" (c) notify the private landowner by certified mail that the United States has acquired an easement across the property; and (d) submit the recorded original "Statement of Interest" to the Regional Office for the permanent files."

355.  The Service conducted a "status" review for the four National Forest System trails in the Crazy Mountains pursuant to its policy, FSM (Region 1 Supplement) § 5460.3(9).

356.  The Service's "status" review revealed easements on all four trails have been and continue to be acquired by prescription. The Service's "status" review revealed recorded (written) easements existed for many segments of the four trails.

357.  The Service drafted Statements of Interests for the four trails but never finalized and filed the documents.

358.  The Service is failing to follow its own direction (travel rule and travel plan) and policy for resolving disputes with respect to the four National Forest System trails.

359.  The Service has not followed its own direction and policy for resolving disputes on the four National Forest System trails in the Crazy Mountains "as soon as feasible."

360.  The Service decided not to follow its own direction and policy for resolving disputes with respect to the four trails. The Service previously stated that, in accordance with its own direction and policy, it would resolve disputes over the four trails "as soon as feasible' and in

accordance with its own regulations, travel plan, and policy. In 2017, the Service changed its position and decided it would only resolve disputes on the four trails by reaching a "mutual agreement" to do so with the landowners. The Service did not provide a reasonable explanation for its change in position in 2017. The Service did not explain how its actions and/or inactions with respect to the four trails in the Crazy Mountains complies with its own direction and policy for resolving disputes on the four trails.

361.  In 2017 and 2018, the Service stated that it has not filed and does not plan to file a Statement of Interest in accordance with its policy on the four trails, will not otherwise take action to resolve the disputes on the four trails as "soon as feasible," and will not demand that landowners remove their illegal obstructions on the four trails.

362.  The Service has not provided a reasonable explanation for why it chose not to follow its own regulations, travel plan, and policy by resolving disputes "as soon as feasible" and filing Statements of Interests on the four trails.

363.  The Service's decision and/or failure to follow its own direction (travel rule, travel plan, and forest plan) and policy for

111

resolving disputes and failure to explain its departure from following its direction and policy is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706 (2)(A) and 706 (1).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A.   Declare the Service has violated and continues to violate the law as alleged herein;

B.   Declare the Service has no authority to relinquish the public's access rights and easement interests on the Porcupine Lowline trail in Sections 15, 22, 27, 34, 35 and on portions of the Elk Creek trail in Section 15 (within Township 4 North and Range 10 East);

C. Set aside the Service's decision to approve the west-side trail project and remand this matter back to the Service with instructions to comply with NEPA and NFMA as alleged herein;

D. Direct the Service to comply with the travel rule, travel plan, forest plan, and own direction and policy, as alleged herein;

E. Direct the Service to manage and maintain the four trails as National Forest System trails and prepare and submit a plan for court approval outlining when, where, and how it will do so;

F. Direct the Service to take reasonable and prudent steps to remove any and all illegal gates, obstructions and/or misleading markers and/or signs on or impacting public use of the four National Forest System trails within sixty (60) days of this Court's order;

G. Direct the Service to take reasonable and prudent steps to repair and/or reinstall National Forest facilities, trail signs and markers at the four trails in the Crazy Mountains within sixty (60) days of this Court's order;

H. Retain continuing jurisdiction of this matter pending the Service's compliance with this Court's order;

I.   Award Plaintiffs their reasonable attorneys' fees, costs and expenses of litigation pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412;

J. Issue any other relief that Plaintiffs may subsequently request; and

K.   Issue any other relief this Court deems necessary, just, or proper.

Respectfully submitted this 10th day of June, 2019.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Michael Kauffman
Michael Kauffman

*Counsel for Plaintiffs*

114