Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
bishop@westernlaw.org

Michael A. Kauffman
Patricia Klanke
DRAKE LAW FIRM, P.C.
111 North Last Chance Gulch
Suite 3J, Arcade Building
Helena, MT 59601
406-502-1668
michael@drakemt.com
patricia@drakemt.com

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLNGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, et al., | 19-cv-00066-SPW-TJC |
| Plaintiffs, vs. | MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION |
| MARY ERICKSON, in her capacity as Forest Supervisor for the Custer-Gallatin National Forest, et al., | |
| Federal-Defendants. | *Action requested by August 1, 2019* |

TABLE OF CONTENTS

INTRODUCTION...................................................................1

BACKGROUND..................................................................1

A.    The Ibex project...................................................... 1

B.    The Service initiates the NEPA scoping process for
the Ibex project.....................................................5

C.    The Service cancels the NEPA process for the Ibex
project................................................................6

D.    The Service makes additional changes to the Ibex
project................................................................7

ARGUMENT....................................................................10

A.    Friends of the Crazy Mountains raises serious questions and
is likely to succeed on the merits...............................11

    1.    The Ibex project violates NEPA....................................11

    2.    The Ibex project violates NFMA....................................18

    3.    The Service has no authority to relinquish the
public's easement interests.......................................24

B.    Friends of the Crazy Mountains is likely to suffer irreparable
harm in the absence of preliminary injunctive relief.................26

C.    The balance of equities and public interest tip sharply in
Friends of the Crazy Mountain's favor....................................31

CONCLUSION..................................................................34

i

TABLE OF AUTHORITIES

CASES

*Alliance for the Wild Rockies v. Cottrell*,
632 F. 3d 1127 (9th Cir. 2011)……………………………………10, 27, 31, 32

*Amoco Prod. Co. v. Village of Gambell*,
480 U.S. 531 (1987)………………………………………………………27

*Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*,
1995 WL 748246 (D.D.C. 1995)……………………………………….. 32

*Citizens for Balanced Use v. Heath*,
07-cv-0059-BLG-DWM (D. Mont. 2007) ……………………………..…22

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*,
789 F.3d 1075 (9th Cir. 2015)……………………………………………..27

*Defenders of Wildlife v. Jewell*,
176 F. Supp. 3d 975 (D. Mont. 2016)……………………………………17

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014)……………………………………………31, 34

*Earth Island Institute v. USFS*,
442 F. 3d 1147 (9th Cir. 2006)……………………………………………33

*EPIC v. Blackwell*,
389 F. Supp. 2d 1174 (N.D. Cal. 2004)…………………………………29, 33

*High Sierra Hikers Ass'n v. Blackwell*,
390 F. 3d 630 (9th Cir. 2004)…………………………………………..…30

*Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*,
150 F.3d 1083 (9th Cir. 1998)…………………………………………..1, 30

*League of Wilderness Defs. v. Connaughton,*
752 F.3d 755 (9th Cir. 2014)...........................................................29

*Marsh v. ONRC,*
490 U.S. 360 (1989)........................................................................11

*Montana Wilderness Association v. McAllister,*
07-cv-0039-M-DWM...........................................................22, 23 n.2

*Motor Vehicle Mfrs. Ass'n of U.S., v. State Farm Mut. Auto.,*
463 U.S. 29 (1983)..........................................................................17

*Native Ecosystems Council v. Marten,*
 2018 WL 3831339 (D. Mont. 2018)...........................10, 11, 26, 27, 29

*Native Ecosystems Council v. U.S. Forest Service,*
418 F. 3d 953 (9th Cir. 2005)..........................................................18

*Organized Village of Kake v. U.S. Dept. of Ag.,*
795 F.3d 956 (9th Cir. 2015)......................................................21, 24

*Sierra Forest Legacy v. Sherman,*
646 F. 3d 1161 (9th Cir. 2011)........................................................31

*Winter v. Natural Resources Defense Council,*
555 U.S. 7 (2008)........................................................................ 10

*Wonder Ranch v. United States,*
2016 WL 6237196 (D. Mont. 2016)...................................................26

STATUTES

16 U.S.C. § 1604(i)...............................................................................................18

REGULATIONS

36 C.F.R. § 212.6(c)...........................................................................................20.

36 C.F.R. § 219.15.............................................................................................18

36 C.F.R. § 219.15(c).........................................................................................21

36 C.F.R. § 220.6...............................................................................................12

36 C.F.R. § 220.7(a)...........................................................................................12

36 C.F.R. §§ 212.50 to 212.57...........................................................................18

36 C.F.R. § 212.55(d).........................................................................................19

40 C.F.R. § 1500.1(c).........................................................................................12

40 C.F.R. § 1501.7.............................................................................................12

40 C.F.R. § 1502.14...........................................................................................12

LIST OF EXHIBITS

Exhibit A          Scoping Packet: Proposed Porcupine Ibex Trail

Exhibit B          Update: Proposed Porcupine Ibex Trail

Exhibit C          Map: Porcupine Ibex Trail Proposed Construction

Exhibit D          Public Comment: Proposed Porcupine Ibex Trail

Exhibit E          Project Status Update, August 13, 2018

Exhibit F          Decision: Proposed Porcupine Ibex Trail

Exhibit G          Project Update: Porcupine Ibex Trail, April 3, 2019

Exhibit H          Porcupine Ibex Trail Project Solicitation for Bid

Exhibit I          Contract Awarded: Porcupine Ibex Trail Project

Exhibit J          Friends of the Crazy Mountain's notice of intent letter

Exhibit K          Record of Decision: 2006 Travel Management Plan

Exhibit L          Detailed Description of 2006 Travel Management Plan

Exhibit M          Appendix A: EIS for 2006 Travel Management Plan

Exhibit N          2009 Forest-Wide Road and Trail Work

Exhibit O          Response to Appeal Points: Travel Management Plan

Exhibit P          Declaration: Robert Dennee

Exhibit Q          Deeds: Northern Pacific Railway Company

Exhibit R          Declaration: Kathryn QannaYahu

Exhibit S        Declaration: Brad Wilson

Exhibit T        Declaration: Louis Goosey

Exhibit U        Declaration: John Daggett

Exhibit V        Declaration of Matthew Bishop

Exhibit W        Wisdom (2018)

Exhibit X        Declaration: Phil Knight

## INTRODUCTION

Plaintiffs, Friends of the Crazy Mountains *et al.*, move this Court for a preliminary injunction to enjoin Federal-Defendants ("the Service") from implementing the Porcupine Ibex Trail Project ("Ibex project") while this case is pending. This motion is needed to preserve the status quo and prevent irreparable environmental harm in violation of the National Environmental Policy Act (NEPA) and National Forest Management Act (NFMA). *See Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087–88 (9th Cir. 1998) (Reinhardt, J., concurring) (explaining importance of such relief in NEPA cases such as this).

## BACKGROUND

### A.     The Ibex project.

The Service's Ibex project is located on the west-side of the Crazy Mountains in the Custer-Gallatin National Forest ("Gallatin Forest") and involves four components: (1) constructing eight miles of new mountain bike, stock, and hiking trail on National Forest System lands, (2) securing an easement from a landowner to accommodate the new trail, (3) closing and then obliterating portions of two existing National

Forest System trails – the Porcupine Lowline trail (No. 267) and Elk Creek trail (No. 195), and (4) relinquishing the public's easement interests to use and access portions of the Porcupine Lowline and Elk Creek trails. *See* Exhibit (Ex.) A at 2.[1]

The Ibex project's new eight-mile mountain bike trail will require use of an excavator to construct and clear a roughly eight-foot wide section of trail and switchbacks in undisturbed forested lands, installing culverts for stream crossings, and blasting and hammering to clear "numerous sections" of surface rock. Ex. H at 50; *see also* Ex. I at 2, 4-5 (photos of similar trail work).

A Service map depicting the location of the Ibex project and its four components is provided below and attached as Ex. C:

---

[1] Citations are to the ECF page number.



| | | |
|---|---|---|
| National Forest System Lands | Seasonal FS Road | Proposed New Construction of Porcupine Ibex Trail |
| Other Lands | Unimproved Dirt Route | FS Interests to be Relinquished Upon Completion of New Trail Construction |
| Custer Gallatin NF Boundary | Proposed Trail Maintenance on Existing FS Trails | |

This area of the Crazy Mountains and the trails that will be abandoned by the Ibex project are extremely important to Friends of the Crazy Mountains. *See* Exs. R, S, T,U, and X. The higher elevation National Forest System lands in the Ibex project – including the area slated for the new mountain bike trail – are also sacred lands for the Crow Tribe, *see* Ex. K at 53, and provide important habitat and security for big game species and other wildlife, including threatened Canada lynx and wolverine. Ex. R at ¶9-10, 13; Ex. X at ¶5 Ex. D at 73; Ex. T at ¶10. Friends of the Crazy Mountains' members and supporters are intimately familiar with the project area and use it, including the undisturbed forested lands and existing trails, for hiking, wildlife viewing (and tracking), hunting, fishing, skiing and snowshoeing, photography, and other recreation. Ex. S at ¶ 6-12; Ex. T at ¶3; Ex. U at ¶2; Ex. X at ¶3-5. Many of Friends of the Crazy Mountains' members and supporters live in the area so the Ibex project is essentially in their backyard. Ex. S at ¶1-4; Ex. T at ¶ 1,3; Ex. U at ¶2.

**B.    The Service initiates the NEPA scoping process for the Ibex project.**

On March 1, 2018, the Service initiated a 30-day public scoping period under NEPA for the Ibex project. Ex. A. The scoping notice informed the public of the proposed project and that it would accept written comments for 30 days. *Id.* at 2-3. On March 18, 2018, the Service provided an update and included additional information in a "public scoping packet," including a "frequently asked questions" document explaining the purpose of the project and its four components. Ex. B. The Service explained that it considered the Ibex project to be the "best option" for resolving access disputes on the Porcupine Lowline and Elk Creek trails, even though it meant giving up its interest on the two trails. Ex. B at 2.

To comply with NEPA, the Service explained it was conducting the scoping process for the Ibex project to identify the preliminary issues and interested persons and explore alternatives and their environmental effects. Ex. B at 2. The Service applies scoping to all proposals, including those that require an environmental impact statement (EIS), an environmental assessment (EA), or are categorically excluded (CE) from these documents. *Id.* The Service noted

that if "the responsible official determines, based on scoping, that it is uncertain whether the proposed action may have a significant effect on the environment," it will prepare an EA for the Ibex project. *Id.*

During the comment period, members of the public submitted over eighty comments. *See* Ex. D. The majority either asked for more environmental analysis or objected to the Ibex project. *See id.* Many raised concerns about the location of the new trail, the cost of the project, and potential environmental impacts. The new trail location is in undisturbed forest lands, includes steep terrain and crosses high mountain streams. The public expressed concerns about how cutting, clearing, and constructing a new trail in higher country would affect wildlife including wolverine, big game habitat and security, and water quality and native trout populations. *See, e.g.,* Ex. D at 73. Concerns were also raised about alternatives and the need to consider whether a new trail was necessary given the current access already provided.

## C.   The Service cancels the NEPA process for the Ibex project.

On August 13, 2018, the Service's website listed the Ibex project's status as "cancelled." Ex. E. No detailed information was provided. Two days later, the Service issued an update. Ex. F. The Service notified the

public that it approved the Ibex project and chose to do so in the absence of any new NEPA analysis. *Id*. The Service decided not to prepare an EIS or EA (or even issue a CE) because the environmental analysis for the Ibex project was purportedly already included the 2006 Travel Management Plan and EIS ("travel plan") and a 2008 forest-wide "road and trail" EA. *Id*. at 2.

On February 13, 2019, Friends of the Crazy Mountains sent the Service a letter raising concerns about the proposed Ibex project's lack of NEPA compliance, as well as the Service's related failure to protect existing access rights and comply with its own travel plan on specific trails in the Crazy Mountains. *See* Ex. J. Friends of the Crazy Mountains also requested to meet with the Service to discuss the issues raised, *id*. at 13, but the Service never responded in writing.

## D.  The Service makes additional changes to the Ibex project.

On April 3, 2019, the Service released another update for the Ibex project. Ex. G. The update explained that the Service had "continued specialist, layout and design, easement work, and final consultation work" for the project, and that phase one of the trail re-route is planned for the "summer/fall 2019." Ex. G. Notably, the map provided in the

7

update revealed the Service had made significant changes to the

location and design of the new trail re-route. *Compare* Ex. C with Ex. G

at 3. The trail was moved onto higher National Forest lands and a new

trail design that resembles more of a mountain bike or BMX downhill

course with large curves and bends was unveiled. The differences

between the previous trail (in red) and new trail (in yellow) mountain

are depicted on this Google Earth image (Ex. R at 11):



The public was never informed of these changes. Nor was it given the opportunity to review and comment on them, including the new location  and "downhill" mountain bike design.

On May 1, 2019, the Service put the Ibex project out for bid. Ex. H Building the new mountain bike trail will require the use of small-track mounted excavators to clear an area that is approximately eight feet wide, Ex. H at 38 (diagram), building new switchbacks with sufficient turn radius for mountain bikes, "blasting and hammering" to clear "numerous sections of surface rock," new culverts for stream crossings, and related work. *Id.* at 38-49; *see also* Ex. I at 2, 3-4 (photos of similar trails).

On June 10, 2019, Friends of the Crazy Mountains filed this civil action for declaratory and injunctive relief. Doc. 1. This case challenges the Service's approval of the Ibex project, as well as the Service's decision and related failure to manage the Porcupine Lowline trail, Elk Creek trail and two trails on the east-side of the Crazy Mountains in accordance with its own regulations and travel plan. *See* Doc. 1 at 95-112. On June 21, 2019, the Service issued a contract for phase one of the Ibex project to "Bo Trails, Inc." which is known for building and

designing mountain bike trails. *See* Ex. I. To date, the Service has

refused all requests to postpone work on the Ibex project while this case

is pending. Friends of the Crazy Mountains is thus compelled to file this

motion for preliminary injunctive relief.

## ARGUMENT

The "purpose of a preliminary injunction is to preserve the status

quo and prevent the 'irreparable loss of rights' before a final judgment

on the merits." *Native Ecosystems Council v. Marten*, 2018 WL 3831339,

*3 (D. Mont. 2018). A party seeking preliminary injunctive relief must

establish that (a) they are likely to succeed on the merits, (b) they are

likely to suffer irreparable harm in the absence of preliminary

injunctive relief, (c) the balance of equities tips in their favor, and (d) an

injunction is in the public interest. *Winter v. Natural Resources Defense

Council*, 555 U.S. 7, 20 (2008).

The Ninth Circuit uses a sliding scale approach when applying

this test. *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131-

32, 1135 (9th Cir. 2011). Under this approach, the elements are

balanced "so that a stronger showing of one element may offset a

weaker showing of another." *Id*. A "stronger showing of irreparable

harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id*. A preliminary injunction could issue if plaintiff shows that "serious questions going to the merits were raised" and the "balance of hardships tips sharply" in his favor, so long as the other two elements are also met. *Id*. at 1135. "'Serious questions on the merits' are those questions that present a 'fair ground for litigation and thus for more deliberative investigation.'" *Native Ecosystems Council,* 2018 WL 3831339 at *3. "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id*. (citation omitted). Friends of the Crazy Mountains satisfies this test.

## A. Friends of the Crazy Mountains raises serious questions and is likely to succeed on the merits.

### 1. The Ibex project violates NEPA.

NEPA "promotes its sweeping commitment to 'prevent or eliminate damage to the environment' . . . by focusing Government and public attention on the environmental effects of proposed agency action." *Marsh v. ONRC*, 490 U.S. 360, 371 (1989). By so doing, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Id.* "Ultimately, of

course, it is not better documents but better decisions that count." 40

C.F.R. § 1500.1(c).

The Service initiates the NEPA process through scoping. 40 C.F.R.

§ 1501.7. The Service's regulations direct the agency to prepare an EA

for all proposed actions that are not categorically excluded from

documentation and "for which the need for an EIS has not been

determined." 36 C.F.R. § 220.7(a). An EA includes an analysis of the

environmental impacts of a proposed action (direct, indirect, and

cumulative) and an evaluation of alternatives. 40 C.F.R. § 1502.14. The

Service's regulations state that proposed actions can only be issued a

categorical exclusion (CE) if there are "no extraordinary circumstances

related to the proposed action" and if the action fits with certain,

defined categories. 36 C.F.R. § 220.6. The Service's NEPA flow chart,

(Ex. B at 4) provides a helpful illustration of the options available to the

Agency:

**NEPA Documentation Overview|**

## Proposal

Scoping

**Are Effects Significant?**

**YES,** or may be or
normally required
(36 CFR 220.5(a))

**NO** or Don't know

**NO,** fits a category in
FSH 1909.15 ch. 30
AND
no extraordinary
circumstances

**EIS
Environmental
Impact
Statement**

**EA
Environmental
Assessment**

**Categorical
Exclusion**

**Are Effects Significant?**

**Decision Memo Required?**

**YES,** or
may be

NO

YES

**FONSI**

**Record of
Decision**

**Decision
Notice**

**Decision
Memo**

In this case, the Service started and then abruptly stopped the NEPA process for the Ibex project. The Service initiated scoping, solicited and received public comment (most of which raised concerns), and then abruptly cancelled the process. *See* Exs. A-F. On August 15, 2018, the Service made the unexpected and unprecedented determination that no NEPA analysis *at all* – i.e., no EIS or EA (not even a CE) – was required for the Ibex project. Ex. F. This means no environmental analysis of the direct, indirect, or cumulative impacts of the Ibex project was undertaken. The Service never analyzed how the

13

Ibex project may directly, indirectly, or cumulatively impact big game habitat and security in the area even though best available science says new mountain bike trails may be a problem. *See* Ex. W (Wisdom (2018) documenting elk responses to mountain bike trail); *see also* Ex. D at 73 (raising concerns about elk impacts). Nor did the Service evaluate a reasonable range of alternatives as required by NEPA.

Notably, following this decision to cancel the NEPA process, the Service made the behind-closed-door decision to revise the Ibex project and change the location and design of the trail re-route. *Compare* Ex. C *with* Ex. G at 3. This means the Ibex project – as currently designed, authorized, and approved by the Service – was never vetted for public review and comment. For support, the Service insists no environmental impacts (direct, indirect, and cumulative) analysis or alternatives analysis for the Ibex project is necessary because the project was already analyzed in the 2006 travel plan and 2008 "forest-wide" roads and trails EA. Ex. F at 1; Ex. G at 1. But this is inaccurate.

Neither the travel plan or forest-wide EA (which is dated 2009) include *any* analysis or specifics about the Ibex project. *See* Ex. K (travel plan); Ex. N (forest-wide decision and EA). Nowhere in the

14

travel plan or the forest-wide EA, for instance, does the Service discuss
the project (and its four components) or analyze the direct, indirect, and
cumulative effects of it. Nowhere does the Service discuss and analyze
the location and impacts of the new eight-mile trail re-route or the
Service's decision to obliterate and relinquish public access rights on
portions of the Porcupine Lowline and Elk Creek trails. Nor does the
Service consider and analyze a reasonable range of alternatives,
including alternative locations for the trail re-route and alternatives
that keep the existing trails in place. In fact, when responding to
appeals on the travel plan, the Service explicitly stated that any "future
construction of new roads and trails on National Forest lands will
require a new NEPA analysis and period for public comments and
concerns." Ex. O at 3.

For support, the Service points to page 53 of the travel plan
decision, *see* Ex. G at 1. But on page 53 the Service simply provides its
reasoning for its decision in the Ibex travel planning area and this
decision actually includes managing and maintaining (not obliterating
and relinquishing) both the Porcupine Lowline and Elk Creek trails. Ex.
K at 53. Page 53 of the travel plan does mention the Service's intention

to someday look "for ways to re-route this trail to get more of it on national forest land," *id.*, but this simply a statement of future intention, not an analysis of the environmental impacts required by NEPA.

The Service's reliance on the 2009 forest-wide EA is equally unavailing. The document is merely designed to implement the National Forest roads and trails system previously identified and documented by travel plan: "The Travel Plan specified the types of uses to be allowed and managed for on each road and trail . . . [my decision] is designed to provide adequate facilities to accommodate the designated uses [identified in the travel plan] and provide for other resource protection." Ex. N at 3.  As the name suggests, it is a "forest-wide" NEPA document for "proposed improvement work on certain Gallatin National Forest roads and trails" identified in the travel plan, nothing more. *Id*. As such, there is no discussion or analysis of the Ibex project. There are no specifics about the project (components, location and design of new trail, loss of existing access), no evaluation of environmental impacts, and no consideration of alternatives.

On page twelve of the 2009 forest-wide decision, the Service states that some "portions of the [Porcupine Lowline trail] *may* be shifted onto National Forest land to the east" but this is the extent of the discussion and purported analysis. *See* Ex. N at 12, 27. In fact, in the same paragraph, the Service explains that its travel plan expressly designates the Porcupine Lowline trail as providing opportunities for public use and access, including "motorcycle, mountain bike, stock and foot use" and needs to be "remarked and reconstructed." *Id.* Work on the existing Porcupine Lowline trail "will involve" new trail construction, reconstruction, and maintenance. *Id.*

There is thus a disconnect in this case between the facts found and the decision made. This is the hallmark of "arbitrary and capricious" action. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's actions are only valid "if it considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 998 (D. Mont. 2016). Here, the Service's decision and failure to prepare an EIS or EA (let alone even a CE) for the Ibex project is arbitrary, capricious, and violates NEPA.

**2.    The Ibex project violates NFMA.**

Under NFMA, the Service must ensure all project level decisions are consistent with the forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15. This Court must be able to "reasonably discern from the record that the Forest Service complied" with forest plan standards. *Native Ecosystems Council v. U.S. Forest Service*, 418 F. 3d 953, 961-962 (9th Cir. 2005). In 2006, the Service amended its Gallatin forest plan (Amendment No. 45) by removing most of the travel management direction and replacing it with new direction from the travel plan. Ex. K at 9, 135; *see also* Ex. M (describing various amendments).

The travel plan was prepared in accordance with the Service's 2005 travel management regulations (travel rule), which directed the agency to identify and then manage and maintain all National Forest System roads and trails for their specific uses. 36 C.F.R. §§ 212.50 to 212.57. The Service's travel plan for the Crazy Mountains does just that: "identifies and establishes opportunities for public recreation use and access using the Forest's road and trail system." Ex. L at 1."For each road and trail, [the travel plan] specifies the types of uses that are appropriate . . . [and] describes seasonal restrictions that may apply

18

and programmatic direction that will provide guidance for future management proposals related to Forest travel." *Id.*

Relevant here, the Service's travel plan specifically identifies and designates the Porcupine Lowline trail (No. 267) and Elk Creek trail (No. 195) as National Forest System trails open for public use and access. *See* Ex. L at 27-28; Ex. K at 52-53. Under the travel plan, both trails are to be managed for the "Emphasized" uses of hiking, stock use, and mountain bike use "YEARLONG" and with "No Restrictions." Ex. L at 28. The Service explains that if a use is "Emphasized" the trail will be managed for such use. Ex. L at 3. If "a use is identified as emphasized (E) on a road or trail it is an indication that the Forest Service believes [] it is a good opportunity and will manage the route for that use." Ex. K at 13 (note 1). If a use is simply "allowed" then the Service will permit the use to occur on the trail but not actively manage for it. *Id.*

The Service's travel rule and travel plan (and related decision) also commit the agency to protect existing public access rights. The Service can only identify a road or trail as a National Forest System road or trail if it has "valid existing rights" to it. 36 C.F.R. § 212.55(d).

Once identified, the Service must protect existing public access rights: the "use of existing National Forest System roads and trails shall be permitted for all proper and lawful purposes subject to compliance with rules and regulations governing the lands and the roads or trails to be used." 36 C.F.R. § 212.6(c); *see also* Ex. K at 29 (existing travel plan gives Service "direction to protect existing access rights"); Ex. L at 14 (travel plan direction to "protect existing access rights" on National Forest System trails); Ex. P at ¶ 7 (same).

Here, the Ibex project violates NFMA because it conflicts with the Service's travel rule, travel plan and related decision by: (a) changing the designation and management of portions of the Porcupine Lowline and Elk Creek trails from an "Emphasised use" to no use at all; and (b) abandoning the public's existing access rights to use portions of the two National Forest System trails. Instead of managing and maintaining public access on the two trails for the "Emphasized" hiking, mountain biking, and stock use, the Service is obliterating and removing portions of the Porcupine Lowline and Elk Creek trails and relinquishing the public's easement interests. Ex. A at 2; Ex. B at 2; *see also* Ex. C (map).

Public access on portions of the two National Forest System trails will be prohibited. *See id*.

   This is a significant change and departure from the travel plan. Large portions of both trails will be obliterated and removed by the Service and the public's easement interest in such trails will be abandoned. The Service certainly has the discretion to change its mind about how best to manage the two trails. But the Service must first amend the travel plan and follow its own regulations before doing so. *See* 36 C.F.R. § 219.15(c). This has yet to occur. The Service must also provide a "reasonable explanation" for any such decision. *See Organized Village of Kake v. U.S. Dept. of Ag.*, 795 F.3d 956, 966 (9th Cir. 2015) (explaining that if the Service's new direction rests upon findings that contradict those underlaying prior policy, it must include "a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy").

   Notably, in 2006, the travel plan went through extensive public review and comment, including the preparation of an EIS and following its adoption, the Service fought hard to protect and defend public access and use of the Porcupine Lowline and Elk Creek trails. When

21

landowners, along with others, challenged the Service's authority to manage and maintain two trails as National Forest System trails, the Service fought back, explaining to this Court that the Service and public have an easement to the trails and that it is "perfectly within its rights" to reflect the trails on the travel plan maps. *Citizens for Balanced Use v. Heath*, 07-cv-0059-BLG-DWM (D. Mont. 2007) consolidated with *Montana Wilderness Association (MWA) v. McAllister,* 07-cv-0039-M-DWM (Doc. 48-2 at 9); *see also* Doc. 1 at ¶¶ 127-129, 134-145 (detailing defense of travel plan decision).

Robert Dennee, the Service's former Lands Program Manager and one of the authors of the travel plan, explained that it "is the Forest Service's position that the United States, on behalf of the public, has an easement interest in these roads and trails due to the historic and ongoing public and administrative use and maintenance. The public is the beneficiary of this right of access and the Forest Service defends and maintains that right." Ex. P at ¶4. The Porcupine Lowline and Elk Creek trails are part of a system of existing trails that "provide needed access to [National Forest System] land for public recreation and for administrative purposes." *Id*. at ¶ 9. The Service has chosen to identify

both trails on the travel plan and related maps "because the Forest Service believes the United States has an 'easement interest' in this trail system, and the Forest Service has a responsibility to manage this trail system under the Forest's Travel Management Plan." *Id.* The Service's "direction and policy" is to "take actions necessary to protect the existing access rights to [National Forest System] lands" on the Porcupine Lowline and Elk Creek trails.[2]

The Service's Ibex project, however – which affirmatively abandons portions of the Porcupine Lowline and Elk Creek trails – represents a significant departure from the travel plan, the Service's earlier decision approving and defending the plan, and the Service's earlier commitments in *MWA.* No reasonable or valid explanation for

---

[2] The Dennee declaration was submitted in *MWA* in response to the plaintiffs' assertion that the depiction of the Porcupine Lowline trail across private land "for which no easement across private land had been obtained" violated their rights and caused conflict between the public users of such trails and the landowners. *See MWA*, 07-cv-0039-M-DMW (Doc. 43-1). This Court ultimately agreed with the Service that the "mere fact that a landowner disputes the presence of a prescriptive easement on his or her property does not mean that the landowner is legally correct, and [the plaintiffs] point[] to no authority for its apparent proposition that the Forest Service should simply abandon use rights previously acquired by the public." *MWA*, 07-cv-00039-DWM (Doc. 53 at 26).

23

this change in position is provided. Nor has the Service provided a

reasonable explanation for how its Ibex project complies with the travel

plan's direction for managing and protecting public access on the

Porcupine Lowline and Elk Creek trails. This is arbitrary. *Organized*

*Village of Kake,* 795 F.3d at 966.

> **3.      The Service has no authority to relinquish the
>             public's easement interests.**

The Ibex project includes the relinquishment of the Service's

easement interests "on the current Porcupine Lowline trail (No. 267) in

sections 15, 22, 27, 34, 35 and lower portions of [the] Elk Creek trail

(No. 195) in section 15, within Township 4 North and Range 10 East."

Ex. A at 2. As noted earlier, the Service never evaluated and analyzed

the consequences of this decision as required by NEPA. Nor did the

Service evaluate whether this decision is consistent with NFMA. The

Service also provides no authority, citations, or documentation in

support of this decision to "relinquish" easement interests on two public

National Forest System trails. Nor could it.

While the Service certainly has the discretion and the authority to

amend its travel plan (and forest plan) and decide to no longer manage

these two trails as "National Forest System trails" (after going through

the necessary public review and comment process), it has no authority to relinquish *the public's* easement interest in such trails.

As the Service is well aware, the Porcupine Lowline trail and Elk Creek trail in sections 15 and 35 (Township 4 North and Range 10 East) – where the Service is proposing to give up the public's easement interests – are covered by a recorded (written) easement from the Northern Pacific Railway Company. *See* Ex. Q. The deed transfer from the railway states that the land conveyed is subject to "an easement in the public for any public roads heretofore laid out or established, and now existing over and across any part of the premises." *Id*. at 1,2 ; *see also* Ex. D at 50-51 (deed and 1925 map); Ex. Q at 7 (1937 map); Ex. P at ¶2-4 (explaining history of trails). As such, the public easements on the Porcupine Lowline and Elk Creek trails that the Service is planning to "relinquish" as part of the Ibex project belong to the public, not the Service. *Id*.

Further, as the Service concedes, *see* Ex. P at ¶4, the public also has easement interests in the Porcupine Lowline and Elk Creek trails from over a century of public use and decades of Service management and maintenance. *See* Doc. 1 at ¶ 56-59, at ¶84-197. This was outlined

25

the Dennee declaration. The "United States has an 'easement interest' in [the Porcupine –Lowline trail system] due to the historic and ongoing public and administrative use and maintenance. The public is the beneficiary of this right of access and the Forest Service defends and maintains that right." Ex. P at ¶4.

As part of the Ibex project, however, the Service is now proposing to relinquish this interest. Ex. A at 2. But again, the easement interest was acquired by and remains in "the public's" hands, not simply the Service's. *See, e.g., Wonder Ranch v. United States*, 2016 WL 6237196, *9 (D. Mont. 2016) (recognizing that the public and the Service have access rights). As a trustee, the Service's obligation – consistent with its own direction and policy, including NFMA, the forest plan, and travel plan – is to "defend[] and maintain[]" the public's right of use and access on these trails, Ex. P at ¶ 4, not to abandon or relinquish it.

**B.    Friends of the Crazy Mountains is likely to suffer irreparable harm in the absence of preliminary injunctive relief.**

The Ninth Circuit has established that demonstrating irreparable injury in environmental cases such as this "should not be an onerous task for plaintiffs." *Native Ecosystems Council*, 2018 WL 3831339 at *5

(citing *Cottonwood Envtl. Law Ctr. v. U.S. Forest Service*, 789 F.3d
1075, 1090-91 (9th Cir. 2015)). "Environmental injury, by its nature,
can seldom be adequately remedied by money damages and is often
permanent or at least of long duration, i.e., irreparable. If such injury is
sufficiently likely, therefore, the balance of harms will usually favor the
issuance of an injunction to protect the environment." *Amoco Prod. Co.
v. Village of Gambell*, 480 U.S. 531, 545 (1987).

Consistent with these findings, the Ninth Circuit has been
satisfied by a showing that plaintiffs' use of the project area – whether
for hunting, wildlife viewing, hiking, or other pursuits – and desire to
visit and continue to use an area in an "undisturbed state" suffices for
demonstrating a likelihood of irreparable harm. *Cottrell*, 632 F.3d at
1135; *see also Native Ecosystems Council*, 2018 WL 3831339 at *5
(same). Friends of the Crazy Mountains satisfies this test because the
Ibex project will irreparably harm their interests in: (a) using and
conserving the undisturbed forested lands and big game habitat that
will be disturbed by the new mountain bike trail re-route; and (b) using
and accessing the Porcupine Lowline and Elk Creek trails. Ex. S at ¶13,
20; Ex. T at ¶14; Ex. U at ¶9; Ex. R at ¶18; Ex. X at ¶8.

27

As explained by Brad Wilson – a local resident who was born and raised in the area and has spent his entire life exploring the Crazy Mountains: the location of the Ibex project's new mountain bike trail "is special and fragile." Ex. S at ¶13. The area "is critical" to big game species and the "newly engineered mountain bike trail – as proposed by the [Ibex project] – and the blasting and cutting of trees that will be necessary to construct it, will irreparably disrupt this undisturbed, forested land in the Crazy Mountains ecosystem and my interests in using and conserving it." *Id.* "The area proposed for the trail re-route is beautiful, undisturbed country . . . the flagged trail enters old mature forests with moss on the trees, like something out of a Dr. Seuss book . . . The Crazy Mountains are sacred to me. When you go into them, you can almost feel a presence. I grew up in these mountains and just love them." *Id.* at ¶11, 13; *see also id.* at ¶15 (discussing lynx and wolverine sightings in area).

This sentiment is shared by others, including John Daggett, Kathryn QannaYahu, Lou Goosey, and Phil Knight, all of whom value and use the area and whose interests will likely be irreparably harmed by the Ibex project. *See* Ex. T at ¶14; Ex. U at ¶9; Ex. R at ¶18; Ex. X at

¶8; *see also* Ex. D at 73 (discussing how the proposed Ibex project and proposed mountain bike trail would negatively impact big game habitat and security); Ex. W (Wisdom (2018) discussing the negative effects of mountain biking on elk habitat and use of areas).

This type of harm to Friends of the Crazy Mountains' interests, i.e., harm to a plaintiffs' interests in using and conserving undisturbed forest lands satisfies the irreparable harm test. *See Cottrell*, 632 F.3d at 1135; *Native Ecosystems Council*, 2018 WL 3831339 at *5. The removal of mature trees – even smaller trees or small amounts of trees – if "indeed incorrect in law, cannot be remedied easily if at all. Neither the planting of new seedlings nor the paying of money damages can normally remedy such damage. The harm here, as with many instances of this kind of harm, is irreparable for the purposes of the preliminary injunction analysis." *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *see also EPIC v. Blackwell*, 389 F. Supp. 2d 1174, 1221 (N.D. Cal. 2004) ("Once the forest stands are logged there "would be no means to replace such trees in any meaningful fashion since it takes years for such trees to mature.").

In this case, irreparable harm will also flow from the Service's plans to obliterate and officially relinquish its easement interests on the trails before this Court can rule on the merits. *See* Ex S at ¶20; Ex. U at ¶9; Ex. R at ¶18; Ex. T at ¶14; Ex. X at ¶8. This could ultimately determine the outcome of the case. *See Kettle Range*, 150 F.3d at 1087-1088. In "such cases, judges must be particularly sensitive to practical consequences of their initial action or inaction, not only because of the effect of the transactions involved, but because of the need to ensure that the court does not inadvertently lose its ability to enforce an important Congressional mandate." *Id*. Here – as in *Kettle Range* – if an easement transfer in the trails is allowed to move forward prior to this case being heard and decided on the merits, it is likely to deprive this Court of its ability to "grant appropriate equitable relief." *Id.* at 1088. "This is not how our legal system is supposed to work." *Id*.

This is why in NEPA cases such as this, irreparable injury often flows from the failure to evaluate the environmental impacts of an action *before* they occur. *High Sierra Hikers Ass'n v. Blackwell*, 390 F. 3d 630, 642 (9th Cir. 2004). "If the courts could not stop the Service from moving forward with an illegal project pending NEPA compliance,

30

regardless of the equities, then NEPA . . . would be toothless." *Sierra*

*Forest Legacy v. Sherman*, 646 F. 3d 1161, 1184-1185 (9th Cir. 2011).

## C.    The balance of equities and public interest tip sharply in Friends of the Crazy Mountain's favor.

When the Federal government is a party, the balance of equities

and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747

F.3d 1073, 1092 (9th Cir. 2014) (citation omitted).

In this case, if the Ibex project is allowed to proceed while this

case is pending, eight miles of new mountain bike trail in a currently

undisturbed, forested part of the Crazy Mountains will be excavated

and built and two National Forest System trails will be obliterated and

the Service's (and public's) easement interests relinquished. Once this

occurs it will be difficult – if not impossible – to undo the damage and

related harm to Friends of the Crazy Mountain's interests. The wildlife

habitat and security of the area will be lost and the harm to Friends of

the Crazy Mountain's interest in protecting, preserving, using and

accessing the area will be irreparably harmed. As recognized by the

Ninth Circuit, there is a "public interest in preserving nature and

avoiding irreparable environmental injury." *Cottrell*, 632 F. 3d at 1138

(citation omitted).

If the Ibex project moves forward while this case is pending, it will also be difficult to give meaningful consideration to the environmental impact of and alternatives to the proposed project – the very goal of NEPA. Such a result would undermine the public's interest in "careful consideration of environmental impacts *before* major federal projects go forward . . . suspending such projects until that consideration occurs [therefore] 'comports with the public interest.'" *Id*. Congress, when enacting environmental laws like NEPA and NFMA, identified a procedure and a substantive standard for federal projects to comply with. It therefore comports with the public interest for the Service to comply faithfully with these procedures and standards before moving forward. *See id*. at 1138. "Such compliance is especially appropriate in light of the strong public policy expressed in the nation's environmental laws." *Citizen's Alert Regarding Environment v. U.S. Dep't of Justice*, 1995 WL 748246, *11 (D.D.C. 1995).

In contrast, the hardship to the Service includes no more than a temporary delay in implementing the Ibex project – a non-time sensitive project – until a final decision on the merits is rendered or until steps are taken to bring the project into compliance with NEPA

32

and NFMA. The harm is temporary delay pending compliance with the law, not complete and final cancellation of the project. *See EPIC*, 389 F. Supp. 2d at 1221-22.  Any temporary harm to the Service would merely be economic in nature. The "loss of anticipated revenues . . . does not outweigh the potential irreparable damage to the environment." *Earth Island Institute v. USFS*, 442 F. 3d 1147, 1177 (9th Cir. 2006).

Also weighing against the Service is its decision to move forward with the Ibex project, put it out for bid, and then award a contract on June 21, 2019, *after* this matter was filed and after the Service was put on notice about the need for this motion. As explained by John Daggett (who worked for a federal agency for 38 years), "I was particularly surprised that the Forest Service decided to move forward with this project . . . AFTER the civil action was filed . . .the [Service] has a large backlog of trail work and a shortage of funds to do it. Awarding a contract ties up that money so it can't be used elsewhere." Ex. U at 5-6.

Regardless, any economic loss that the Service and new purchaser might suffer due to a suspension of project operations caused by a preliminary injunction – assuming this is true – is an eventuality that was well known and understood. If a preliminary injunction is issued,

33

the Service and the purchaser would "become largely responsible for their own harm." *Drakes Bay Oyster Co.*, 747 F.3d at 1093.

## CONCLUSION

For the forgoing reasons, Friends of the Crazy Mountain's respectfully requests this Court grant this motion for a preliminary injunction.

Respectfully submitted this 28th day of June, 2019.


/s/ Matthew K. Bishop
Matthew K. Bishop


*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of June, 2019, I filed a copy of this document electronically through the CM/ECF system, which caused all ECF registered counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Matthew K. Bishop
Matthew K. Bishop

**CERTIFICATE OF COMPLIANCE**

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 6,500 words. I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop