MARK STEGER SMITH
Assistant U.S. Attorney
U.S. Attorney's Office
2601 2nd Avenue North, Suite 3200
Billings, MT 59101
Phone: (406) 247-4667
Fax: (406) 657-6058
Email: mark.smith3@usdoj.gov

Attorney for Defendant
United States of America

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MONTANA
### BILLINGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, a public land organization; MONTANA CHAPTER BACKCOUNTRY HUNTERS AND ANGLERS, a non-profit organization; ENHANCING MONTANA'S WILDLIFE AND HABITAT, a public outreach organization; SKYLINE SPORTSMEN'S ASSOCIATION, a non-profit organization, | CV 19-66-BLG-SPW-TJC |
| Plaintiffs, | |
| vs. | FEDERAL DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION |
| MARY ERICKSON, in her official capacity as Forest Supervisor for the Custer Gallatin National Forest; LEANNE MARTEN, in her official capacity as Regional Forester, Region One, for the U.S. Forest Service; VICKI CHRISTIANSEN, in her official capacity as chief of the U.S. Forest Service; THE | |

UNITED STATES FOREST SERVICE, a federal agency; THE UNITED STATES DEPARTMENT OF AGRICULTURE, a federal department,

Federal Defendants.

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES ................................................................ iii

EXHIBIT LIST ................................................................................... vi

I.      Introduction ........................................................................... 1

II.     Factual background ............................................................... 2

III.    Preliminary injunction standard ............................................ 5

IV.     Argument. .............................................................................. 6

        A.      Plaintiffs are unlikely to succeed on the merits and raise
                no "serious questions." ........................................... 6

                1. APA standard of review. ...................................... 6

                2. NEPA ................................................................... 7

                        a.      USFS analyzed direct, indirect, and cumulative
                                effects. ....................................................... 7

                        b.      USFS analyzed Wisdom and mountain biking
                                effects. ..................................................... 11

                        c.      The Travel Plan and R&T EA disclosed
                                information as required by NEPA. .................. 12

                        d.      USFS considered reasonable range of alternatives. ............ 15

                3. NFMA ................................................................ 16

        B.      Plaintiffs do not "clearly show" irreparable harm. ...................... 21

                1. Plaintiffs' ability to use and enjoy public lands is
                   enhanced. ............................................................... 23

                2. No irreparable harm from relinquishment of prior
                   route. ..................................................................... 24

C.      The balance of equities and the public interest do not
favor an injunction.......................................................................... 25

CONCLUSION ...................................................................................................28

CERTIFICATE OF COMPLIANCE.....................................................................29

CERTIFICATE OF SERVICE .............................................................................30

TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adidas v. Skechers*,
  890 F.3d 747 (9th Cir.2018) ................................................................25

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir.2011) ......................................... 6, 21, 22, 27

*Associated Gen. Contractors v. Coal. For Econ. Equity*,
  950 F.2d 1401 (9th Cir.1991) ...............................................................21

*Bernhardt v. L.A. Cty.*,
  339 F.3d 920 (9th Cir.2003) ......................................................... 26, 27

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
  631 F.3d 1072 (9th Cir.2011) ................................................................6

*College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,
  527 U.S. 666 (1999)................................................................................17

*Conservation Cong. v. United States Forest Serv.*,
  2018 WL 5629335 (E.D. Cal. Oct. 30, 2018)................................. 22, 23

*Cook v. Hartman*,
  317 Mont. 343 (2003) ...........................................................................19

*Dome Mountain Ranch v. Park Cty.*,
  307 Mont. 420 (2001) ...........................................................................19

*Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*,
  356 F.3d 1256 (10th Cir.2004) ............................................................21

*Earth Island Inst. v. Elliott*,
  290 F. Supp. 3d 1102 (E.D. Cal. 2017) ........................................ 23, 24

*Fulton v. D.C.*,
  2 App. D.C. 431 (D.C. Cir.1894).........................................................17

*Heckler v. Chaney,*
    470 U.S. 821 (1985)........................................................................20

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.,*
    140 F. Supp. 3d 1123 (D.N.M. 2015)................................................17

*Kafka v. Mont. Dept. of Fish, Wildlife & Parks,*
    348 Mont. 80 (2008) .......................................................................17

*Lands Council v. McNair,*
    537 F.3d 981 (9th Cir.2008) ..............................................................7

*League Of Wilderness Defs. v. Allen,*
    615 F.3d 1122 (9th Cir.2010) ...........................................................16

*League of Wilderness Defs. v. Connaughton,*
    752 F.3d 755 (9th Cir.2014) ...............................................................5

*Leisz v. Avista Corp.,*
    340 Mont. 294 (2007) .....................................................................19

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997)........................................................................21

*Minnesota Ctr. For Envtl. Advocacy v. U.S. Forest Serv.,*
    914 F. Supp. 2d 957 (D. Minn. 2012)...............................................15

*Munaf v. Geren,*
    553 U.S. 674 (2008)..........................................................................5

*National Parks Conservation Ass'n v. Jewell,*
    965 F. Supp.2d 67 (D.D.C. 2013)....................................................20

*Native Ecosystems Council v. Dombeck,*
    304 F.3d 886 (9th Cir.2002) ..............................................................6

*Native Ecosystems Council v. Erickson,*
    330 F. Supp. 3d 1218 (D. Mont. 2018)................................. 11, 12, 13

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir.2005) ...............................................................15

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................26

*Pub. Lands Access Ass'n v. Boone & Crockett*,
    259 Mont. 279 (1993) ...........................................................................19

*Reid v. Park Cty.*,
    192 Mont. 231 (1981) ...........................................................................19

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*,
    608 F.3d 592 (9th Cir.2010) ........................................................ 14, 15

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008)............................................................ 5, 21, 25, 26

## Statutes

5 U.S.C. § 701 ...............................................................................................6
42 U.S.C. § 4332...........................................................................................15

## Regulations

36 C.F.R. § 212.55(d) ................................................................................18
40 C.F.R § 1500.1 .......................................................................................11
40 C.F.R. 1502.14(d) ................................................................................. 15
40 C.F.R. § 1502.14(e)................................................................................15
40 C.F.R. § 1502.24 ................................................................................... 11

# EXHIBIT LIST

1       Porcupine Lowline Map Progression 1925-2012

2       Gallatin National Forest Road and Trail Improvement Projects, Environmental Assessment, February 2009

3       Road and Trail Work, Decision Notice and Finding of No Significant Impact, April 15, 2009

4       Biological Assessment for Terrestrial Wildlife Species, Gallatin Travel Plan Implementation Project

5       March 2009 Correspondence

6       Frequently Asked Questions:  Proposed Porcupine Ibex Trail

7       Public Comment Coding Report

8       Interdisciplinary Team draft document

9       Road and Trail Construction/Reconstruction Project Status Update 2019

10     Email from Deputy Forest Supervisor Chad Benson

11     Gallatin Forest Plan, Management Indicator Species Assessment, Population and Habitat Trends

12     Biological Assessment for Canada Lynx and Wolverine, Porcupine Ibex Trail Project

13     April 2019 Wildlife Report

14     March 2019 Letter to FWS to accompany the BA

15     March 2019 letter from FWS

16     November 2018 Aquatics NEPA sufficiency review for Porcupine Ibex Trail Reroute Project

17      October 2018 TESP Botanical report

18      June 2019 letter to State Historic Preservation Officer

19      July 2019 Letter of Concurrence received from State Historic Preservation
        Officer

20      Elk Habitat Management Report

21      Mailing List

22      Sign-in sheet from the 8/29/2019 public information meeting

23      Compilation of maps shared with the public from March of 2018 through the
        April 2019 project update

24      Photo display used at 8/29/2019 public meeting

25      Trail Matrix and handbook excerpts used at 8/29/2019 public meeting

26      Gallatin Forest Plan, 1987.

27      2006 Cover Letter for Travel Plan Record of Decision

28      Final Environmental Impact Statement, Travel Plan, Table of Contents,
        Chapters 1, 2, 5

29      Final Environmental Impact Statement, Travel Plan, Table of Contents,
        Chapter 3 Intro

30      Final Environmental Impact Statement, Travel Plan, Chapter 3, Issues 1
        through 8

31      Final Environmental Impact Statement, Travel Plan, Chapter 3, Issues 9
        through 16

32      Final Environmental Impact Statement, Travel Plan, Chapter 3, Issues 17
        through 23, references

33      Final Environmental Impact Statement, Travel Plan, Chapter 4

34    Final Environmental Impact Statement, Travel Plan, Appendix D, Biological Assessment Travel Plan

35    Travel Plan Response to Comments (2006) excel spreadsheet

36    2006 Map displaying the final Motorized Travel Plan decision extent

37    Declaration of Todd Orr

38    Declaration of Kathy Nash

## I.      Introduction.

Plaintiffs seek a preliminary injunction preventing the U.S. Forest Service (USFS) from starting work on the Porcupine Ibex Trail in the Crazy Mountains just north of Livingston, Montana.  Docs. 6-7.  As set forth more fully below, the Court should deny the injunction.

Plaintiffs are unlikely to succeed on the merits, and raise no serious questions, because USFS conducted programmatic NEPA analysis of roads and trails in 2006 (Travel Plan) and 2009 (R&T analysis), including the reroute at issue here.  That review encompassed all possible environmental impacts from the proposed Porcupine Ibex reroute, and USFS correctly determined the project imparted no significant environmental impacts warranting an EIS.  Plaintiffs' NFMA claims will fail because the neither the Forest Plan nor Travel Plan require USFS to sue private landowners to establish a purported prescriptive use right.

Plaintiffs confront no irreparable harm because the effects of the trail work are not "permanent or of long duration," will not negatively impact wildlife, and do not diminish (but actually enhance) Plaintiffs' and the public's ability to access and recreate on public lands.

Finally, the balance of equities and public interest favor denial of an injunction because the Porcupine Ibex reroute resolves a longstanding dispute between public land users and private landowners in a cooperative and mutually

beneficial way.  The reroute also improves the trail, improves public access, and simplifies future USFS maintenance and administration.

Accordingly, the Court should deny Plaintiffs' motion.

## II.    Factual background.

The Porcupine Lowline Trail has been depicted on historic Absaroka National Forest maps going back to the early 1900s, though the trail location changes over time.  Nash dec. ¶3 (Exh. 38) and Exh. 1.  Through the 1960s, public use and USFS trail maintenance remained high.  *Id*. ¶4.  That use and maintenance dropped off significantly in the 1970s and 1980s.  The trail became difficult to follow, needed signing, and was blocked by extensive blowdown.  *Id*.  There was no trail tread in several areas.  By the late 1990's it was difficult to find the trail. *Id*.

By 2002, landowners had begun complaining about public users, and began trying to close the Porcupine Lowline trail to public use.  *Id*. ¶5.  They posted "Private Property, No Trespassing" signs.  *Id*.  In 2004, USFS and landowners began meeting to try and negotiate public access.  *Id*. ¶6.  These negotiations continued through release of the Draft EIS for the Travel Management Plan.  *Id*.

In 2006, the Gallatin completed a Final Environmental Impact Statement (EIS) and Record of Decision (ROD) for a Travel Management Plan.  Doc. 7-11; Exhs 28-34.  The Plan identified opportunities for public recreational use and

access using the Forest's road and trail system.  *See*, e.g., Doc. 7-11 at 46, 52-53.

In this decision, USFS stated it was seeking to re-route the Porcupine Lowline

Trail off private property and onto National Forest.  *Id*.  The public was invited to

comment and participate in the Travel Management process from August 2002

until the ROD was signed on October 30, 2006.  Landowners commented and

ultimately appealed the decision because it purported to establish public access

across their private property.  Exh. 38, ¶6.  In appeal resolution documents, USFS

acknowledged the Forest Travel Plan, in itself, does not establish or perfect

public access rights.  *Id*.

In 2009, the Gallatin implemented the Travel Management Plan through a

site-specific Road & Trail (R&T) Environmental Analysis (EA).  Exh. 2.  The

Gallatin determined the trails projects posed no threat of significant

environmental impacts, and accordingly issued a FONSI.  Exh. 3.  The

corresponding Decision Notice (DN) disclosed the potential environmental

consequences of specific projects.  *Id*.

The DN details road and trail projects to be implemented across the

Gallatin Forest.  *Id*. at 6-35.  As part of this overall environmental analysis, the

Forest Supervisor determined the construction of trail segments would not cause

unacceptable environmental effects – to the contrary they would result in

beneficial effects.  *Id*. at 6-7.

By 2009, the landowners had erected a locked gate to prevent public use of the trail.  Exh. 38, ¶7.  They continued to post the area as "Private Property, No Trespassing."  *Id*.  USFS asked the landowners to remove the gate and tried to negotiate easements, but the landowners refused.  *Id*.  In 2010, USFS recommended in an internal notice the public not use the trail until an easement is acquired.  *Id*.

The Forest has been implementing Roads and Trail projects since 2009. The DN anticipated the Forest would complete work within five years.  *Id*. at 6. Budgetary constraints and negotiations with private landowners delayed implementation of the Porcupine-Ibex reroute.  Doc. 7-6 at 1.  After USFS secured a tentative agreement with landowners, it released a public scoping notice in March 2018 to solicit input on the proposed reroute.  Doc. 7-1.  The scoping probed whether changed circumstances or new information required USFS to revise its previous analyses or decisions.  *Id*.  Public opinions on the reroute varied, but no new issues were identified.  Exh. 7; Exh. 8 at 2.  USFS therefore affirmed its previous decisions, and notified the public through an open letter and a public meeting.  Doc. 7-6, Exhs. 21-25.

During summer 2018, an interdisciplinary team analyzed the final layout of the reroute to evaluate impacts and designate appropriate mitigation measures. Exh. 8.  The standard operating procedures and mitigation utilized by the Team

were designated by the Roads and Trails EA and DN.  Exh. 2 at 2-20 to 2-23;

Exh. 3 at 25-28.  Pursuant to those terms, the Forest completed additional

specialist checklists and consulted with partner agencies like Fish and Wildlife

Service and the State Historic Preservation Office.  Exhs. 10, 12-19.  These

checklists and consultations all confirm the Porcupine Ibex reroute will not entail

any unacceptable environmental effects.  *Id.*

Implementation of the Porcupine Ibex project represents a culmination of

years of negotiations and work under the Travel Plan and R&T EA to secure

public access to public land in the Crazy Mountains.

## III.   Preliminary injunction standard.

A preliminary injunction is an "extraordinary and drastic remedy," *Munaf v.*

*Geren*, 553 U.S. 674, 689-90 (2008), one that "may only be awarded upon a clear

showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def.*

*Council*, 555 U.S. 7, 22 (2008) (quotation omitted).  To succeed on a motion for a

preliminary injunction, a plaintiff must show that "he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary

relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest."  *League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 759

(9th Cir.2014).

The Ninth Circuit permits a preliminary injunction where a plaintiff shows

"'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir.2011). This "sliding scale" test does not apply here because Plaintiffs show no likelihood of irreparable harm, and the public interest favors public access that minimizes conflicts with private landowners.

As set forth more fully below, Plaintiffs fail to sustain their burden of proving they are entitled to the extraordinary remedy of preliminary injunction.

## IV.   Argument.

### A.   Plaintiffs are unlikely to succeed on the merits and raise no "serious questions."

#### 1. APA standard of review.

Plaintiffs' NEPA and NFMA claims are reviewed under the Administrative Procedures Act ("APA"), 5 U.S.C. §701 et seq. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir.2002). Under the APA, agency actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* "[T]his standard is highly deferential, presuming the agency action to be valid." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir.2011).

The Court must "not substitute [its] judgment for that of the agency." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008)(reversed on other grounds). Instead, the Court may reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id*.

**2. NEPA**

**a.    USFS analyzed direct, indirect, and cumulative effects.**

Plaintiffs argue USFS failed to provide the necessary level of analysis and process for the Porcupine Ibex reroute. *See*, e.g., Doc. 7 (Br.) at 13 ("…the Service started and then abruptly stopped the NEPA process for the Ibex project."). Indeed, Plaintiffs assert USFS determined that "no NEPA analysis *at all* – i.e., no EIS or EA (not even a CE) – was required for the Ibex project." *Id*. (Plaintiffs' italics). Plaintiffs say USFS conducted "no environmental analysis of the direct, indirect, or cumulative impacts of the Ibex project…." *Id*. Plaintiffs are wrong.

USFS actually engaged in extensive NEPA analyses regarding the trail reroute. This process began with the agency's promulgation of a new Travel Plan in 2006. *See* Doc. 7-11, 7-12, Exhs. 27, 30. This "program level" action identified areas where USFS needed to address access problems across the Forest, including

Porcupine-Lowline Trail.  The Travel Planning documents clearly established USFS was aiming to re-route this Trail to get more of it on National Forest and off private lands.  Exh. 28 at 53.  The public was invited to comment and participate in the Travel Management Planning process from August 2002 and until the ROD was signed on October 30, 2006.  Exhs. 28, 30.

USFS then drilled down on the project-level details in its 2009 R&T EA.  Exh. 2.  Again, with issuance of the 2009 EA, the public was invited to participate in the R&T EA through a 30-day comment period.  Exh. 8 at 1.  The Forest received one comment, which did not pertain to the Porcupine Ibex Trail.  *Id.*  USFS issued a DN and FONSI on April 15, 2009.  Doc. 7-14.  Having determined trail relocation work posed no threat of significant environmental effects, USFS set about negotiating with private landowners to secure easements across the small portions of the proposed reroute that would cross private land.  Doc. 7-6.  USFS successfully acquired agreements for the necessary easements in 2018.  USFS then re-scoped the Ibex reroute project to ensure no new information had arisen that would alter its 2009 Finding of No Significant Impact.  Docs. 7-1, 7-2, 7-5, 7-6.  Public input confirmed no new information had arisen that would undermine the 2009 FONSI, so USFS decided to proceed with the reroute without additional NEPA analysis.  Docs. 7-6, 7-7.

Contrary to Plaintiffs' assertion, the EA examined potential direct, indirect, and cumulative effects of the road and trails work ad nauseam. In the fisheries analysis, for example, Porcupine-Lowline is identified as one of the work areas where trail work will involve stream crossings and wetlands (Exh. 2 at 3-22, Table 3), but this does not portend significant environmental effects:

> …new trail and road construction will increase fine sediment delivery, but when combined with road decommissioning, it is reduced from pre-Travel Plan levels…. Furthermore, application of the aquatic standards (E-4, E-5, E-6, and E-7) in the Tavel [sic] Plan will effectively reduce effects of proposed improvements to be minor, with no effects to overall aquatic habitat function, and thus aquatic organism population function, in all work areas…. (Table 3).

*Id.,* at 3-23 to 3-24. The EA goes on to discuss the risk of mortality to aquatic organisms, including ESA-listed species (westslope cutthroat trout), again finding that none of the proposed actions would likely endanger specimens or species in any of the work areas. *Id* at 3-24.

Another example of effects analysis in the Roads & Trails EA is the "General Wildlife" analysis, which includes potential impacts on big game and carnivores, noting that "Road and trail improvements have several potential ways of affecting wildlife species." *Id.* at 3-29. These effects were analyzed in detail. Doc. 7-11 at 81. The Forest Supervisor found motorized uses have greater adverse

impacts than non-motorized, and "wildlife displacement from human activity as the primary factor." *Id*. at 81-82.

To address wildlife displacement, USFS applied a one-kilometer buffer on each side of both motorized and non-motorized routes, and categorized everything else as "core" habitat for wildlife. *Id*. at 82. This analysis revealed that – even if the Porcupine Ibex reroute were open to motorized use (it is not) – the effects on wildlife habitat would still be virtually the same as a "no action alternative." *Id*. This is only logical: As pointed out in the Wildlife Report, "Some direct loss of wildlife habitat from new routes will occur, but habitat will also be gained from routes that are closed." Exh. 2 at 3-36.

Overall implementation of the R&T decision benefits species through an overall reduction in motorized routes, especially in areas important for wildlife. Exh. 3 at 31. Trail construction will be implemented in a way that mitigates effects to species. *Id*. at 30. New routes like Porcupine-Ibex "will be surveyed and routed in such a manner as to avoid important wildlife habitats such as old growth, riparian, willow, aspen, and whitebark pine, therefore, there will be minor to no effect to rare habitats." *Id* at 29. Plaintiffs show no flaw in this analysis.

The Roads & Trails EA further analyzes the direct, indirect, and cumulative impacts of the reroute project to ensure it does not negatively impact grizzly bears (Exh. 2 at 3-52), lynx (*Id.,* 3-87), migratory birds (*Id.*, 3-93), roadless areas (*Id.,* 3-

99), water quality (*Id.,* 3-105), wolverine (*Id.,* 3-115), rare plants (*Id.,* 3-123),

sensitive species (*Id.,* 3-126 to 3-129), and to ensure it does not promote the spread

of invasive weeds (*Id.,* 3-78).  Contrary to Plaintiffs' claim that "no environmental

analysis of the direct, indirect, or cumulative impacts was undertaken," the Roads

& Trails EA and the Travel Plan extensively addressed all reasonably foreseeable

impacts.

### b.    USFS analyzed Wisdom and mountain biking effects.

Plaintiffs posit "best available science says new mountain bike trails may be

a problem" for big game habitat.  Br. 14, citing Wisdom (2018).  As an initial

matter, "NEPA does not have a 'best available science requirement.'" *Native*

*Ecosystems Council v. Erickson*, 330 F. Supp. 3d 1218, 1239 (D. Mont. 2018).

Rather, NEPA's implementing regulations require "information of 'high quality'

and professional and scientific integrity."  *Id*., citing 40 C.F.R §§ 1500.1, 1502.24.

Plaintiffs fail to establish the reroute is not based on such high quality information.

In fact, USFS considered Wisdom's thesis that mountain bikes are more

disruptive of elk.  The Travel Plan EIS examined findings from Wisdom et al.

2004 from a study evaluating the effects of ATVs, mountain bikes, hiking, and

horseback riding on elk and mule deer.  Exh. 30 at 3-19.  As with the 2018 study,

the 2004 study indicated that "elk exhibited much higher rates of movement (or

greater displacement) and probability of flight response from ATVs and mountain

bikes compared to horses and hikers." *Id*.  Thus, Plaintiffs fail to identify any high quality information that was not considered by USFS in determining the reroute.

Further, Wisdom establishes motorized use as the greatest source of elk displacement.  Doc. 7-23 at 223.  Mountain bikes, which Plaintiffs identify as their locus of concern, cause only "intermediate" elk dispersal.  *Id*. at 228.  As finally approved, the Porcupine-Ibex reroute is closed to motorized use (Doc. 7-3, 7-6 at 2), thereby avoiding the chief disruptor to wildlife, including elk.  *Id*.; Exh. 2 at 3-28, 3-29.  As noted above, even if motorized vehicles (the most disruptive) were allowed on the trail, USFS's buffer analysis and mitigation measures ensure no adverse effects to elk.  The proposed trail reroute will also not reduce secure elk habitat because the trail is non-motorized.  Exh. 13 at 4.  Because the reroute replaces a motorized trail, the overall impact to elk habitat will be positive.  *Id*. Impacts to potential foraging habitat or hiding cover will also be minimal due to the small trail width.  *Id*.

### c.     The Travel Plan and R&T EA disclosed information as required by NEPA.

Plaintiffs repeatedly complain the reroute was never disclosed and that neither the Travel Plan nor R&T documents "include *any* analysis or specifics about the Ibex project."  Br. 14-16.  As set forth above (§IV(A)(2)(a)), this is incorrect in light of the numerous effects analyses in the EA applied to the Porcupine Ibex reroute.  *Supra*, §IV(A)(2)(a).  It is also incorrect as regards the

path of the reroute.  The reroute decision is described in the EA:

> Porcupine Area (Crazy Mountain Range, Map CRZ-1)
> In the Porcupine area portions of the Porcupine-Lowline Trail
> #267 between the Ibex and Porcupine trailheads would be
> relocated to correspond with final rights-of-way. Some portions
> of the trail may be shifted onto National Forest land to the east.
> Currently, the trail passes through large portions of private
> lands with fences, gates, past harvest and road building and
> needs to be remarked and reconstructed. Under the decision for
> the Gallatin Travel Plan this trail is to provide opportunities for
> motorcycle, mountain bike, stock and foot use (Travel Plan
> Decision, page II-111). Work would involve about 5.2 miles of
> new trail construction, 2.6 miles of reconstruction and 3.0 miles
> of maintenance.

Exh. 2 at 2-7 to 2-8.

The referenced map – CRZ 1 – was distributed during scoping and attached

to the EA.  Exh. 2 at Maps 1 and 2.  The map fixes the beginning and end-points of

the relocation, thereby identifying the specific sections where the trail traverses

private property.  *Id*.  The map places a red oval around the analysis area, thereby

defining the area of "National Forest land to the east" where USFS would seek to

relocate the trail.  *Id*.  In red text, the map states within this oval: "Relocate

portions of Porcupine Trail onto final rights-of-way and NF Lands between these

points."  *Id*.  The EA and DN thus analyzed the environmental effects of trail

relocation onto these specific portions of National Forest.  *See*, e.g., Exh. 2 at 3-7,

3-8, Exh. 3 at 41-42.

Plaintiffs believe NEPA requires a precise delineation of the eventual Porcupine Ibex reroute, but this is incorrect.  "NEPA's ultimate focus is on the assessment of environmental impacts."  *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior*, 608 F.3d 592, 600 (9th Cir.2010).  Where the nature of the agency action prevents analysis of precise locations, an agency's analysis complies with NEPA if it considers the impact of proposed activities "in all parts of the project area and impose[s] effective avoidance and mitigation measures to account for unknown impacts."  *Id*.  In *Te-Moak*, BLM could not know the precise location of drill sites because the whereabouts of ore deposits were unknown pending geological exploration.  *Id*.

Here, likewise, USFS could not know the precise path of the Procupine Ibex reroute because it had yet to secure landowner agreements granting "final rights-of-way" in specific locations.  Hence, Map CRZ 1 identifies a discrete area where the reroute could occur, and the EA analyzes potential impacts (sedimentation, wildlife, etc.) for that entire area.  *See*, e.g., Exh 3. at 41-42 (describing how "any new crossings" will avoid sedimentation by using bridges wider than the banks). As required by the R&T EA, avoidance and mitigation measures in the form of specialist checklists and consultations with outside agencies ensure the Porcupine Ibex reroute *as finally determined* will not cause unacceptable environmental effects.  Exhs. 10, 12-19; Exh. 2 at 2-20 to 2-23; Exh. 3 at 25-28.  Re-scoping the

final route additionally ensured no significant effects beyond those analyzed in the

R&T EA.  Exhs. 4-7.  Accordingly, as in *Te-Moak*, the R&T EA fulfilled NEPA's

requirements and purpose, despite not depicting the precise location of the reroute.

Plaintiffs assert USFS "explicitly stated that any 'future construction of new

roads and trails on National Forest lands will require a new NEPA analysis and

period for public comments….'"  Br. 15.  But this quote comes from the 2006

program-level Travel Plan.  The Gallatin implemented the Travel Management

Plan through the project-level R&T EA.  Exh. 2.  This was the "new NEPA

analysis" addressing road and trail construction, and it comported with the Forest

Service Manual, and NEPA.  *Minnesota Ctr. For Envtl. Advocacy v. U.S. Forest

Serv.*, 914 F. Supp. 2d 957, 966 (D. Minn. 2012).

### d.      USFS considered reasonable range of alternatives.

Plaintiffs argue USFS never evaluated a "reasonable range of alternatives as

required by NEPA."  Br. 14-16.  But NEPA does not require the agency to

consider a certain minimum number of alternative.  *Native Ecosystems Council v.

U.S. Forest Serv.*, 428 F.3d 1233, 1245–46 (9th Cir.2005).  The agency merely

needs to analyze "appropriate" alternatives (42 U.S.C. §4332 (E)), a "no action"

alternative (40 C.F.R. §1502.14(d)), and a "preferred alternative" (40 C.F.R.

§1502.14(e)).

Here, the EA analyzed the proposed (and therefore preferred) alternative (Alternative 1), and a "no action" alternative (Alternative 2).  Exh. 2 at 2-1 through 2-28.  NEPA requires no more.  The EA further explains that other alternatives were not evaluated in detail because mitigation would address significant environmental concerns and the effects of alternatives can be assessed by comparing the proposed action with no action.  *Id.* at 2-24.  This makes sense as applied to the Porcupine Ibex reroute because alternatives were constrained by the area of potential reroute (Exh. 2 at Map 1 and Map 2) and the landowners' consent to a specific easement in that area.  No other alternatives were available or appropriate, so NEPA did not require additional analyses.

### 3. NFMA

Plaintiffs contend that travel management direction from the Gallatin Forest Plan compels USFS to manage Trails 267 and 195 as "Emphasized" for hiking, stock use, and mountain biking.  Br. 18-19.  They say USFS must keep the trails open "YEARLONG" with "No Restrictions."  Br. 19, citing Exh. L.  Plaintiffs argue USFS violates NFMA by not managing Trails 267 and 195 in this way, and instead proposing their closure.  *Id.* at 25.

But NFMA governs management of federal lands, i.e., "National Forest System Lands."  *League Of Wilderness Defs. v. Allen*, 615 F.3d 1122, 1125 (9th Cir.2010).  Neither NFMA nor the Gallatin's Forest Plan apply on private property,

and neither can override private property owners' Constitutional rights.  *Fulton v. D.C.*, 2 App. D.C. 431, 437 (D.C. Cir.1894).  In the entire history of NFMA, no case has ever held a USFS Travel Plan could establish a USFS or public use right across private property.

Concordantly, the Travel Plan here did not purport to establish public access rights across private property.  The Travel Plan contains four categories of direction: goals, objectives, standards, and guidelines.  Doc. 7-12 at 1-2.  All of these are hortatory – and thus unenforceable[1] – except "standards."  *Id*. at 2.  But "standards" do not apply to every management situation.  "Standards are binding limitations placed on management activities, <u>not already covered by law or regulation</u>, that are designed to maintain a specified minimum level of resource protection."  *Id*. (underlines added).  Any standards the Travel Plan would otherwise apply to private property on Trails 267 and 195 are preempted to the extent those lands are "already covered by law."  Here, that law would include a landowner's right to exclude the public.  *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999); *Kafka v. Mont. Dept. of Fish, Wildlife & Parks*, 348 Mont. 80, 99 (2008) ("the most significant of all the indicia [of property is] ... the right to exclude").

---

[1]  *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1193 (D.N.M. 2015) ("agency objectives are not enforceable") (collecting cases).

USFS repeatedly stated in response to comments (Exh. 35 at 87), in administrative appeals of the Travel Management Plan (Doc. 7-15 at 1-2), and in a November 2007 declaration from Forest Service Lands Program Manager Robert Dennee (Doc. 7-16 at ¶13) that the Travel Plan in itself "does not establish nor perfect access rights."  The landowners' appeal of the Travel Plan was resolved based in part on that stipulation.  Exh. 38, ¶6.  Thus, Plaintiffs cannot cite the Travel Plan as the basis for a putative duty under NFMA to manage the privately owned portions of Trails 267 and 195 as open yearlong without restriction.

Plaintiffs contend USFS can only identify a trail as a National Forest System trail if it has "valid existing rights" to the trail.  Br. 19 citing 36 C.F.R. §212.55(d).  First, the regulation actually says: "[I]n making designations pursuant to this subpart, the responsible official shall recognize... Valid existing rights."  Thus, trails with valid existing rights must be included in the Travel Plan, but not all trails in the travel plan must have valid existing rights.

Second, Plaintiffs assume without any evidence that USFS possesses "valid existing rights" on Trails 267 and 195.  Br. 19-20, 25, 30.  Yet Plaintiffs cannot dispute the trails cross private property, and that no express, recorded easement authorizes USFS or public use.  *See*, e.g., Doc. 7-10 at 11; 7-15 at 1-2.  Plaintiffs cite 1934 and 1940 Northern Pacific deeds reserving easements for any "public roads heretofore laid out."  Doc. 7-17.  But Plaintiffs fail to establish the relevant

parcels contained *any* "public roads" within the meaning of Montana law as of

1934 or 1940. *See Reid v. Park Cty.*, 192 Mont. 231, 234 (1981). Second, the

railroad deeds fail to define the location of any "public roads heretofore laid out."

Given the undisputed evidence the trails are now in different locations (Exh. 38,

¶3), it would be impossible to perfect access rights under those deeds.

The sole possible basis for a putative use right is therefore prescription.

§70-20-101, MCA. Plaintiffs assume USFS possesses a valid prescriptive

easement, yet such a claim is pure speculation pending litigation and a showing, by

clear and convincing evidence, of "open, notorious, adverse, continuous and

uninterrupted use of the claimed easement for the full statutory period of five

years." *Leisz v. Avista Corp.*, 340 Mont. 294, 299 (2007). Plaintiffs further

assume any putative public prescriptive easement was not extinguished by reverse

prescription, i.e., where a landowner bars public access – like by putting up a

locked gate or "no trespassing signs" – for five years. *Pub. Lands Access Ass'n v.*

*Boone & Crockett*, 259 Mont. 279, 287 (1993); *Dome Mountain Ranch v. Park*

*Cty.*, 307 Mont. 420, 426 (2001); Docs. 7-20 ¶6, 7-21 ¶5.

The purported easement is merely an "inchoate servitude" until it is

established by court decree. *Cook v. Hartman*, 317 Mont. 343, 352 (2003).

Proving such a claim is fraught with difficulty, expense, and all the risks inherent

in litigation. Those legal risks, in themselves, provide a rational basis for USFS to

reroute the trail. *National Parks Conservation Ass'n v. Jewell*, 965 F. Supp.2d 67, 87 (D.D.C. 2013).[2]

USFS has discretion to decide whether to enforce or defend a trail easement. In fact, an agency's decision to not take enforcement action is presumptively immune from judicial review under APA § 701(a)(2). *Heckler v. Chaney,* 470 U.S. 821, 832 (1985). In *Heckler*, the court explained that refusal to take enforcement action has traditionally been committed to agency discretion, because such decisions are generally unsuitable for judicial review. *Id.* at 831. The presumption against judicial review can be rebutted only if a substantive statute clearly provides guidelines for the agency to follow in exercising its enforcement powers. *Id.* at 832-835. No such clear statutory guidelines require USFS to litigate trail easements, prescriptive or otherwise.

In short, Plaintiffs cannot establish they or USFS currently possess "valid existing rights" on Trails 267 and 195, and they certainly cannot anchor a NFMA

---

[2] Plaintiffs' allusion to two 2007 cases, *Citizens for Balanced Use v. Heath* and *Montana Wilderness Association v. McAllister* (Br. 22), need not detain the Court. The dispute there centered on whether USFS could validly depict trails on Motor Vehicle Use Maps despite lacking legal use rights. USFS never disputed "legal access had not been obtained," but merely asserted an "easement interest" justified marking routes on a map. Twelve years later, much has changed. Locked gates have blocked the trail for the last decade. "No trespassing" signs have been posted since 2002. USFS has advised the public to avoid the trails since 2010. Dennee's assessment of USFS's "easement interests" on Trails 267 and 195 would likely differ materially today.

attack on the conjecture that USFS might be able to establish such rights via litigation.  Plaintiffs are unlikely to succeed on their NFMA claims.

**B.    Plaintiffs do not "clearly show" irreparable harm.**

"[C]ourts have consistently noted that because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements" will be considered.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir.2004). Plaintiff must do "more than merely allege imminent harm sufficient to establish standing."  *Associated Gen. Contractors v. Coal. For Econ. Equity*, 950 F.2d 1401, 1410 (9th Cir.1991).  Rather, plaintiff must make a "clear showing" and present "substantial proof" that they will imminently suffer irreparable harm in the "absence of" the specific injunction they request.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Winter*, 555 U.S. at 22.  Such harm must be "likely, not just possible."  *Cottrell*, 632 F.3d at 1131.

Plaintiffs cite *Cottrell*, 632 F.3d at 1135, for the proposition that "the Ninth Circuit has been satisfied by a showing that plaintiffs' use of the project area – whether for hunting, wildlife viewing, hiking, or other pursuits – and the desire to visit and continue to use an area in an 'undisturbed state' suffices for demonstrating a likelihood of irreparable harm."  Doc. 7 at 27.  But in *Cottrell*,

plaintiffs established their members would actually be unable to use the 1,652-acre logging area for "work and recreational purposes" like hunting, fishing, horseback riding and cross-country skiing. *Cottrell*, 632 F.3d at 1135. Where a plaintiff fails to establish "actual inability" to use an area as a result of disputed project activities – as here – they cannot rely on *Cottrell* to prop up irreparable harm. *Conservation Cong. v. United States Forest Serv.*, 2018 WL 5629335, at *5 (E.D. Cal. Oct. 30, 2018).

Plaintiffs repeatedly try to portray this case as akin to other environmental cases. *See*, e.g., Doc. 7 at 26, 30. But this case is not like the other cases Plaintiffs evoke: This is not a large timber harvest project that stands to eliminate vast tracts of old growth, or destroy spotted owl habitat. This is about moving a 24"-wide trail less than one mile from its current location. Old growth trees cannot be put back on the stumps, and dead owls cannot be resurrected. But trail work disturbs a tiny area of the forest (2.5 acres) (Exh. 37, ¶9), and a trail *can* be moved back to its original location.

Plaintiffs allege the trail reroute will: 1) Irreparably harm their interest in using and conserving undisturbed forested lands and big game habitat; and 2) Irreparably harm their use and access to the Porcupine Lowline and Elk Creek trails. Br. 27. But neither of these actually constitute "irreparable harm," or cause Plaintiffs' "actual inability" to use public lands. To the contrary, the reroute will

provide more reliable access to more acres of National Forest.

### 1. Plaintiffs' ability to use and enjoy public lands is enhanced.

Plaintiffs say they will be unable to enjoy the pristine nature of the area if the trail is rerouted. Br. 27. Brad Wilson claims the rerouted trail disrupts habitat critical to elk, mule deer, mountain goats, moose, and occupied by lynx and wolverine. Doc. 7-19 ¶13. He feels he will lose a part of himself and that "[e]veryone will lose, including the flora and fauna, except a certain select group of people." *Id.* ¶20. But USFS evaluated impacts of the trail reroute on wildlife in the 2008 Roads & Trail EA. Exh. 2 at 3-27 through 3-75; 3-115 through 3-120. As established above (§IV(A)(2)(b)), the reroute will not displace or harm elk. As established by the USFS Biological Assessment, and confirmed by FWS concurrence, the reroute is "not likely to adversely affect" lynx, will have "no effect on lynx critical habitat," and is "not likely to jeopardize the continued existence of …wolverine." Exhs. 14-15.

Siting and design requirements will avoid removal of large trees, and the vast majority of trees will remain intact. Exh. 37, ¶¶9-10. Removing dead and dying trees within 300' of roads for over 50 miles is not irreparable harm. *Earth Island Inst. v. Elliott*, 290 F. Supp. 3d 1102, 1124 (E.D. Cal. 2017). Plaintiffs in *Earth Island* alleged logging would eliminate its' members' ability to experience the land in an undisturbed state, causing irreparable harm. *Id.* The court found the

harm "objectively minimal," in part because the project left 88% of the area

untouched.  *Id*.  Here too, the trail reroute will disturb a tiny ribbon of land 24"

wide.  Exh. 37, ¶9.  Even spread across the 2.5 miles of trail construction at issue

here, this amounts to a mere 2.5 acres of disturbance.  *Id*.  The rest of the area will

remain untouched.

Brad Wilson wants reliable and stable access to his favorite spot, Campfire

Lake.  Doc. 7-19 ¶6.  The trail reroute will provide that access.  Exh. 37, ¶5.

Plaintiffs' declarant Phil Knight would also be able to use the reroute to ski off the

upper reaches of Elk Creek.  *Id*.  The general public will also enjoy easier and

more reliable access to National Forest lands that currently lack any trail access.

Doc. 7-6.  This not a "certain select group of people," as Mr. Wilson fears, but

includes all hikers (like himself) that want access to the Crazy Mountains.

## 2. No irreparable harm from relinquishment of prior route.

Plaintiffs' second theory also fails because they show no likelihood of

irreparable harm if USFS relinquishes any purported interest in Trails 267 and 195.

As set forth above, Plaintiffs lack any legitimate basis to assert USFS is

relinquishing anything in exchanging Trail 267 and 195 for the new Porcupine

Ibex reroute.  Prescriptive easement rights on the previous trails are dubious: If

USFS sought to litigate those prescriptive access rights, and lost, it could lose

Trails 267 and 195 *and* the good will of the landowners (effectively torpedoing the

reroute and eliminating public access).  By contrast, the reroute will guarantee public access to a greater quantity of public lands, perpetually.   Exh. 37 at ¶5, Doc. 7-6.

The reroute also portends no irreparable harm in terms of the trail itself. Plaintiffs argue the reroute will make the trail too difficult for the elderly or disabled.  But this claim is largely predicated on speculation: Ms. QannaYahu speculates the reroute will be inaccessible to the young, elderly, or handicapped, but does not claim any of these infirmities herself.  Doc. 7-18 ¶15.  Plaintiffs lack standing to assert the purported harm to third parties as their own imminent and irreparable harm.  *See Winter*, 555 U.S. at 20.  John Daggett claims "Tony and Harold could not hike" the proposed reroute due to its steepness, but their site visit occurred in August 2018 – before any trail was built establishing a prism, stable footing, and eight-foot radius switchbacks.  Moreover, none of the three tried to follow the actual reroute.  Doc. 7-21 ¶¶5-6.  Thus, the Daggett declaration is based on speculation, which is insufficient to support irreparable harm.  *Adidas v. Skechers*, 890 F.3d 747, 765 (9th Cir.2018).

On both of its theories, Plaintiffs fail to clearly show imminent irreparable harm is likely in lieu of an injunction prohibiting trail work.

**C.**     **The balance of equities and the public interest do not favor an injunction.**

Analysis of the "balance of equities" and "public interest" merge when the

Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "balance of equities" refers to the relative burdens or hardships to the plaintiffs versus other parties depending on if an injunction is issued. *Winter*, 555 U.S. at 24-31. The public interest inquiry primarily addresses impact on non-parties rather than parties. *Bernhardt v. L.A. Cty.*, 339 F.3d 920, 931 (9th Cir.2003).

The "public interest" inquiry weighs heavily against an injunction. The impact to non-parties implicates private landowners who have engaged with USFS in good faith negotiations for close to a decade, trying to engineer a solution to a thorny and politically charged issue. They deny a public easement on Trails 267 and 195, but have compromised to try and ensure public access by granting smaller easements essential for the reroute. Issuing an injunction and halting construction of the reroute will funnel public users back to the contested routes, prompting untold future trespasses by those like Louis Goosey and Katherine QannaYahu. Docs. 7-20 at ¶6, 7-18 ¶8. Such ongoing trespasses risk conflict between trail users and landowners. At a minimum, such behavior will further balkanize the parties, possibly imperiling the deal in hand.

As noted above, the reroute guarantees permanent public access as soon as the reroute is built. Litigating the purported prescriptive easements would take several years, with substantial risk of losing all access. On the simple premise that a bird in the hand is worth two in the bush, all those who seek public access to the

Crazy Mountains would be negatively impacted by an injunction.  USFS has spent decades and extensive resources to secure this alternate access, and wants to make good on the commitments it made in the Travel Plan and numerous public meetings.

Moreover, the reroute is better.  It is more scenic, provides a more remote experience, and allows trail users to actually leave the trail to immediately access surrounding public land (useful when hunting, berry picking, camping, etc.).  Exh. 37, ¶5.  Those using the lower trail must stay within the trail prism, or else they are trespassing.  *Id*. ¶12.  The lower trail passes through miles of private property where there are no constraints on timber harvest or other aesthetic variables Plaintiffs claim to treasure.  It is home to extensive cattle operations and their inevitable byproduct, i.e., manure.  *Id*.  National Forest users who would rather avoid those obstacles, and traverse wild public lands with a beautiful view, are not served by an injunction.  *Id*. ¶5.

On the other side of the ledger, Plaintiffs cannot really demonstrate how an injunction is in the public interest.  They fall back on purely dogmatic arguments that there is "public interest in preserving nature and avoiding irreparable environmental injury."  Br. 31, citing *Cottrell*, 632 F.3d at 1138.  But as noted above, *Cottrell* did not involve a 24"-wide trail.  It involved cutting down 1,652 acres of forest.  All Plaintiffs' claims of environmental injury are debunked above.

Thus, Plaintiffs cannot demonstrate a balance of equities or public interest favoring injunction by citing other environmental cases where large-scale irreparable environmental harm was actually established.

Plaintiffs' "balance of equities" arguments do not withstand scrutiny.  The public interest and the balance of equities weigh heavily against an injunction.

## CONCLUSION

Plaintiffs have not justified the extraordinary remedy of a preliminary injunction.

The Court should deny Plaintiffs' motion.

DATED this 10th day of July, 2019.

KURT G. ALME
United States Attorney


/s/ MARK STEGER SMITH
Assistant U.S. Attorney
Attorney for Federal Defendants

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(d)(2)(E), the attached brief is proportionately spaced, has a typeface of 14 points and contains 6,498 words, excluding the caption and certificates of service and compliance.

DATED this 10th day of July, 2019.


/s/ MARK STEGER SMITH
Assistant U.S. Attorney
Attorney for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of July, 2019, a copy of the foregoing document was served on the following person by the following means.

  1-3   CM/ECF
_____ Hand Delivery
_____ U.S. Mail
_____ Overnight Delivery Service
_____ Fax
_____ E-Mail


1.  Clerk of Court

2.  Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
(406) 324-8011 – phone
bishop@westernlaw.org
Attorney for Plaintiffs

3.  Michael A. Kauffman
Patricia Klanke
DRAKE LAW FIRM, P.C.
111 North Last Chance Gulch
Suite 3J, Arcade Building
Helena, Montana 59601
michael@drakemt.com
patricia@drakemt.com
Attorneys for Plaintiffs


/s/ MARK STEGER SMITH
Assistant U.S. Attorney
Attorney for Federal Defendants