IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED

JUL 2 9 2019

Clerk, U S District Court
District Of Montana
Billings

FRIENDS OF THE CRAZY
MOUNTAINS, a public land
organization; MONTANA CHAPTER
BACKCOUNTRY HUNTERS AND
ANGLERS, a non-profit organization;
ENHANCING MONTANA'S
WILDLIFE AND HABITAT, a public
outreach organization; SKYLINE
SPORTMEN'S ASSOCIATION, a
non-profit organization,

         Plaintiffs,

vs.

MARY ERICKSON, in her official
capacity as Forest Supervisor for the
Custer Gallatin National Forest;
LEANNE MARTEN, in her official
capacity as Regional Forester, Region
One, for the U.S. Forest Service;
VICKI CHRISTIANSEN, in her
official capacity as chief of the U.S.
Forest Service; THE UNITED
STATES FOREST SERVICE, a
federal agency; THE UNITED
STATES DEPARTMENT OF
AGRICULTURE, a federal
department,

        Defendantⁿs.

CV 19-66-BLG-SPW

ORDER

1

Before the Court is the Plaintiffs' motion for a preliminary injunction to enjoin the Defendants from constructing the Porcupine Ibex Trail. (Doc. 6). For the following reasons, the motion is denied.

## I.    Background

This is a case about the Forest Service's attempt to resolve a long running dispute with private landowners over easement interests on portions of a trail in the Gallatin National Forest. Since at least 2006, the Forest Service has planned to solve this problem by negotiating easements with the landowners and moving most of the trail onto national forest land. (Doc. 7-11 at 53). As of now, the Forest Service has reached tentative easement agreements with the landowners and is set to begin re-routing the trail onto national forest land. (Doc. 7-6 at 1). The Plaintiffs are interested organizations that believe the Forest Service has neither adequately vetted the environmental impact of the project nor complied with the Gallatin National Forest's Plan in rerouting the trail.

On the west side of the Crazy Mountains in the Gallatin National Forest are two National Forest System trails, known as the Porcupine Lowline Trail (No. 267) and the Elk Creek trail (No. 195). The Porcupine Lowline Trail has been depicted as a National Forest trail since the early 20th century and remains so to this day. (Doc. 1). Around 2002, private landowners began disputing public access on some

portions of the Porcupine Lowline trail, including posting "No Trespassing" signs. (Doc. 8-38 at ¶ 5).

Also in 2002, the Forest Service began the process of creating a Travel Management Plan for the Gallatin Forest. (Doc. 7-11 at 5). Throughout the process, the Forest Service and private landowners were negotiating public access on the Porcupine Lowline Trail. (Doc. 8-38 at ¶ 6). By the time the Travel Management Plan was complete, a resolution on the Porcupine Lowline Trail had still not been reached. Private landowners disputed and appealed the Travel Management Plan's listing of portions of the Porcupine Lowline Trail as a National Forest System trail. (Docs. 8-38 at ¶6; 9-6 at 1). The Forest Service admitted written easements didn't exist for the disputed portions of the Porcupine Lowline Trail, but its position was that the Forest Service and public retained an interest in the trail because of decades of use. (Doc. 9-6 at 1). Due to the access dispute on the Porcupine Lowline Trail, the Travel Management Plan stated the Forest Service's intent to "negotiate an easement for portions of this trail that pass through private land," and "look[] for ways to re-route this trail to get more of it on national forest land." (Doc. 7-11 at 53). The matter remained unresolved and by 2009 had deteriorated to the point that private landowners erected barriers across the trail, such as locked gates, to prevent public access. (Doc. 8-38 at ¶ 7).

After the Travel Management Plan was finalized, the Forest Service began work on proposals for improvement work needed on certain roads and trails, known as the Road and Trail Improvement Projects. (Doc. 8-2). In February of 2009, the Forest Service completed an Environmental Assessment (EA) of the Road and Trail Improvement Projects. (Doc. 8-2 at 1). One of the projects analyzed was the relocation of the Porcupine Lowline Trail. (Doc. 8-2 at 16). The plan was to relocate portions of the Porcupine Lowline Trail "to correspond with final rights-of-way" by shifting some portions "onto National Forest land to the east" because "[c]urrently, the trail passes through large portions of private lands with fences, gates, past harvest and road building and needs to be remarked and reconstructed." (Doc. 8-2 at 16). The work "would involve about 5.2 miles of new trail construction, 2.6 miles of reconstruction and 3.0 miles of maintenance." (Doc. 8-2 at 16). The location of the contemplated work was illustrated on maps attached to the EA. On the first map, a red oval was drawn around the area of the contemplated work with the words "Relocate portions of Porcupine Trail onto final rights-of-way and NF Lands between these points." (Doc. 8-2 at 210). On the second map, two arrows mark the end points of the project, next to the words "Relocate portions of Porcupine Trail onto final rights-of-way between these points." (Doc. 8-2 at 211).

The EA considered the impact of every project included in the Road and Trail Improvement Projects proposal, including the relocation of the Porcupine Lowline Trail. The EA considered impacts to Biodiversity, Fisheries, General Wildlife, Grizzly Bear, Invasive Weeds, Lynx, Migratory Birds, Water Quality, Wolverine, Rare Plants, Sensitive Wildlife Species, and more. (Doc. 8-2 at 4). For instance, Yellowstone cutthroat trout, a sensitive aquatic species, were determined to be present in the Porcupine area but no mitigation was needed other than existing standards. (Doc. 8-2 at 60-61). The same determination was made regarding stream crossings and wetlands. (Doc. 8-2 at 60-61). The Black-backed Woodpecker's habitat was determined to be impacted but the Porcupine project was "not expected to have an adverse effect on distribution or nest success," due in part to an increase in optimal habitat for the species. (Doc. 8-2 at 168). The foraging and nesting habitat of the Flammulated Owl was expected to be impacted, but not in a measurably detrimental way. (Doc. 8-2 at 169).

The EA also included the Forest Service's responses to public comments received during the scoping period for the Road and Trail Improvement Projects. At least three people commented on the relocation of the Porcupine Lowline Trail. The first comment stated "We support the construction and reconstruction and maintenance in the Porcupine Area provided an easement can be obtained or the trail can be relocated. We do not support the taking of private property rights."

(Doc. 8-2 at 192). The Forest Service responded it intended "to continue to maintain the route for existing uses as it has in the past until a relocation resolution agreement has been reached. Discussions and resolutions with landowners will start well ahead of any actual construction and will attempt to balance the needs of the landowner, the public, and the Forest Service administrative needs." (Doc. 8-2 at 192). The second comment stated "Any new crossings related to the relocation of the trail should not negatively impact the streambed and/or banks and should not be a sediment source. The preferred alternative is a bridge that spans the stream and its immediate banks." (Doc. 8-2 at 201). The Forest Service responded live stream crossings will be spanned with bridges that meet or exceed standards. (Doc. 8-2 at 201).

The third comment stated, in part, that "Many elements of several of the proposals (e.g. Porcupine Area) contains proposals that are the subject of current litigation (especially concerning private land easement perfection) that demands they be addressed in a SEIS, not an informal, non-NEPA document . . . [t]hese projects clearly need significant analysis as to cumulative impacts within the context of the latest CEQ and internal USDA/USFS NEPA requirements." (Doc. 8-2 at 206). The Forest Service responded it did "not agree that these road and trail proposals require supplements of the Travel Plan FEIS. The appropriate level of

NEPA analysis is determined by the potential for significant impacts of these projects . . . ."  (Doc. 8-2 at 207).

In April 2009, the Forest Service published its decision notice regarding the Road and Trail Improvement Projects and also issued a Finding of No Significant Impact (FONSI).  (Doc. 8-3).  The decision notice stated the Forest Service would move forward with the Porcupine Lowline Trail relocation project.  (Doc. 8-3 at 12).  The FONSI determined an Environmental Impact Statement was unnecessary for any of the proposals in the Road and Trail Improvement Projects because the EA determined the projects would not have a significant impact on the quality of the environment.  (Doc. 8-3 at 36).  The decision notice also included the Forest Service's responses to public comments it received on the EA.  The Forest Service received one comment regarding the relocation of the Porcupine Lowline Trail, which stated "Any new crossings related to the relocation of the trail should not negatively impact the streambed and/or banks and should not be a sediment source. The preferred alternative is a bridge that spans the stream and its immediate banks. Porcupine and North Fork Elk Creek have known populations of pure Yellowstone Cutthroat trout."  (Doc. 8-3 at 42).  The Forest Service responded it would use a bridge to cross the stream and consult a Montana Fish, Wildlife, and Parks biologist to assure the concern was addressed in the implementation.  (Doc. 8-3 at 42).

After publishing its decision notice and FONSI, the Forest Service began work on the Road and Trail Improvement Projects. However, work on the Porcupine Lowline Trail languished due to the unresolved public access dispute. The Forest Service negotiated back and forth with landowners through 2017, when there was finally a breakthrough and a tentative easement agreement was reached. (Doc. 8-38 at ¶¶ 7-10).

In March 2018, the Forest Service issued a public scoping notice period for the Porcupine Lowline Trail relocation, which it called the Porcupine Ibex Trail. (Doc. 7-1). Later that month, the Forest Service issued an updated notice which included a public scoping packet and frequently asked questions document. (Doc. 7-2). In the updated notice, the Forest Service stated the Porcupine Ibex Trail would resolve the public access dispute over the Porcupine Lowline Trail by securing permanent easements over portions of private land and constructing roughly eight miles of new trail. (Doc. 7-2 at 1-2). The Forest Service would relinquish interest in the disputed portions of the Porcupine Lowline Trail and also a small section of a disputed portion of the Elk Creek Trail, which would no longer be necessary with construction of the Porcupine Ibex Trail. (Doc. 7-2 at 2). Additionally, the Forest Service stated that if it determined, based on scoping, that it is uncertain whether the project may have a significant effect on the

environment, it would prepare a new Environmental Assessment for the project. (Doc. 7-2 at 5).

During the public scoping period, the Forest Service received over eighty comments, both positive and negative. (Doc. 7-4). Many commenters commended the Forest Service for solving a years-long dispute while preserving public access to national forest land. Some thought the Forest Service was giving in to private landowner bullying. Others expressed concern about the environmental impact of rerouting the trail.

In August 2018, the Forest Service issued a notice that after reviewing the comments during the public scoping, it had approved work for the Porcupine Ibex Trail. (Doc. 7-6 at 1). The Forest Service stated it used the public scoping period to determine if any new significant issues or conditions had arisen since it completed its EA for the Road and Trail Improvement Projects that would warrant supplemental environmental analysis. (Doc. 7-6 at 1). Based on the comments received, the Forest Service determined the EA had already adequately addressed all issues raised. (Doc. 7-6 at 2).

In April 2019, the Forest Service released an update for the Porcupine Ibex Trail. (Doc. 7-7). The Forest Service stated phase one of the project was to be constructed in the summer/fall of 2019. (Doc. 7-7 at 1). Additionally, the update included a map that showed the Forest Service had slightly adjusted the planned

route of the Porcupine Ibex Trail. (Compare Doc. 7-3 with 7-7 at 3). Apart from a small portion on the tail end of the southern part of the route, the adjusted route was still well within the area depicted on the maps attached to the EA. (Compare Doc. 7-7 at 3 with Doc. 8-2 at 210-211). In May 2019, the Forest Service put the project out for bid and in June 2019 a contract was secured to begin construction. (Docs. 7-8; 7-9).

The Plaintiffs filed this action for alleged violations of the National Environmental Policy Act (NEPA) and National Forest Management Act (NFMA), seeking to enjoin the Defendants from constructing the Porcupine Ibex Trail.

## II.    Legal Standard

The purpose of a preliminary injunction is to preserve the status quo and prevent the "irreparable loss of rights" before a final judgment on the merits. *Textile Unlimited, Inc. v. A. BMH and Co.*, 240 F.3d 781, 786 (9th Cir. 2001). A preliminary injunction is an extraordinary remedy and should not be awarded as a matter of right, but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A party seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

10

The Ninth Circuit permits a sliding scale approach to the *Winter* test. Under the sliding scale, a preliminary injunction is appropriate when a plaintiff raises serious questions going to the merits and the balance of hardships tips sharply in the plaintiff's favor, so long as the other two *Winter* elements are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Thus, when the hardships merely tip in the plaintiff's favor, it must show a likelihood of success on the merits, whereas when the hardships tip heavily in the plaintiff's favor, it must only show serious questions on the merits.

## III.  Discussion

The Plaintiffs make three arguments: (1) the Porcupine Ibex Trail violates NEPA, (2) the Porcupine Ibex Trail violates NFMA, and (3) the Forest Service cannot relinquish the public's interest in the Porcupine Lowline and Elk Creek Trails.

### A.    Whether plaintiffs demonstrate a likelihood of success or serious questions on the merits

The Plaintiffs claims are reviewed under the Administrative Procedures Act. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). Under the APA, agency actions may be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dombeck*, 304 F.3d at 891. The standard is highly deferential, presuming the agency action to be valid. *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1084 (9th Cir.

11

2011). "Even when an agency explains its decision with 'less than ideal clarity,' a reviewing court will not upset the decision on that account if the agency's path may be reasonably discerned." *San Luis & Delta-Mendota Water Authority v. Locke,* 776 F.3d 971, 994 (9th Cir. 2014). It is not the reviewing court's task to make its own judgment about the appropriate outcome. *Locke,* 776 F.3d at 994 (citation omitted).

An agency action is arbitrary or capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency's decision is contrary to the governing law. *Lands Council v. Powell,* 395 F.3d 1019, 1026 (9th Cir. 2005).

### 1.    Alleged NEPA violation

NEPA is the basic "national charter for protection of the environment. 42 U.S.C. §§ 4321-4370; 40 C.F.R. § 1500.1(a). It is a procedural statute that requires Federal agencies to assess the environmental consequences of their actions before the actions may be undertaken.

NEPA has "twin aims." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1065 (9th Cir. 2002). First, it requires a federal agency to consider every significant aspect of the environmental impact of a proposed action. *Kern,* 284

F.3d at 1065. Second, it ensures that the agency will inform the public that it has considered environmental concerns in its decision-making process. *Kern*, 284 F.3d at 1065. NEPA does not contain any substantive environmental standards. Instead it establishes "action-forcing" procedures that require agencies to take a "hard look" at environmental consequences. *Metcalf v. Daley*, 214 F.3d 1135, 1141-42 (9th Cir. 2000) (internal citations omitted).

Under these procedures, an agency must identify those actions which normally require an environmental impact statement ("EIS"). 40 C.F.R. § 1501.4(a)(1). Some actions categorically require an EIS. If an EIS is not categorically required, agencies must perform an environmental assessment ("EA") to determine whether a particular proposed action requires the preparation of an EIS. If the EA reveals that the agency must prepare an EIS, then the agency must prepare one. If the EA reveals no significant effect, the agency may issue a Finding of No Significant Impact ("FONSI"). 40 C.F.R. §§ 1501.4, 1508.9; *Kern*, 284 F.3d at 1067.

Because NEPA is essentially a procedural statute, judicial "review of agency decision-making under NEPA is limited to the question of whether the agency took a 'hard look' at the proposed action as required by a strict reading of NEPA's procedural requirements." *Bering Strait Citizens for Resp. Dev. v. U.S. Army Corps of Eng'rs,* 524 F.3d 938, 947 (9th Cir. 2008). In reviewing the sufficiency of an

agency's NEPA analysis, a court should evaluate whether the agency has presented a "reasonably thorough discussion of the significant aspects of the probable environmental consequences." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Relief will not be granted for NEPA violations if the decision-maker was otherwise informed as to the environmental consequences and NEPA's goals were met. *Block*, 690 F.2d at 761.

Plaintiffs argue the Porcupine Lowline Trail reroute analyzed in the EA is not the same project as the Porcupine Ibex Trail project, and therefore the Forest Service never analyzed the environmental effects of the Porcupine Ibex Trail project. The Defendants respond it is the same project and the Forest Service sufficiently analyzed the environmental impact of the project in the EA. The Court agrees with the Defendants and holds the Plaintiffs are not likely to succeed on the merits of the claim and do not raise serious questions going to the merits.

On the record before it, the Porcupine Ibex Trail looks like the culmination of the Forest Service's efforts to relocate the Porcupine Lowline Trail. The Forest Service described the Porcupine Ibex Trail as resolving a longstanding dispute along the Porcupine Lowline Trail by constructing approximately 8 miles of new trail and securing permanent easements where the new trail crossed private land. That is the resolution the Forest Service stated it would pursue in both the Travel Management Plan and the EA. The finalized Travel Management Plan stated the

Forest Service's intent to "negotiate an easement for portions of [the Porcupine Lowline Trail] that pass through private land," and "look[] for ways to re-route [the Porcupine Lowline Trail] to get more of it on national forest land." The EA described the project it analyzed as the relocation of portions of the Porcupine Lowline Trail "to correspond with final rights-of-way" by shifting some portions "onto National Forest land to the east" because "[c]urrently, the trail passes through large portions of private lands with fences, gates, past harvest and road building and needs to be remarked and reconstructed."

Although the Porcupine Ibex Trail describes the work as 8 miles of new construction, whereas the EA describes the work as about 5.2 miles of new trail construction, 2.6 miles of reconstruction and 3.0 miles of maintenance, NEPA's ultimate focus is on the assessment of environmental impacts and the Porcupine Ibex Trail is almost entirely within the area analyzed by the EA as illustrated by the two maps. *Te-Moak Tribe of Western Shoshone of Nevada v. U.S. Dept. of Interior*, 608 F.3d 592, 600 (9th Cir. 2010). Furthermore, the Plaintiffs have not carried their burden to provide evidence to determine the reason for the discrepancy. It could be semantics, i.e., the Porcupine Ibex Trail is generalizing the 5.2 miles of new construction and 2.6 miles of reconstruction described in the EA into a rough estimate of 8 miles of new trail construction. Or it could be that

the Porcupine Ibex Trail is actually 3 miles longer than the project contemplated in the EA due to a number of issues.

The public comments received during public scoping of the Road and Trail Improvement Projects and after publication of the EA show the public understood the project to mean the Porcupine Lowline Trail would be mostly rerouted onto national forest land. The first commenter was concerned about private property rights, to which the Forest Service responded that it was working on a relocation resolution with private landowners. The second commenter was concerned about the new stream crossings required by the reroute, to which the Forest Service responded that stream crossings would be spanned with bridges that meet or exceed standards. The third commenter specifically mentioned the easement issue in the Porcupine area and asked the Forest Service to perform a NEPA analysis of the project, which the Forest Service then did in the EA. The only comment received after publication of the EA concerned the new stream crossings' impact on Yellowstone cutthroat trout, to which the Forest Service responded that it would use bridges to cross streams and also consult a Montana Fish, Wildlife, and Parks biologist to assure the concern was addressed in the implementation.

The Court concludes the Plaintiffs have not raised serious questions about whether the Porcupine Ibex Trail is the culmination of the long planned reroute of the Porcupine Lowline Trail, which was analyzed in the EA.

The Plaintiffs additionally argue, without much specificity, that the EA did not evaluate the environmental impact of the project or consider alternatives. But the EA contains separate sections for Biodiversity, Fisheries, General Wildlife, Grizzly Bear, Invasive Weeds, Lynx, Migratory Birds, Water Quality, Wolverine, Rare Plants, Sensitive Wildlife Species, and more. The EA analyzed whether the projects will impact any of these species or plants or the environment as a whole, and specifically notes which of these species or plants may be impacted by the reroute of the Porcupine Lowline Trail. The reroute was flagged as potentially impacting Yellowstone cutthroat trout, sedimentation due to stream crossings, wetlands, Black-backed Woodpeckers, and Flammulated Owls. The EA also considered a no action alternative to the project, and explained any other alternatives were contemplated by comparing the proposed project and no action alternative, which it did with a comparison-by-the-issue table. The Court therefore concludes the Plaintiffs have not raised serious questions about whether the Forest Service took the necessary hard look at the environmental impact of the Porcupine Ibex Trail.

### 2.    Alleged NFMA violation

Under the NFMA, projects must be consistent with the forest plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(b). A court must uphold an agency's decision, even one of less than ideal clarity, if it can reasonably discern from the

record that the agency complied with the forest plan. *Native Ecosystems Council v. U.S. Forest Service, an agency of U.S. Dept. of Agriculture*, 418 F.3d 953, 962 (9th Cir. 2005).

The Plaintiffs argue the Porcupine Ibex Trail is not consistent with the Travel Management Plan because the Travel Management Plan states the Porcupine Lowline and Elk Creek Trails will be managed for the emphasized use of hiking, stock use, and mountain biking yearlong but the Porcupine Ibex Trail will result in the loss of portions of those trails. The Defendants respond the Forest Service does not have recorded easements over the portions of the trails in dispute and is therefore not entitled to apply its Travel Management Plan over property in which it has no recorded interest.

The Court agrees with the Defendants because the Plaintiffs' argument rests on the faulty assumption the Forest Service has a bonafide interest in the disputed portions of the trails. The Forest Service cannot enforce its Travel Management Plan over private property. Although the Forest Service has a potential easement interest in portions of the trails, it has decided as a matter of policy to pursue a mutually agreeable resolution with private landowners to secure permanent public access to that area of the Gallatin National Forest instead of litigating the potential easement interest in those portions. The Plaintiffs disagree with the Forest Service's policy decision, but it does not violate the Travel Management Plan.

Because the Plaintiffs do not otherwise argue the Forest Service is inconsistently managing the portions of the Porcupine Lowline and Elk Creek Trails over which it does have a recorded interest, the Plaintiffs do not raise serious questions going to the merits of their NFMA claim.

### 3. Relinquishment of public's interest

The Plaintiffs argue the Forest Service cannot relinquish the public's interest in the disputed portions of the trails. The Court declines to address this argument because the Plaintiffs cite no legal authority for it and the issue involves a prescriptive easement claim against the private landowners, who are not parties to this lawsuit.

### B. Irreparable harm

The Plaintiffs argue they will suffer irreparable harm if the Porcupine Ibex Trail is constructed because they will lose use of the forest lands where the trail is placed and also lose use of the Porcupine Lowline and Elk Creek Trails. The Defendants argue the harm is minimal because the trail is only 24" wide and trees over 6" in diameter and over 3' from the trail will not be removed.

Plaintiffs seeking preliminary relief must demonstrate that irreparable injury is likely in the absence of an injunction. *Winter*, 555 U.S. at 22. Environmental injury by its nature is usually irreparable because it can seldom be adequately remedied by money damages and is often permanent. *Amoco Production Co. v.*

*Village of Gambell, AK*, 480 U.S. 531, 545 (1987). This does not mean any potential environmental injury warrants an injunction; the plaintiff must show the injury is actual, irreparable, and likely. *Cottrell*, 632 F.3d at 1135.

Under *Village of Gambell* and *Cottrell*, the Court finds the Plaintiffs have shown irreparable harm is actual and likely. New trail construction will involve removing trees and creating a 24" wide path through several miles of the Gallatin National Forest. The Defendants don't seriously dispute that many trees will be cut down and the natural environment disturbed, but argue the harm is essentially de minimis, citing *Earth Island Institute v. Elliott*, 290 F.Supp.3d 1102, 1124 (E.D. Cal. 2017). In *Earth Island*, the district court held a project that left 88% of the trees intact was "objectively minimal" harm. Similarly, the district court held harm to a few species of animals was "not likely to be great." The Court is unaware of Ninth Circuit precedent establishing a minimum level of harm threshold. Although its possible an alleged harm could be so minimal that it is not "actual" harm, the Plaintiffs show enough environmental harm here to meet their burden.

### C.   Balance of hardships and public interest

The balance of hardships factor requires courts to weigh the burden on each party if the injunction is granted or denied. *Winter*, 555 U.S. at 24. The public interest factor requires courts to consider the impact on the public at large.

*Bernhardt v. Los Angeles County*, 339 F.3d 920, 932 (9th Cir. 2003). When the government is a party, the balance of hardships and the public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

The Plaintiffs argue that if the injunction is not granted, they and the public will lose portions of the Porcupine Lowline and Elk Creek Trails. The Defendants argue that the Plaintiffs and public are gaining a new, better trail with significantly more access to the Gallatin National Forest and permanent easements across private land. The Court agrees with the Defendants that the balance of hardships and public interest weighs against granting the injunction.

If the injunction is not granted, the Plaintiffs stand to lose a potential easement interest in portions of the trails but stand to gain permanent, actual easement interests in a new trail. If the injunction is granted, the Defendants stand to lose permanent, actual easement interests in a new trail on behalf of the Plaintiffs and the public but stand to keep a potential easement interest in portions of the trails. In a sense, the Defendants are attempting to trade uncertain property rights for secure property rights, whereas as the Plaintiffs are attempting to preserve uncertain property rights at risk of losing secure property rights. Weighing these interests, the Court finds the balance of hardships between the parties leans towards the Defendants because an injunction may result in losing permanent public access rights to preserve what is only a potential easement

interest in the trails. However, even if the balance of hardships was more equal than that, the public interest tips that balance sharply in the Defendants' favor.

Since 2002, private landowners have posted no trespassing signs and erected locked gates across portions of the trails, resulting in spotty and confrontational public access to this part of the Gallatin National Forest. Since at least 2006, the Forest Service's goal has been to negotiate permanent easements on behalf of the public. In the public scoping period for the Porcupine Ibex Trail, many commenters applauded the Forest Service for finally resolving the dispute and giving the public permanent access rights. On the Porcupine Ibex Trail, there will be no signs telling the public to keep out, no locked gates preventing their access, and no confrontations with landowners. The public will be free to enjoy all the same areas of the forest that they did before, plus more, due to the Porcupine Ibex Trail. The public interest factor therefore tips the balance of hardships heavily in the Defendants' favor.

## IV.    Conclusion and order

The Plaintiffs' motion for a preliminary injunction is denied because although they showed irreparable harm, they did not raise serious questions going to the merits and the balance of hardships and public interest tips heavily in the Defendants' favor.

DATED this _29th_ day of _July_ , 2019.

_Susan P. Watters_

SUSAN P. WATTERS
United States District Judge