Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
406-324-8011
bishop@westernlaw.org

Michael A. Kauffman
DRAKE LAW FIRM, P.C.
111 North Last Chance Gulch
Suite 3J, Arcade Building
Helena, MT 59601
406-502-1668
michael@drakemt.com

*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, *et al.*, | CV-19-66-BLG-SPW-TJC |
| Plaintiffs, | |
| vs. | FIRST SUPPLEMENTAL COMPLAINT |
| MARY ERICKSON, in her capacity as Forest Supervisor for the Custer-Gallatin National Forest, M HANGING LAZY 3, LLC, HENRY GUTH, INCORPORATED, *et al.*, | |
| Defendants. | |

1

## INTRODUCTION

1. Friends of the Crazy Mountains, the Montana Chapter of Backcountry Hunters and Anglers, Enhancing Montana's Wildlife and Habitat, and the Skyline Sportsmen's Association (collectively "Plaintiffs"), bring this civil action for declaratory and injunctive relief against Federal-Defendants ("the U.S. Forest Service" or "the Service") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., for violations of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. app. 2 § 1 *et seq*., the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq*., and the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*

2. This case is a challenge to the Service's decisions and related failures with respect to four National Forest trails in the Crazy Mountains: the Porcupine Lowline trail (No. 267) and the Elk Creek trail (No. 195) on the west-side and the East Trunk trail (No. 115/136) and Sweet Grass trail (No. 122) on the east-side (collectively "four trails" or "four National Forest trails").

2



3. These four trails were established well over 100 years ago and have been consistently used by the public for hunting, hiking and other recreational pursuits since that time. All four trails provide important

public access to the Crazy Mountains. The four trails also have been used and maintained by the Service for more than a century and were classified as National Forest trails during preparation of the 1986 forest plan and 2006 travel plan for the Crazy Mountains. The four trails are (and remain) depicted on every visitor use map for the area.

4. Until mid-2017, the Service actively managed, signed, and maintained the four trails, protected the public's right to use the trails, and pushed back against illegal attempts by private landowners to block public access on them. But in mid-2017, the Service started meeting privately with the landowners and drastically changed its approach to the four trails, in ways that 1) violate applicable law, 2) are inconsistent with the Service's longstanding policies and actions with respect to the trails, 3) contradict its repeated promises and representations to the public regarding access to the trails, and 4) reward landowners for their illegal actions related to the four trails.

5. With respect to the two west-side trails (the Porcupine-Lowline and Elk Creek trails), the Service arranged a "deal" with a landowner who has illegally attempted to block public access. The deal, which emerged as the Porcupine Ibex trail project ("Ibex project"), includes

exchanging many miles of public easements on the current National Forest trail for a much smaller easement through a sliver of one section of the landowner's property that will be used to build a harmful and unnecessary new trail, largely on National Forests lands. The Service's "deal" with the landowner was consummated based on the advice of an invite-only "working group" formed by the Service that included the landowner and his representatives, and select other parties, but that did not include the public, did not make its meetings open to the public, and did not properly report to the public.

6. With respect to the two east-side trails (the East Trunk and Sweet Grass trails), the Service is also in the process of working out a "deal" with landowners who are also attempting to illegally block public access. In mid-2017, and as part of these negotiations, the Service made the decision to stop managing the trails as National Forest trails available for public use.

7. With this civil action, Plaintiffs challenge: (a) the Service's August, 2018 decision to approve the Ibex project, which involves new trail construction and an exchange of easement interests on two National Forest trails on the west-side of the Crazy Mountains; and (b)

the Service's 2017 decision and related failure to properly manage and

maintain two National Forest trails on the east-side of the Crazy

Mountains.

## JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5

U.S.C. § 704.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

10. Plaintiffs have exhausted all available administrative

remedies. Plaintiffs have Article III standing to pursue this civil action.

There is a present and actual controversy between the Parties. This

matter is ripe for judicial review.

11. Final agency action subject to judicial review exists pursuant

to 5 U.S.C. §§ 702, 704, and 706.

12. This Court has authority to issue the relief requested under 28

U.S.C. §§ 2201 and 2202, 5 U.S.C. §§ 702 and 706.

## PARTIES

13. Plaintiff, FRIENDS OF THE CRAZY MOUNTAINS

("Friends"), is an organization dedicated to "lending a public hand to

our public lands" and protecting public access to our public, National

Forest System lands in the Crazy Mountains. Friends and its supporters engage in trail work and maintenance on National Forest System trails in the Crazy Mountains, including the four trails at issue in this complaint. Friends also works closely with and watchdogs County, State, and Federal agencies who have jurisdiction over the Crazy Mountains. The organization was formed over concerns about how public access on public trails was being obstructed by private landowners and their agents. Friends brings this action on behalf of itself, its members, and its supporters.

14. Plaintiff, MONTANA BACKCOUNTRY HUNTERS AND ANGLERS ("Backcountry Hunters") is a non-profit organization headquartered in Missoula, Montana. Backcountry Hunters is an informed and engaged group of Montana hunters and anglers who value public access to public lands and the challenge, peace and solitude that occurs with a quiet-use backcountry experience. Backcountry Hunters values the wild lands, wildlife and fish that make Montana a special place to live and worthy of the title "Last Best Place." Backcountry Hunters works across our diverse public lands, from grasslands to mountain peaks. Backcountry Hunters strives to protect large parcels of

backcountry fish and wildlife habitat, as well as the opportunity for traditional non-motorized hunting and fishing experiences. This includes protecting recreational and hunting opportunities for the public and on public trails and public lands in the Crazy Mountains. As Montana sportsmen and women, Backcountry Hunters recognizes that standing up for these threatened resources, values and public access now is the only way our kids will have the same opportunities in the future. Backcountry Hunters brings this action on behalf of itself, its members, and its supporters.

15. Plaintiff, ENHANCING MONTANA'S WILDLIFE AND HABITAT ("EMWH"), is an organization that advocates for Montana citizen's right to public participation and right to know. EMWH works to empower the public with information and ensure transparency and accountability at all levels of government. EMWH is also dedicated to protecting public access to public lands and waters, ensuring management decisions are in the public interest and utilizing the best available science, and protecting and "enhancing" Montana's wildlife and habitat. EMWH brings this action on behalf of itself, its subscribers, and its supporters.

16. Plaintiff, SKYLINE SPORTSMEN'S ASSOCATION, is a non-profit organization headquartered in Butte, Montana. The Skyline Sportsmen Association was founded in 1958 and is dedicated to representing the interests of Montana resident sportsmen. The Skyline Sportsmen's Association works to maintain and further hunting and fishing opportunities, including public access to public land and waters in Montana. The organization routinely contributes funds and labor to wildlife research, wildlife management, habitat enhancement, and public access projects to lands and waters. The Skyline Sportsmen's Association brings this action on behalf of itself, its members, and its supporters.

17. Friends of the Crazy Mountains, Backcountry Hunters, EMWH, and the Skyline Sportsmen's Association (collectively "Plaintiffs") are committed to protecting public access rights on National Forest System trails in the Crazy Mountains and ensuring Service compliance with federal law, including and its own forest plan and travel plan.

18. Plaintiffs live near and use the Crazy Mountains for commercial and recreational purposes, including the four National

Forest System trails at issue in this case. Plaintiffs' routinely use and visit and have specific plans to return to the Crazy Mountains and the four trails soon to hike, hunt, track wildlife, and recreate in the Crazy Mountains. Plaintiffs use the four trails in accordance with the Service's visitor maps for the Crazy Mountains and the Service's travel plan. Plaintiffs' routinely contact Service personnel about using the four National Forest System trails. Plaintiffs also volunteer their time and energy, assist in trail maintenance efforts, and work with the Service to improve public access to public lands in the Crazy Mountains and intend to continue this work in the near future.

19. Plaintiffs are committed to ensuring the Service complies with its own direction and policy and properly manages, maintains, and protects public access on the four trails. Plaintiffs are committed to ensuring the Service complies with all federal laws, including FACA, NEPA, NFMA, and FLPMA. Plaintiffs are committed to ensuring the Service takes a hard look at the environmental consequences of its decisions and explore a reasonable range of alternatives as required by NEPA.

20. Plaintiffs' interests in using and accessing the Crazy

Mountains on the four trails has been and continue to be adversely affected by the Service's actions and/or inactions as described in this complaint.

21. Plaintiffs have, among other interests, aesthetic, professional, commercial, recreational, and personal interests in the four trails at issue and ensuring public access to public lands in the Crazy Mountains. Plaintiffs have an interest in making sure public officials comply with their own direction and policy and plans (forest and travel) and take a hard look at all impacts and alternatives before making important and significant decisions that affect public resources.

22. Plaintiffs are adversely affected by the Service actions and/or inactions, especially in the absence of full FACA, NEPA, NFMA, and FLPMA compliance. Plaintiffs have also suffered procedural injury by the Service's failure to comply with NEPA and ensure compliance with NFMA.

23. Plaintiffs have not been compelled to participate in this lawsuit. The Service has disregarded (or ignored) Plaintiffs' comments, correspondence, and notice of intent letter.

24. If this Court issues the relief requested, the harm to Plaintiffs'

interests will be alleviated and/or lessened.

25. Defendant MARY ERICKSON is sued in her official capacity as the Forest Supervisor for the Gallatin National Forest. Ms. Erickson is the agency official responsible for the actions and/or inactions challenged in this complaint.

26. Defendant LEANNE MARTEN is sued in her official capacity as Regional Direction for the Service, Region One. As Regional Director Ms. Marten is the agency official responsible for the actions and/or inactions challenged in this complaint.

27. Defendant VICKI CHRISTENSEN is sued in her official capacity as Chief of the Service. As Chief, Ms. Christensen is the agency official responsible for the actions and/or inactions challenged in this complaint.

28. Defendant the UNITED STATES FOREST SERVICE ("the Service") is a federal agency within the United States Department of the Agriculture. The Service is responsible for agency actions and/or inactions challenged herein.

29. Defendant the UNITED STATES DEPARTMENT OF AGRICULTURE is a federal department responsible for applying and

implementing the federal laws and regulations at issue in this

complaint.

30. Defendant M HANGING 3, LLC is a Montana limited liability

corporation with its principal place of business in Wilsall, Montana. On

September 20, 2019, M Hanging Lazy 3 LLC acquired title to the

Porcupine Lowline Trail No. 267 and North Fork Elk Creek Trail No.

195 Forest Service trails at issue in this case, as part of the easement

exchange for the Ibex project.

31. Defendant HENRY GUTH, INCORPORATED is a Montana

corporation with its principal place of business in Wilsall, Montana. On

September 20, 2019, Henry Guth, Incorporated acquired title to the

Porcupine Lowline Trail No. 267 Forest Service trail at issue in this

case, as part of the easement exchange for the Ibex project.

## BACKGROUND

### *The four National Forest trails in the Crazy Mountains*

32. The four trails at issue in this case – the Porcupine Lowline,

Elk Creek, East Trunk, and Sweet Grass trails – were established in

the Crazy Mountains in the late 1800s and/or early 1900s.

33. The Porcupine Lowline trail runs along the west-side and in

the foothills of the Crazy Mountains. The trail is approximately 11 miles long. The trail was used by turn-of-the-last-century forest rangers who were stationed in the Ibex, Porcupine, and other historic guard stations that encircled the Crazy Mountains.

34. The Elk Creek trail runs from the Porcupine Lowline trail east to the saddle before Campfire Lake. The Elk Creek trail is approximately 6 miles long.

35. The East Trunk trail runs from Big Timber Canyon Road, north to the Sweet Grass trail and is approximately 13 miles in length. The East Trunk trail was historically known as "Trail 115" but today is considered "Trail 136."

36. The East Trunk trail was part of the lowline trail system that circumnavigated the Crazy Mountains and connected historic Service guard stations (many of which are now rental cabins). A Service ranger station (and later a Service guard station) once existed upon the East Trunk trail at its juncture in Big Timber Canyon which is now the Big Timber Canyon Picnic Area. Historically, forest rangers rode their work hitches on this trail system, administering public lands grazing allotments to private ranchers, managing mineral activity, putting up

timber sales, fighting fire, and maintaining public access for hiking, hunting and fishing.

37. The Sweet Grass trail runs from Sweet Grass Road (currently called "Rein Lane") and is approximately 10 miles in length. The trailhead for the Sweet Grass trail is located on private property in Section 2 (Township 4 North, Range 12 East). The Service has a "trailhead agreement" with the private landowners at this location. Pursuant to the agreement, the Service has a lock on a gate that crosses the road on their property and has built a facility (with an associated National Forest System sign) to allow for public access of pack and saddle stock and backpackers around the gate. The Service also constructed an unloading facility for the public at the trailhead and installed Service signs about use of the Sweet Grass trail.

38. Since the early 1900s, these four trails – the Porcupine Lowline trail, Elk Creek trail, East Trunk trail, and Sweet Grass trail – have been maintained, signed, managed and used by the Service for administrative and official purposes.

39. Since the early 1900s, these four trails have been used by the public for commercial (logging, grazing, wildlife tracking and

photography) and recreational activities, including hunting, fishing, hiking, snowshoeing, and/or skiing.

40. Every visitor map prepared for the Crazy Mountains by the Service, including the current map, depicts the four trails as National Forest trails open to the public.

41. In 1986, the location and use of the four trails was discussed, analyzed, and vetted with the public during preparation of the Gallatin National Forest Land and Resource Management Plan ("forest plan"). The forest plan depicts and recognizes all four trails as National Forest trails that are to be managed for public use and access.

### The 2006 travel plan

42. In 2006, the Service adopted the Gallatin Travel Management Plan ("travel plan"), which included the Crazy Mountains.

43. The travel plan amended the forest plan and provides direction for managing public access on National Forest System roads and trails.

44. In the travel plan, the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails were formally recognized as National Forest System trails to be managed for public use and access.

45. The travel plan designates all four trails in the Crazy Mountains for the "Emphasized" use of "hiking" "YEARLONG" and with "No Restrictions."

46. In the travel plan, the Porcupine Lowline trail's emphasized uses include mountain biking, stock, and hiking yearlong and with no restrictions. The Elk Creek trail's emphasized uses include motorcycles (closed September 15 to June 15) and mountain biking and hiking yearlong with no restrictions. The East Trunk trail's emphasized uses include stock and hiking yearlong with no restrictions. The Sweet Grass trail's emphasized uses include stock and hiking yearlong with no restrictions.

### *The landowners' challenge to the 2006 travel plan*

47. In 2006, area landowners administratively appealed the 2006 travel plan on the grounds that it illegally depicted National Forest trails across their private sections of land, including the four National Forest trails at issue here.

48. The landowners alleged that the Service has no easement interest in the four National Forest trails. The landowners said the Service cannot "create property interests for itself by depicting a trail on

a map or discussing an alleged trail in a traveling planning document, nor can the Forest Service legally exert rights that have never existed."

49. The Service denied the landowners appeal. The Service said the travel plan does not include a "complete laundry list" of all legal rights on each road or trail but that the Service chose to only identify those road and trails "that it believes there are sufficient rights, either perfected or historic, to rightfully show the designated public or administrative uses."

50. Following the Service's adoption of the travel plan, the landowners chose not to bring a Quiet Title Action pursuant to 28 U.S.C. § 2409a against the Service for depicting the four trails as National Forest trails open for public access. The 12 year statute of limitations has now run on the landowners' ability to bring a Quiet Title Action. 28 U.S.C. § 2409a(g).

51. In 2007, and instead of pursuing a Quiet Title Action, landowners joined a lawsuit filed by Citizens for Balanced Use against the Service for its approval of the travel plan. *Citizens for Balanced Use v. Heath*, 07-cv-0059-BLG-DWM (D. Mont. 2007) consolidated with *Montana Wilderness Association (MWA) v. McAllister,* 07-cv-0039-M-

DWM (D. Mont. 2007). The plaintiffs asserted that that the travel plan map's depiction of National Forest System trails across private land "for which no easement across private land had been obtained" violated the landowners' rights and caused conflict between the public users of such trails and the landowners. *See MWA*, 07-cv-0039-M-DMW (Doc. 43-1).

52. In 2007, the plaintiffs (and landowners) in *Citizens for Balanced Use* moved for a preliminary injunction to prevent the Service from depicting the National Forest System trails across private land segments where "no easement" exists.

53. On November 16, 2007, the Service filed a response with supporting declarations and explained that the Service "has easement rights on the trails in question" and that it is "perfectly within its rights" to reflect the trails on the travel plan maps. *MWA*, 07-cv-00039-DWM (Doc. 48-2 at 8). For support, the Service relied on a sworn declaration from Robert Dennee, the Lands Program Manager for the Gallatin National Forest and one of the authors of the travel plan. Mr. Dennee's sworn declaration explains that the Service has an "easement interest" in the National Forest System roads and trails depicted on the travel plan map. Mr. Dennee's sworn declaration explains that in

"situation where continued use of a historic road or trail access route is challenged or closed, Forest Service direction and policy is . . . to take actions necessary to protect existing access rights to [National Forest System] lands." Mr. Dennee's statements in his sworn declaration are consistent with Service direction in the forest plan and travel plan and Service policy.

54. In defending the travel plan, the Service explained that the National Forest System roads and trails depicted in the travel plan "were established in the late 1800s and early 1900s" and since that time "have been maintained, signed, managed and used for Forest Service management purposes and recreational activities."

55. In defending the travel plan, the Service said it "is the Forest Service's position that the United States, on behalf of the public, has an easement interest in these roads and trails due to the historic and ongoing public and administrative use and maintenance. The public is the beneficiary of this right of access and the Forest Service defends and maintains that right."

56. In defending the travel plan, the Service said that in the Gallatin National Forest, the Service chose to identify "the Porcupine-

Lowline trail system, as well as several other trail systems crossing

private lands, because the Forest Service believes the United States has

an 'easement interest' in this trail system."

57. In defending the travel plan, the Service said it has "a

responsibility" to manage the trail system in the Gallatin National

Forest and Crazy Mountains "under the Forest's Travel Management

Plan." Mr. Dennee's sworn declaration also stated that the Service "has

a responsibility to manage the trail system under the Forest's Travel

Management Plan."

58. On November 26, 2007, the Court denied the plaintiffs' request

for a preliminary injunction. *MWA*, 07-cv-00039-DWM (Doc. 53). The

Court agreed with the Service and held that the "mere fact that a

landowner disputes the presence of a prescriptive easement on his or

her property does not mean that the landowner is legally correct, and

[the plaintiffs] point[] to no authority for its apparent proposition that

the Forest Service should simply abandon use rights previously

acquired by the public." *Id.* at Doc. 53 at 26. The plaintiffs chose not to

pursue this claim further on summary judgment.

59. On September 30, 2008, the Court entered its final judgment

in the Service's favor on this public access claim. *MWA v. McAllister*,

2008 WL 11348231, \*17 (D. Mont. 2008). The Court upheld the Service's

position that it has an "easement interest" in the National Forest

System roads and trails identified in the travel plan and depicted on the

Service's travel plan maps.

### *The landowners' efforts to obstruct public access on the four trails*

60. Following the final decision on the National Forest trails in

*MWA v. McAllister*, landowners took active steps to attempt to obstruct

public access on the four National Forest trails in the Crazy Mountains.

61. On the Porcupine Lowline trail and Elk Creek trail, the

landowners illegally installed a locked gate and "private property," "no

forest service access" and "no trespassing" signs. The landowners also

removed National Forest System trail markers at the trailhead and on

the trail. The landowners removed the Service's "welcome to your

National Forest" signs on the trail and at the trailhead. The National

Forest System signs directing public to stay on the trails were also torn

down.

62. On the East Trunk trail, the landowners installed "no

trespassing signs," "smile you're on camera signs," and other signs

meant to intimidate forest users and Service employees. The landowners installed single stands of barbed wire rigged across the East Trunk trail that, according to Service reports, "would appear to have been meant as some sort of surprise booby trap." One such wire was of a blue color and difficult to see in certain light. At the trailhead to the East Trunk trail, the landowners put up a locked gate to try and restrict access to the trail. On the East Trunk trail, landowners removed the National Forest System trail signs and blazes.

63. On the Sweet Grass trail, the landowners and/or their agents removed the National Forest System signs and information at the trailhead about allowable uses of the Sweet Grass trail. On the Sweet Grass trail the landowners insist that members of the public first obtain permission and "sign in" prior to being allowed to use the trail. The landowners have installed a sign at the trailhead misleading the public to believe that the Sweet Grass trail is not a National Forest System trail.

64. Despite the illegal efforts by the landowners to obstruct access to the trails, the Plaintiffs and other members of the public continued to use the trails.

65. The Service was aware of the landowners' efforts to obstruct public access on the four National Forest trails in the Crazy Mountains.

66. Up until 2017, the Service actively pushed back on the landowners' attempts to obstruct public access on the Porcupine Lowline, Elk Creek, East Trunk, and Sweetgrass trails.

67. Up until 2017, the Service removed landowner signs and repaired and replaced National Forest trail facilities, signs, and trail markers. The Service informed members of the public that the four National Forest trails were open for public access and that there was no need to ask for permission or "sign in" to use the trails.

68. Up until 2017, the Service actively maintained and managed the four National Forest trails.

69. Up until 2017, the Service used the four trails for administrative and official purposes.

***The removal of the Service's District Ranger***

70. In June 28, 2016, the District Ranger for Service's Yellowstone Ranger District sent an internal e-mail to staff doing seasonal work in the Crazy Mountains. The District Ranger informed Service staff to "NEVER ask permission" to use and access National Forest System

roads and trails depicted on Gallatin forest and travel maps, including the two west-side trails (and other trails) in the Crazy Mountains. The District Ranger emphasized that "[w]hatever past [District Rangers] or colleagues have said. I am making it clear. DO NOT ASK permission and DO NOT ADVISE [the] public to ask permission. These are historic public access routes. By asking permission, one undermines public access rights and plays into their lawyers' trap of establishing a history of permissive access."

71. This internal e-mail from the District Ranger was later posted publicly by a non-profit organization on its Facebook site. The public posting of this e-mail message generated opposition from landowners who sent objection letters to the Service, the Secretary of Agriculture, and Senator Steve Daines.

72. In December, 2016, landowners wrote the Service (and cc'd the Regional Forester, Senator Tester, Senator Daines, and then Representative Zinke) urging the Agency to reprimand the District Ranger for the June, 2016 e-mail.

73. In January, 2017, landowners (through the Montana Farm Bureau Federation) wrote Senator Daines and attached a copy of the

facebook post that included the District Ranger's seasonal help directions e-mail. The landowners asked Senator Daines to put an end the "over-reach" of the District Ranger.

74. In May, 2017, Senator Daines drafted a letter to the Service Chief requesting information from the Service on its policy "for disputed access points near the Crazy Mountains." Senator Daines requested answers to four specific questions, recognized the importance of access to public lands, and stressed the importance of protecting "private property rights" and working "with willing landowners" in facilitating access. Senator Daines concluded his letter by emphasizing that "[p]rivate property rights are of the utmost importance, and ensuring we equally respect all stakeholders involved will only serve to strengthen the reputation of [the Service]."

75. On June 16, 2017, the Service's District Ranger for the Yellowstone District who authored the e-mail (posted by the organization on their Facebook page) was removed from his post. He was eventually restored to his post after completion of an internal investigation.

76. In the summer of 2017, the Service stopped pushing back on

the landowners' efforts to obstruct the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails in the Crazy Mountains.

77. In the summer of 2017, the Service decided to no longer repudiate the landowners' illegal efforts to obstruct public access on the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails as it had done in previous years.

### The Service's Crazy Mountain working group

78. In the summer of 2017, and after the District Ranger was removed from his post, the Service formed the Crazy Mountain working group.

79. The Crazy Mountain working group was formed to discuss public access issues in the Crazy Mountains, including management of the Porcupine Lowline, Elk Creek, East Trunk, and Sweetgrass trails.

80. The Crazy Mountain working group includes representatives from the Service, area landowners, a few local citizens, representatives from certain selected organizations, and a representative from the State of Montana.

81. The Crazy Mountain working group provides consensus advice and/or recommendations to the Service regarding its management of

National Forest trails in the Crazy Mountains, including the Porcupine

Lowline, Elk Creek, East Trunk, and Sweetgrass trails.

82. The Crazy Mountain working group's meeting are by invite

only and are not open to the public. The Crazy Mountain working

group's meeting notes, agendas, and other documents are not shared

with or provided to the public.

***The Porcupine Ibex trail project***

83. On August 15, 2018, the Service approved the Porcupine Ibex

trail project ("Ibex project"). The Ibex project emerged from the Crazy

Mountain working group, which claims the project will resolve public-

private land conflicts on the west-side of the Crazy Mountains.

84. The Ibex project includes two components: (1) an exchange of

easement interests; and (2) new trail construction and the obliteration

of portions of existing trails.

85. The Ibex project's easement exchange includes the Service's

plan to secure a new easement from a landowner for a small slice of

Section 15 (Township 4 North and Range 10 East) to accommodate a

small portion of new trail in exchange for relinquishing its (and the

public's) easement interests on portions of the Porcupine Lowline and

Elk Creek trails in Sections 15, 22, 27, 34, and 35 (Township 4 North and Range 10 East).

86. The Service represented to the public in its March 1, 2018 scoping notice for the Ibex Project that the Service would only complete the exchange and relinqish interests to the current trail "[o]nce the new (Porcupine Ibex) trail is completed . . ."

87. On September 20, 2019, shortly after the Plaintiffs filed their September 6, 2019 Amended Complaint and at the very beginning of work on the project, the Service, in accordance with the Ibex project, exchanged the easement interests at issue with the private landowners.

88. On September 20, 2019, the Service released "any easement interests [the United States] may have in the Porcupine Lowline Trail No. 267 and North Fork Elk Creek Trail No. 195" to the M Hanging Lazy 3 LLC ("Lazy 3 LLC"), a Montana LLC located in Wilsall, Montana. On the same day, and in accordance with the Ibex project, Lazy 3 LLC granted to the United States of America a public easement over land across which the new Ibex trail will pass.

89. On September 20, 2019, the Service also released "any easement interests it may have in the Porcupine Lowline Trail No. 267"

to Henry Guth Incorporated, which is located at the same address in Wilsall, Montana as MLH3. On the same day, and in accordance with the Ibex project, Henry Guth, Incorporated granted to the United States of America a public easement over land across which the new Ibex trail will pass.

90. In the easement exchange with Lazy 3 LLC and Henry Guth, Incorporated, the Service released its (and the public's) interests in 7.75 miles of trail in Sections 15, 22, 27, 34, and 35 (Township 4 North and Range 10 East). In the exchange, Henry Guth conveyed a public easement for a short section of the new Porcupine Ibex trail in part of Section 35 (Township 4 North and Range 10 East), and Lazy 3 LLC conveyed a public easement for short trail segments in Sections 11, 15, and 22. Combined, the length of trail easements coveyed by Henry Guth, Incorporated and Lazy 3 LLC are much shorter than the length of the trail easement interests released by the Service.

91. The interests to the Porcupine Lowline trail (No. 267) and Elk Creek trail released by the Service on September 20, 2019, as part of the Ibex project are the same easement interests at issue in this case and were "Approved as to Consideration, Description, and Conditions"

30

by the Service, including Defendant Mary Erickson, Forest Supervisor
for the Custer-Gallatin National Forest.

92. The small portions of Sections 11, 15, and 35 which the
landowners conveyed to the Service in the exchange already are covered
by a recorded (written) railroad "easement in the public" for the current
and longstanding portion of the Porcupine-Lowline trail that traverses
those Sections.

93. The Ibex project's trail construction includes constructing
approximately eight miles of new trail (open for mountain bike, stock,
and hiking), largely on National Forest System lands. The new trail will
be located in a forested portion of the Gallatin National Forest, at
higher elevation and includes new switchbacks and stream crossings.
The Ibex project's new eight-mile mountain bike trail will require use of
an excavator to construct and clear a roughly eight-foot wide section of
trail and switchbacks in undisturbed forested lands, installing culverts
for stream crossings, and blasting and hammering to clear "numerous
sections" of surface rock. As part of the Ibex project, the Service will
also obliterate large portions of the Porcupine Lowline and Elk Creek
trails.

*The east-side trail decision*

94. In the summer of 2017, and following meetings with the Crazy Mountain working group, the Service decided to no longer manage and maintain the East Trunk trail and Sweet Grass trail as National Forest System trails. The Service decided to no longer remove illegal gates or barriers across the trails and/or insist that the landowners do so on the East Trunk trail and Sweet Grass trail. The Service decided not to remove the illegal signs. The Service decided not to repair and/or reinstall National Forest System signs on the trails and at the trailheads (which had previously been designed and ordered). The Service said it was now attempting to "resolve the access issues" related to the trail "to the satisfaction [of] all involved."

## FIRST CAUSE OF ACTION
## (FACA violation – Crazy Mountain working group)

95. Plaintiffs incorporate all preceding paragraphs.

96. FACA imposes a number of procedural requirements on "advisory committees" which are defined as any committee or "similar group" which is "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government . . ." 5 U.S.C. app. 2

§3(2).

97. FACA was enacted to ensure that such advisory committees be subject to uniform standards and procedures and that Congress and the public remain apprised of their existence, activities, costs, and decisions.

98. FACA requires that all advisory committees file a charter, give advance notice of any meeting, hold all meetings open to the public, and keep minutes and other records of those meetings. 5 U.S.C. app. 2 §§ 9(c), 10(a), 10(c).

99. FACA mandates that unless an exception under FOIA applies, the "records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying . . ." 5 U.S.C. app. 2 § 10(b).

100. FACA requires that each advisory committee be "fairly balanced in terms of points of view represented and the functions to be performed" and not be "inappropriately influenced by the appointing authority or by any special interest." 5 U.S.C. app. 2 §§ 5(b)(2), (b)(3).

101. The Service's Crazy Mountain working group qualifies as an

"advisory committee" subject to FACA.

102. The Crazy Mountains working group was established by the Service. The Service utilizes, controls, and/or manages the Crazy Mountain working group. The Service exercises actual management and control over the Crazy Mountain working group. The Service decides membership of the Crazy Mountain working group. The Service sets the meetings and agendas for the Crazy Mountain working group and controls messaging.

103. The Service's Crazy Mountain working group includes non-federal members. The Crazy Mountain working group provides the Service with consensus advice and/or recommendations. The Crazy Mountain working group provided the Service with consensus advice and/or recommendations about how and whether to manage the four National Forest trails at issue in this case. The Crazy Mountain working group provided the Service with consensus advice and/or recommendations about the Ibex project. The Crazy Mountain working group provided the Service and is still providing the Service with consensus advice and/or recommendation about managing the East Trunk and Sweet Grass trails.

104. The Service's decision(s) with respect to the four trails, including its approval of the Ibex project and decision to stop managing the East Trunk and Sweet Grass trails as National Forest trails emerged from the Crazy Mountain working group.

105. The Crazy Mountain working group is not open to the public. The Crazy Mountain working group is not open to Plaintiffs. Membership in the Crazy Mountain working group is by invitation only.

106. The Service never gave advance notice of the Crazy Mountain working groups meetings. The Crazy Mountain working group did not keep and share records of its meetings with the public. The Crazy Mountain working group does not share or provide records, reports, minutes, agendas, studies, or other documents with the public. The Crazy Mountain working group is not balanced in terms of the points of view represented. The Crazy Mountain working group is in appropriately influenced by special interests, including landowners.

107. The Service's failure to comply with FACA when establishing the Crazy Mountain working group is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C.

§§ 706(2)(A) and 706(1).

## SECOND CAUSE OF ACTION
### (NEPA violation – no CE, EA, or EIS – Ibex project)

108. Plaintiffs incorporate all preceding paragraphs.

109. NEPA requires to Service to carefully analyze and consider the environmental impacts of (and alternatives to) its decisions before they are made and before actions are taken. NEPA's "purpose is not to generate paperwork – even excellent paperwork – but to foster excellent action." 40 C.F.R. §1500.1(c).

110. The NEPA process begins with "scoping" which is required for all proposed Service actions. 36 C.F.R. § 220.4(e)(1). Scoping involves soliciting public review and comment on a proposed action early on and in order to determine "the scope of the issues to be addressed and for identifying the significant issues related to the proposed action." 40 C.F.R. §1501.7.

111. NEPA's scoping process assists the Service in determining whether the proposed action: (1) qualifies for a categorical exclusion ("CE") pursuant to the Service's regulations and policy (Forest Service Handbook ("FSH") 1909.15); (2) qualifies for preparation of an environmental assessment ("EA") to carefully evaluate the

36

"significance" of the effects of the proposed action; or (3) qualifies for preparation of a more robust environmental impact statement ("EIS").

112. On March 1, 2018, the Service initiated 30-day public scoping under NEPA for the Ibex project.

113. Plaintiffs and other members of the public submitted timely comments during the 30-day scoping period.

114. On August 15, 2018, the Service released a letter notifying the public that it decided to cancel the NEPA process and proceed with the Ibex project in the absence of any additional environmental analysis. The Service said it would not prepare a CE, EA, or EIS for the Ibex project. The Service said the Ibex project was already covered by "two past environmental analyses," including the 2006 EIS for the travel plan and a 2009 forest-wide EA for projects designed to implement the travel plan.

115. The Ibex project – as approved by the Service in August, 2018 (including the easement exchange and location and design of the new eight mile trail) – is not discussed, disclosed, or analyzed in the 2006 EIS for the travel plan.

116. The Ibex project – as approved by the Service in August, 2018

(including the easement exchange and location and design of the new eight mile trail) – is not discussed, disclosed, or analyzed in the 2009 Forest-wide EA. The 2009 Forest-wide EA contemplates moving portions of the Porcupine Ibex trail onto National Forest lands but provides no details on the location, design, length or impacts of the new trail (nor any information on the easement exchange).

117. The Service's determination that the Ibex project is already addressed and analyzed in the 2006 EIS for the travel plan and/or 2009 Forest-wide EA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A).

118. The Service's decision and/or failure to complete NEPA document and analysis (CE, EA, or EIS) for the Ibex project as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

### THIRD CAUSE OF ACTION
### (NEPA violation – environmental impacts – Ibex project)

119. Plaintiffs incorporate all preceding paragraphs.

120. NEPA requires to Service to carefully analyze and consider

the environmental impacts (direct, indirect, and cumulative) of a
proposed action.

121. Direct effects are caused by the action and occur at the same
time and place. Indirect effects are caused by the action but occur later
in time or are farther removed in distance but are still reasonably
foreseeable. Cumulative effects are the impact on the environment
which results from the incremental impact of the action when added to
other past, present, and reasonably foreseeable future actions
regardless of what agency or person undertakes such other actions.
Cumulative impacts can result from individually minor but collectively
significant actions taking place over a period of time.

122. The Service did not analyze the direct, indirect, or cumulative
effects of the Ibex project. The Service did not analyze the direct,
indirect, or cumulative effects of the easement exchange. The Service
did not analyze the direct, indirect, or cumulative impacts of
constructing eight miles of new mountain bike, stock, and hiking trail
on National Forest System lands in the project area, including within
dense forested land and across sensitive streams occupied by native
trout.

123. The Service's decision and/or failure to analyze the direct, indirect, and cumulative impacts of the Ibex project as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## FOURTH CAUSE OF ACTION
### (NEPA violation – alternatives – Ibex project)

124. Plaintiffs incorporate all preceding paragraphs.

125. NEPA requires to Service to evaluate a reasonable range of alternatives that would meet the purpose and need of the proposed action.

126. In approving the Ibex project, the Service failed to evaluate a reasonable range of alternatives that would meet the purpose and need of the project. The Service failed to evaluate a reasonable range of alternatives to the easement exchange. The Service failed to evaluate a reasonable range of alternative locations and/or designs of the new trail construction.

127. The Service's decision and/or failure to evaluate a reasonable range of alternatives to the Ibex project as required by NEPA is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law" and/or constitutes "agency action unlawfully

withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## FIFTH CAUSE OF ACTION
### (NEPA/APA – Ibex project)

128. Plaintiffs incorporate all preceding paragraphs.

129. NEPA requires the Service to adequately consider and

disclose all aspects of its proposed decision. The Service must insure

that all relevant information is available to the public and officials

before decisions are made and actions taken. 40 C.F.R. § 1500.1.

130. NEPA compliance is reviewed under the APA. Agency

decisions under the APA are arbitrary and should be set aside and

reversed if the agency failed to consider and disclose an important

aspect of a proposed action.

131. The portions of the Porcupine Lowline and Elk Creek trail

that are the subject of the easement exchange for the Ibex project are

covered by recorded (written) easements from the Northern Pacific

Railway. When the Northern Pacific Railway transferred title the deed

expressly reserved "an easement in the public" for "any public roads

heretofore laid out or established, and now existing over and across any

part of the premises." The reference to "public roads" in the Northern

Pacific Railway grant refers to public rights-of-way that existed in those sections at the time the conveyance was made. The Porcupine Lowline and Elk Creek trail were public rights-of-way that existed at the time the Northern Pacific Railway conveyance was made.

132. The public has a recorded (written) easement from the Northern Pacific Railway to use the Porcupine Lowline trail in Sections 15, 35 and on portions of the Elk Creek trail in Section 15 (all within Township 4 North and Range 10 East).

133. In approving the Ibex project, including the easement exchange, the Service never considered, disclosed to the public, or discussed the recorded (written) easements from the railroad grants.

134. The Service's decision and/or failure to consider, disclose to the public, or discuss the recorded (written) easements from the railroad grants is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## SIXTH CAUSE OF ACTION
### (FLPMA violation – easement exchange - Ibex project)

135. Plaintiffs incorporate all preceding paragraphs.

136. FLPMA requires the Service to determine that the public interest will be "well served" by an exchange in interests in land before approving such exchange. 43 U.S.C. § 1716(c); 36 C.F.R. § 254.3(b). The Service must consider a number of factors when making a public interest finding in support of an exchange. 36 C.F.R. § 254.3(b)(1)

137. FLPMA requires the Service to appraise the land or interest in land included in an exchange before agreeing to the exchange. 43 U.S.C. § 1716(d)(1). The appraisal must set forth an opinion regarding the market value of the interests that are the subject of the exchange. 36 C.F.R. § 254.9(b). In determining the market value, the appraiser shall determine the highest and best use of the property to be appraised, estimate the value of the lands and any interests, and include historic, wildlife, recreation, wilderness, scenic, cultural, or other resource values or amenities in its estimate. 36 C.F.R. § 254.9(b)(1).

138. The Service's regulations implementing FLPMA requires the Service to prepare an environmental analysis in accordance with NEPA after "an agreement to initiate an exchange is signed" by the Service. 36 C.F.R. § 254.3(g). In making this analysis, the Service "shall consider

timely written comments received in response to the exchange. . ." *Id.*

139. FLPMA allows for the exchange of lands which are "of approximately equal value" so long as a determination is made that the exchange is in the public interest, the value of lands to be conveyed out of Federal ownership is not more than $150,000 (based on a statement of value prepared by the appraiser), the interests in land to be exchanged are in a substantially similar in location, acreage, use and physical attributes, and there are no elements requiring complex analysis. 43 U.S.C. § 1716(h); 36 C.F.R. § 254.11.

140. In authorizing the easement exchange for the Ibex project, the Service never considered the relevant factors and made a public interest finding required by FLPMA and the Service's implementing regulations.

141. In authorizing the easement exchange for the Ibex project, the Service never conducted an appraisal of the interests in land subject to the exchange. The Service never obtained an opinion regarding the market value of the interests subject to the exchange.

142. In authorizing the easement exchange for the Ibex project, the Service never undertook an environmental analysis in accordance

with NEPA.

143. The Service's failure to comply with FLPMA when authorizing an easement exchange for the Ibex project is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## SEVENTH CAUSE OF ACTION
### (NFMA violation – non-compliance with travel rule and travel plan – Ibex project and eastside trails)

144. Plaintiffs incorporate all preceding paragraphs.

145. Pursuant to NFMA, all resource decisions, projects, and actions and/or inactions must be consistent with the forest plan. 16 U.S.C. § 1604(i). The 2006 travel plan and record of decision approving the travel plan is an amendment to the forest plan. The Service must comply with obligations included (and commitments made) in its travel plan and record of decision approving the travel plan. *Id.*; 40 C.F.R. § 1505.3 (NEPA regulation).

146. The travel rule directs the Service to manage and maintain all National Forest System trails identified in the travel plan according to their specific uses (and seasons of use). 36 C.F.R. §§ 212.50 to 212.57.

147. The forest plan and travel plan identifies the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails as National Forest System trails.

148. The travel plan and record of decision approving the travel plan directs the Service to manage and maintain the four National Forest trails for their designated or "Emphasized" uses. In the travel plan and record of decision approving the travel plan the Service commits itself to manage and maintain each National Forest System trail for their designated or "Emphasized" uses.

149. The travel plan and record of decision approving the travel plan identifies the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails for the "Emphasized" use of "hiking" "YEARLONG" and with "No Restrictions." The Porcupine Lowline trail is also depicted on the Service's Motor Vehicle Use Map (MVUM).

150. The Service's August, 2018 decision to approve the Ibex project conflicts with the Service's travel plan, decision approving the travel plan, and MVUM. Pursuant to the Ibex project (and as a result of the easement exchange) portions of the Porcupine Lowline and Elk Creek trails will no longer be managed for their designated and

Emphasized uses. The Service has not amended the travel plan or MVUM.

151. The Service's 2017 decision to no longer manage the East Trunk and Sweet Grass trails as National Forest trails conflicts with the Service's travel plan and decision approving travel plan.

152. The Service's decision and/or failure to comply with its own travel plan, decision approving the travel plan, travel rule, and MVUM is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## EIGHTH CAUSE OF ACTION
**(Violation of NFMA – failure to protect existing access rights – Ibex project and eastside trails)**

153. Plaintiffs incorporate all preceding paragraphs.

154. Pursuant to the travel rule, the "use of existing National Forest System roads and trails shall be permitted for all proper and lawful purposes subject to the rules and regulations governing the lands and the road or trails to be used." 36 C.F.R. § 212.6(c)

47

155. The forest plan, travel plan, and record of decision approving the travel plan state that the Service will "protect existing access rights" on National Forest System trails.

156. The forest plan, travel plan and record of decision approving the travel plan states the Service will provide and maintain public access to National Forest lands on National Forest System roads and trails.

157. The travel plan and record of decision approving the travel plan states that the Service will protect public and/or administrative access rights on specific trails, including the Porcupine Lowline, Elk Creek, East Trunk trail and Sweet Grass trail.

158. The Service is not protecting existing access rights on the four National Forest trails. The Service is failing to protect existing access rights on the four National Forest trails.

159. In 2018, and when approving the Ibex project, the Service decided to not protect existing access rights on the Porcupine Lowline and Elk Creek trails. In 2017, and following meetings with the Crazy Mountain working group, the Service decided not to protect existing access rights on the East Trunk trail and Sweet Grass trail. The Service

said it would only protect existing access rights on the two trails if it could reach a "mutual agreement" to do so with the landowners.

160. The Service previously stated that, in accordance with its own direction and policy, it would protect existing access rights on the four National Forest trails as required by the travel rule and travel plan. The Service did not provide a reasonable explanation for its change in position in 2017 and 2018. The Service did not explain how its actions and/or inactions with respect to the four trails complies with the travel rule and travel plan's direction to protect existing access rights.

161. The Service's decision and/or failure to protect existing access rights on the four National Forest trails as required by the travel rule, travel plan (and forest plan), and record of decision approving the travel plan is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A) and 706(1).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

A. Declare the Service has violated and continues to violate the

law, including FACA, NEPA, NFMA, and FLPMA, as alleged herein;

B. Remand this matter back to the Service with direction to comply with the law (including the Service's own travel plan), as alleged herein;

C. Vacate the Service's decision approving the Ibex project and void the property transaction (easement exchange) that occurred while this case was pending and any additional or future easement exchanges (that may occur while this case is pending);

D. Direct the Service to take steps to restore and repair any on-the-ground damage caused by construction of the Ibex project while this case was pending;

E. Direct the Service to take affirmative steps to manage and maintain the Porcupine Lowline, Elk Creek, East Trunk and Sweet Grass trails as National Forest trails and prepare and submit a plan for court approval outlining when, where, and how it will do so;

F. Direct the Service to take reasonable and prudent steps to remove any and all illegal gates, obstructions and/or misleading markers and/or signs on or impacting public use of the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails within sixty

(60) days of this Court's order;

G. Direct the Service to take reasonable and prudent steps to repair and/or reinstall National Forest facilities, trail signs and markers at the Porcupine Lowline, Elk Creek, East Trunk, and Sweet Grass trails within sixty (60) days of this Court's order;

H. Retain continuing jurisdiction of this matter pending the Service's compliance with this Court's order;

I. Award Plaintiffs their reasonable attorneys' fees, costs and expenses of litigation pursuant to the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412;

J. Issue any other relief that Plaintiffs may subsequently request; and

K. Issue any other relief this Court deems necessary, just, or proper.

Respectfully submitted this 18th day of November, 2020.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Michael Kauffman
Michael Kauffman

*Counsel for Plaintiffs*