Matthew K. Bishop
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
406-324-8011
bishop@westernlaw.org

Michael A. Kauffman
DRAKE LAW FIRM, P.C.
111 North Last Chance Gulch
Suite 3J, Arcade Building
Helena, MT 59601
406-502-1668
michael@drakemt.com

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, et al., | 19-CV-00066-SPW-TJC |
| Plaintiffs, | |
| vs. | REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |
| MARY ERICKSON, in her capacity as Forest Supervisor for the Custer-Gallatin National Forest, et al., | |
| Federal-Defendants. | |

TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................iii

LIST OF ATTACHMENTS ................................................................viii

ARGUMENT .................................................................................... 1

A.   The Ibex project violates FLPMA .................................... 1

    1.   No post-hoc rationalizations .................................... 2

    2.   Judicial estoppel applies .......................................... 5

    3.   The Forest Service already determined it had valid
        easement interests in the two trails that needed to be
        released..................................................................... 7

    4.   The Forest Service's easement interests in the two
        trails are not "interests in private land"................................ 16

B.   The Ibex project was never evaluated and analyzed in a
    NEPA document.............................................................. 20

    1.   The Ibex project is not discussed or analyzed in the
        2006 EIS ................................................................. 21

    2.   The Ibex project is not discussed or analyzed in the
        2009 EA ................................................................... 22

    3.   There was no decision and no claims to exhaust................... 28

C.   The Ibex project violates the travel plan (which amended
    and replaced the forest plan) ........................................... 33

D.   The Forest Service is failing to protect public access on the
    two east-side trails as required by the travel rule, travel
    plan, and the agency's own policies ................................. 38

i

CONCLUSION ........................................................................... 43

CERTIFICATE OF COMPLIANCE...................................................... 44

## TABLE OF AUTHORITIES

CASES:

*Alliance for the Wild Rockies v. Savage,*
    897 F.3d 1025 (9th Cir. 2018)..............................................................30

*Alliance for the Wild Rockies v U.S. Forest Service,*
    907 F.3d 1105 (9th Cir. 2018)..............................................................35

*Arrington v. Daniels,*
    516 F.3d 1106 (9th Cir. 2008)................................................................3

*Bennett v. Spear,*
    520 U.S. 154 (1997)..............................................................................28

*Bitterroot Ridge Runners v. U.S. Forest Service,*
    329 F. Supp. 3d 1191 (D. Mont. 2018)..................................................38

*Blue Mountains Biodiversity Project v. Blackwood,*
    161 F.3d 1208 (9th Cir. 1998)..............................................................21

*Cleveland v. City of Los Angeles,*
    420 F.3d 981 (9th Cir. 2005)................................................................37

*Ctr. for Biological Diversity v. Zinke,*
    900 F.3d 1053 (9th Cir. 2018)..............................................................14

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
    140 S. Ct. 1891 (2020)..............................................................2, 3, 15

*Fed. Power Comm'n v. Texaco, Inc.,*
    417 U.S. 380 (1974)................................................................................4

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985)................................................................................4

*Frank Lyon Co. v. United States,*
    435 U.S. 561 (1978) ............................................................... 15

*Friends of Animals v. Sparks,*
    200 F. Supp. 3d 1114 (D. Mont. 2016) ......................................... 37, 42

*Hamilton v. State Farm Fire & Cas. Co.,*
    270 F.3d 778 (9th Cir. 2001) ........................................................ 5, 7

*Hunters v. Marten,*
    470 F. Supp. 3d 1151 (D. Mont. 2020) ............................................. 4

*Idaho Sporting Congress v. Alexander,*
    222 F. 3d 562 (9th Cir. 2000) ...................................................... 29

*Leisnoi, Inc. v. United States,*
    170 F.3d 1188 (9th Cir. 1999) ..................................................... 18

*Meine v. Hren Ranches, Inc.,*
    378 Mont. 100 (2015) ................................................................. 9

*Montana Wilderness Ass'n v. McAllister,*
    CV-07-39-DWM, 2008 WL 11348231 (D. Mont. 2008) .............. 6, 7, 34

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ..................................................................... 3

*Norton v. Southern Utah Wilderness Alliance,*
    542 U.S. 55 (2004) ................................................................ 42, 43

*Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
    625 F.3d 1092 (9th Cir. 2010) ...................................................... 15

*Organized Village of Kake v. U.S. Dep't of Agriculture,*
    795 F.3d 956 (9th Cir. 2015) ......................................................... 5

*State By & Through Montana State Fish & Game Comm'n v. Cronin,*
    179 Mont. 481, 587 P.2d 395 (1978) ............................................. 32

*Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,*
    608 F.3d 592 (9th Cir. 2010)......................................................24, 25

*U. S. Forest Serv. v. Cowpasture Preservation Ass'n,*
    140 S. Ct. 1837 (2020)..................................................................19, 20

*United States v. Smith & Dew, Inc.,*
    No. 7:16-CV-00334, 2018 WL 2670067 (W.D. Va. June 4, 2018).......40

*United States v. Tellstrom,*
    2013 WL 1499491 (E.D. Cal. Apr. 11, 2013) ......................................40

*Wild River Adventures, Inc. v. Bd. of Trustees of Sch. Dist. No. 8 of
Flathead Cty.,*
    248 Mont. 397 (1991) ...................................................................9, 32

*Wonder Ranch LLC v. United States,*
    2016 WL 6237196 (D. Mont. 2016)...............................................10, 35

STATUTES:

16 U.S.C §§ 521c-521i..............................................................................17

16 U.S.C. § 521d ......................................................................................17

16 U.S.C. § 1604 (f)(4) .......................................................................33, 37

16 U.S.C. § 1604 (i) ..................................................................................33

16 U.S.C. § 1716 .......................................................................................17

16 U.S.C. § 1716(a)...................................................................................18

40 U.S.C. § 101 .........................................................................................19

40 U.S.C. §§ 541–545................................................................................19

43 U.S.C. § 1715 (a) ................................................................. 1

43 U.S.C. § 1716 (a) ............................................................. 1, 2

43 U.S.C. § 1716(d)(1) .......................................................... 1

REGULATIONS:

36 C.F.R. § 212.54 ....................................................... 6, 33, 37

36 C.F.R. § 212.55(d) ...................................................... 13, 34

36 C.F.R. § 212.6 ................................................................. 40

36 C.F.R. § 212.6(b) ........................................................... 40

36 C.F.R. § 212.6(c) .................................................. 39, 40, 41

36 C.F.R. § 220.4(e) ........................................................... 29

36 C.F.R. § 254 .................................................................. 17

36 C.F.R. § 254.1(a) ........................................................... 17

36 C.F.R. § 254.1(b) ........................................................... 17

36 C.F.R. § 254.2 ............................................................... 17

36 C.F.R. § 254.3(b) ............................................................. 1

36 C.F.R. § 254.3(b)(1) ...................................................... 18

36 C.F.R. § 254.8 ................................................................. 1

36 C.F.R. § 254.9 ................................................................. 1

36 C.F.R. § 254.11 ............................................................................... 1

36 C.F.R. § 254.31 ........................................................................ 1, 15

40 C.F.R. § 1501.7 .............................................................................. 29

40 C.F.R. § 1508.25 ............................................................................ 27

41 C.F.R. § 102.75.936.................................................. 3, 5, 8, 13, 14, 19

41 C.F.R. § 102.75.937.................................................. 5, 8, 13, 14, 16, 19

41 C.F.R. § 102.75.938.................................................. 5, 8, 13, 14, 19

FEDERAL REGISTER:

70 Fed. Reg. 67786 (November 8, 2005) ................................................ 19

70 Fed. Reg. 68264 (November 9, 2005) ................................................ 13

LIST OF ATTACHMENTS

Exhibit 10          Forest Service Handbook (FSH) 5409.13, Land
                    Acquisition Handbook, Chapter 30 (Land Exchanges)

Exhibit 11          Declaration of Ned Zimmerman, *Montana Wilderness
                    Ass'n v. McAllister*, 07-cv-0039-DWM (D. Mont.
                    2008)(Doc. 43-8).

Plaintiffs submit this response to the Forest Service's and landowners' cross-motions for summary judgment (Docs. 81, 85) and reply in support of its motion for summary judgment (Doc. 78).

## ARGUMENT

**A.   The Ibex project violates FLPMA**.

An exchange in land or interests in land is as a "discretionary, voluntary transaction involving mutual transfers of land or interests in land between . . . the Forest Service and a non-federal entity." 36 C.F.R. § 254.31. Before authorizing an exchange of interests in land, i.e., an exchange of easement rights-of-way, water, timber, or mineral interests, FLPMA requires the Forest Service make a public interest determination, appraise and value the exchange, provide public notice and comment, and complete an environmental analysis. 43 U.S.C. §§ 1716 (a), 1716(d)(1); 36 C.F.R. §§ 254.3(b), 254.8, 254.9, 254.11; *see also* Exhibit 10 at 11 (Forest Service Handbook (FSH) 5409.13).

In this case, FLPMA's exchange requirements were triggered by the Ibex project because the Forest Service acquired easement interests from the landowners by donation under section 205 of FLPMA, 43 U.S.C. § 1715 (a), *in exchange* for agreeing to release of its easement

interests in two National Forest trails as provided by section 206 of FLPMA, 43 U.S.C. § 1716 (a). AR-5483–5384.

In response, the Forest Service and landowners concede FLPMA's requirements were not complied with before this exchange occurred. According to the Forest Service, while there was purportedly "*some kind* of exchange between the parties" that was "causally related," it was not an exchange involving easement interests because the agency does not own such an interest in the two trails. Doc. 82 at 12-13. And the landowners assert the Forest Service had no easement interests in "federal land" to release. This Court should reject these arguments for four reasons.[1]

### 1.    No post-hoc rationalizations.

Judicial review of agency action "is limited to the grounds that the agency invoked when it took the action." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907 (2020). Courts

---

[1] The landowners pursue a number of alternative theories for why FLPMA does not apply but all are outside the scope of this case. The landowners insist there is no deeded easement on the trails but a deeded easement is not required to have a valid easement interest. *See infra* section A.3. The landowners maintain the Forest Service never established a prescriptive easement but the agency already determined it did. The landowners raise a Fifth Amendment takings claim but no "taking" of private lands is implicated by this case.

look to the record to determine whether the agency has articulated a rational basis for its decision, *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008), and the agency action must be upheld, if at all, on the basis articulated by the agency itself. *Motor Vehicle Mfrs. Ass'n v. State Farm,* 463 U.S. 29, 50 (1983).

This is why post-hoc rationalizations put forth by agency counsel for the first time in briefing "cannot substitute for the agency's own articulation of the basis for its decision." *Arrington*, 516 F. 3d at 1113. Courts must reject impermissible "post hoc rationalization[s]" or justifications "belatedly advanced by advocates." *Dep't of Homeland Sec.*, 140 S. Ct. at 1908–09. This ensures the explanations provided are "not simply 'convenient litigating position[s].'" *Id.* at 1909.

Here, the record reveals the Forest Service designated the two trails as public, National Forest trails in the 2006 travel plan because it firmly believed it had a legally valid easement interest in the trails that needed to be formally released pursuant to 41 C.F.R. §102.75.936 in order to finalize the Ibex project. AR-4996. This is the basis articulated by the Forest Service at the time it made its decision and the only basis which may be considered in determining whether the agency's action

3

should be upheld. *Fed. Power Comm'n v. Texaco, Inc.,* 417 U.S. 380, 397 (1974). "The basic rule here is clear: An agency must defend its actions based on the reasons it gave when it acted." *Id.* If the record "does not support the agency action . . . or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it" then the proper course is to vacate the decision and remand it back to the agency. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

This Court should therefore reject the Forest Service's new theory that it has no easement interests in the Porcupine Lowline (No. 267) and Elk Creek (No. 195) trails. This is a post hoc rationalization that runs counter to evidence in the record. *Hunters v. Marten*, 470 F. Supp. 3d 1151, 1170 n. 9 (D. Mont. 2020). Indeed, just like the post-hoc rationalization in *Hunters*, this argument appears for the first time in the Forest Service counsel's briefs and a new extra-record declaration (Doc. 83-1) and is nowhere found in the Ibex decision documents or record.[2] The Forest Service has also failed to provide a reasonable

---

[2] The Forest Service submitted two post-hoc, extra-record declarations (Docs. 83-1, 83-3) that should be struck. In one, the agency attempts to explain why it failed to comply with FLPMA but in so doing actually

explanation for its change in position on its easement interests as required by the APA. *Organized Village of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015).

### 2.   Judicial estoppel applies.

The doctrine of judicial estoppel precludes a party "from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.,* 270 F.3d 778, 782 (9th Cir. 2001) (citation omitted). Courts consider three factors when applying the doctrine: (1) whether the party's later position is inconsistent with its earlier one; (2) whether the party succeeded in persuading a court to accept its earlier position; and (3) whether the party asserting an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *Id.* at 782–83. The doctrine applies to inconsistent statements made by the same party in two different cases. *Id.* All three factors are met here.

---

concedes an easement exchange occurred and that the agency gave up a "property right" to do so under 41 C.F.R. §§ 102.75.936–938. Doc. 83-1 at 5-6. The declaration explains the releases were not conveyances of *perfected* or *recorded* easements but this is not a prerequisite to having a valid easement interest.

The Forest Service's position here conflicts with its previous position in *Montana Wilderness Ass'n v. McAllister*, CV-07-39-DWM, 2008 WL 11348231 (D. Mont. 2008). There, the Forest Service explained in a sworn declaration that while the travel plan does not establish or perfect access rights, the agency chose to designate the trails as public, National Forest trails and include them in the travel plan and visitor maps because "the Forest Service believes the United States has an 'easement interest' in this trail system, and the Forest Service has a responsibility to manage this trail system under the Forest's Travel Management Plan." Doc. 79-15 at 4. The travel plan has not been amended or revised pursuant to 36 C.F.R. § 212.54 since this statement was made.

Based on this testimony, the Forest Service successfully defended the travel plan against the landowners' claims that the plan and its related maps were invalid because no easement interests existed in the two trails. Doc. 80 at ¶74–75. The Forest Service explained that it "has easement rights on the trails in question and is perfectly within its rights to reflect such rights" on its maps, including the Motor-Vehicle Use Map (MVUM). *Id.* The Court agreed, noting that the "mere fact

that a landowner disputes the presence of a prescriptive easement on his or her property does not mean that the landowner is legally correct, and [there is] . . . no authority for [the] proposition that the Forest Service should simply abandon use rights previously acquired by the public." *Id.* at ¶78.[3] If not estopped in this case, therefore, the Forest Service would be allowed to flip-flop its position to avoid its statutory obligations under FLPMA, thereby undermining the integrity of the judicial process. *Hamilton*, 270 F.3d at 785.

### 3. The Forest Service already determined it had valid easement interests in the two trails that needed to be released.

Even if this Court considers the Forest Service's new position that it has no easement interests to exchange under FLPMA, the argument is misplaced and directly contradicted by evidence in the record.

The issue is not *whether* the Forest Service has a valid easement interest in the two National Forest trails it relinquished. Nor is the issue whether the agency has demonstrated and met the requirements for establishing a public prescriptive easement or even whether those interests (if previously established) have now lapsed. None of these

---

[3] The landowner was not a plaintiff in *Montana Wilderness Ass'n* but did submit a declaration in support of plaintiffs' claims. Exhibit 11 at 2.

issues are part of this dispute. This is because, correct or not, the Forest Service *already determined* it had a legally valid easement interest in the Porcupine Lowline (No. 267) and Elk Creek (No. 195) trails that needed to be released. This is why it signed a "Trails Easement Agreement" detailing the exchange (AR-5483) and a formal "Release of Easement Interests" in accordance with its own regulations, 41 C.F.R. §§ 102.75.936–938. AR-4996; *see also* Doc. 80 at ¶ 208 (discussing same); AR-4998 (map of releases); AR-5498 (email explaining release).

Indeed, up until the Forest Service signed the Release of Easement Interests for the Ibex project, the agency consistently asserted its legally valid easement interests in the trails which it constructed as part of the Lowline trail system to connect historic guard stations. Doc. 80 at ¶¶10–12. These trails have been "maintained, signed, and managed and used for Forest Service management purposes and public recreational activities" for nearly a century and, as such, the agency acquired a legally valid easement interest in the them for the public. Doc. 79-15 at 3.

Notably, the Forest Service asserted its valid easement interests in the trails irrespective of whether they were perfected or recorded or

8

part of a court decree. Doc. 79-15 at 3; *see also* Doc. 29-12 at 13 (noting

that despite being unperfected and unrecorded, the Forest Service

believes it has an easement interest in the trails "[a]s a matter of law.");

Doc. 29-13 at 4 (same). This position is consistent with Montana law

which recognizes that an easement interest can be created by

prescription alone. *Meine v. Hren Ranches, Inc.*, 378 Mont. 100, 109–10

(2015); *see also Wild River Adventures, Inc. v. Bd. of Trustees of Sch.*

*Dist. No. 8 of Flathead Cty.*, 248 Mont. 397, 400 (1991) (easements can

be created, granted, and transferred by prescription).[4]

This position is also consistent with FSM 5460.3, Region 1

Supplement (Doc. 79-10), which explains that the agency can assume it

has a valid legal interest in easements by prescription without a

recorded deed or "perfected" right when it is supported by the agency's

own historic documentation, information, and status checks. Doc. 79-10

---

[4] The Forest Service says the location of trail has changed over the last
century but this is not accurate. Doc. 29-6 at 11. As previously
explained by the agency, the trails "have always followed a definite
fixed course" and to the extent depictions on various maps may vary
that is "merely an artifact of changing technology over the years." *Id*.
The earlier maps were "based on ground surveys and hand-drafted" but
as technology has changed the maps became more precise. *Id*. The
various representations of the trails on the maps "do not change the fact
that these Trails have always followed a definite fixed course." *Id*.

at 7. This policy protects public access to our public lands across Montana and the American West, affecting hundreds of miles of National Forest trails in the Gallatin alone and likely thousands of miles of National Forest and BLM trails in Montana. Roughly 200 to 250 miles of National Forest trails in the Gallatin are based solely on public prescriptive easements and remain unperfected and unrecorded. Doc. 29-12 at 12; *see also id.* at 7 (noting same). Indeed, the Forest Service relied on this policy when preparing and defending the 2006 travel plan. Doc. 79-15.

This Forest Service policy also recommends preparing an affidavit to document and establish such easement interests before perfecting title and, if necessary, filing a "statement of interest." *Id.* at 7–8. For example, in *Wonder Ranch LLC v. United States*, 2016 WL 6237196, (D. Mont. 2016), *aff'd*, 740 F. App'x 519 (9th Cir. 2018), the Forest Service assumed it had a valid easement interest in the disputed trail and filed a statement of interest to that effect even though it was not recorded, not perfected, nor established by court decree. *Id.* at *8.[5]

---

[5] A statement of interest is a creature of agency policy and merely provides constructive notice that the United States claims an interest in the trail. Doc. 29-12 at 4, 13. The filing is discretionary and rarely used.

10

Here, the Forest Service has not filed "statements of interests" for the two National Forest trails but following publication of the 2006 travel plan which gave actual (as opposed to constructive) notice of the United States' easement interests, there was no need to do so. Filing a statement of interest would have been unnecessary and redundant because the 2006 travel plan already formally proclaimed the United States' interests in the two trails. Doc. 80 at ¶¶ 54–60.

The Forest Service also went further and prepared a declaration in federal court describing the history and contours of its valid easement interests in the two trails when defending the travel plan. Doc. 79-15 at 3. And, following its successful defense of the travel plan, the Forest Service took steps to defend this easement interest up until the Ibex project. This included compiling and collecting historic documents about the trails, Doc. 29-6 at 1, 3, working to remark and reconstruct the trails for public use (including motorcycle use), Doc. 80 at ¶¶ 86–88 and Doc. 29-6 at 3, working to remove illegal landowner signs and obstruction efforts, *id.* at ¶¶ 91, 92, 94–95, 97–98, instructing agency staff and members of the public to never ask for permission to

---

*Id.* at 2, 4; Doc. 83-1 at 6.

11

use the trails, *id.* at ¶¶ 93, 96, and walking, inventorying, and touring the trails with Forest Service staff, *id.* at ¶100.

In a June, 2014 email, the Forest Service told the landowners that despite holding an "'unperfected' easement" in the two trails, the Forest Service has a "legal public trail easement across Trails 195 and 267." Doc. 29-6 at 13. These two trails "are as much Forest Service/Public easements as the surrounding land is Yours." *Id.* "To reiterate, the Forest Service has a LEGAL property interest in those trails." Doc. 80 at ¶ 98; Doc. 29-6 at 13. In 2015, the Forest Service also organized a work party on the trail to clear downed trees, put up ribbons, and replace National Forest signs. *Id.* at ¶¶ 112-113. In 2018, the Forest Service also walked and surveyed the Porcupine Lowline trail (No. 267) to evaluate its eligibility in the National Register. *Id.* at ¶ 149; AR-591. This work only occurs on trails where the Forest Service has a legally valid easement interest.

If the Forest Service did not have legally valid easement interests in the two trails, it would not have mapped and designated them as National Forest trails in the 2006 travel plan or depicted them on all visitor use maps or the MVUM for the Crazies, Doc. 80 at ¶¶ 54, 60, 71,

because the agency has no authority to designate trails without having valid existing rights. 36 C.F.R. § 212.55(d); *see also* 70 Fed. Reg. 68264, 68276 (November 9, 2005) (noting the same). And, if there was no legally valid easement interests in the two trails, there would be no need for a formal "Release of Easement Interests" because there would be nothing to release. AR-4996; *see also* AR-424 (agency explaining that it will "relinquish interests" in portions of the two trails); AR-256 (same); AR-265 (same); AR-261 (same); AR-432 (same); AR-434 (map depicting release). Nor would the Forest Service have any valid property rights and easement interests to "dispose of" under its Federal Management Regulations, 41 C.F.R. §§ 102.75.936–938. AR-4996.

Relevant here, the very landowners who now claim no federal interests exist previously insisted that the Forest Service release those interests before agreeing to the easement exchange: "[The landowners] really want assurance that the old trail segments are relinquished at the same time they are granting new easements." AR-5582; *see also* AR-6012 (landowner resolution that easement granted to Forest Service "[o]n the condition that the United States Forest Service relinquishes all previous claims" to the trails). This is why the Forest Service

reassured the landowners that was "exchanging interests" with them. AR-5498.

The "Trail Easement Agreement" speaks for itself. AR-5484. The Forest Service's commitment to release its easement interests in the two trails was "consideration" for acquiring the new easements from the landowners. AR 5483-5484; Doc. 80 at ¶¶ 199–202. In September, 2019, the Forest Service then signed its "Release of Easement Interests" for the two trails pursuant to the Federal Management Regulation, 41 C.F.R. §§ 102.75.936–938. AR-4996; *see also* AR-5001 (map depicting release).

The record therefore reveals that the Forest Service firmly believed (correct or not) that it owned "legally valid easement" interests in the two trails irrespective of whether or not those easement interests were perfected, owned in fee, recorded, or established by court decree. Doc. 79-15 at 3; *see also* Doc. 29-12 at 13 (explaining same); Doc. 79-10 at 7 (policy regarding same). In this case, there is thus a disconnect between the facts found in the record and the Forest Service counsel's post-hoc rationalizations. This is the hallmark of arbitrary agency action. *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th

14

Cir. 2018). The Forest Service asks for deference but there is nothing to defer to. This Court cannot defer to the agency's post-hoc litigation positon and declarations, *Dep't of Homeland Sec.*, 140 S. Ct. at 1908–09, and there are no documents in the record supporting its position. This Court "cannot defer to a void." *Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010).

As a fallback, the Forest Service says it released its easement interests outside the FLPMA process, acquired an easement solely by donation and did so "without consideration." Doc. 82 at 17. But, as previously noted, these arguments are all contradicted by the record.

The agreement with the landowners was an "exchange" because it was a "discretionary, voluntary transaction involving mutual transfers of land or interests in land between . . . the Forest Service and a non-federal entity." 36 C.F.R. § 254.31. The landowners only agreed to grant a permanent easement across their land in exchange for the Forest Service's agreement to relinquish its easement interests on the two trails. AR-5483-5484. It is the substance (not form) of the agreement that matters. *Frank Lyon Co. v. United States,* 435 U.S. 561, 573 (1978).

Further, the "without consideration" language highlighted by the

Forest Service only pertains to monetary consideration. AR-5483. The

agreement states: "While these Easements are donated without

monetary consideration, the Easements *are consideration* for an

agreement between Landowners and United States, as described in

Number 9 [which describes the Forest Service's agreement to release its

easement interests in the two trails]." AR-5483 (emphasis added); *see*

*also* AR-4997 (document was signed "for the purposes and consideration

herein mentioned and set forth"); AR-4996 (document approved as to

"Consideration, Description, and Conditions").[6]

### 4.   The Forest Service's easement interests in the two trails are not "interests in private land."

The landowners claim FLPMA is not triggered because it only

applies to *federal* land or interests therein and the easement exchange

for the Ibex project only involved private interests in land. This is

incorrect.

Unlike other land transfer statutes, FLPMA's exchange

requirements expressly apply to federal lands *and interests* in federal

---

[6] Even without consideration, the Forest Service is still required to consider the costs it incurred in acquiring the trail easements before releasing them, 41 C.F.R. § 102.75.937, but this never occurred.

16

lands, 16 U.S.C. § 1716, including "but not limited to minerals, water rights, and timber, except those exchanges made under the authority of the Small Tracts Act . . ." 36 C.F.R. § 254.1(b).[7] "Federal lands means any lands or interests in lands, such as mineral and timber interests, that are owned by the United States and administered [by the Forest Service], without regard to how the United States acquired ownership." *Id*. § 254.2. FLPMA's implementing regulations also explain that additional instructions on such interests can be included in the FSM and FSH 5409.12 and 5409.13. 36 C.F.R. § 254.1(a).

FSH 5409.13, in turn, expressly recognizes easement interests as interests in federal land that can be processed in accordance with the implementing regulations, 36 C.F.R. § 254 (subpart A), unless authorized under the Small Tracts Act. Exhibit 10 at 11 (FSH 5409.13.31.11). Exchanges involving easement interests are considered "land-for-land exchanges" because they involve "[p]artial interests in land" that "may be acquired or conveyed when it is in the public interest

---

[7] The Small Tracts Act, 16 U.S.C §§ 521c-521i, also directs the agency to make a public interest determination and assess the value of the exchange. 16 U.S.C. § 521d. The Act only applies to smaller exchanges and is the preferred authority for disposal of Federal easements surrounded private lands. AR-4913. The Forest Service did not utilize the Act here.

to do so." *Id*. Such partial interests in land "may include, but are not limited to, several mineral estates, rights-of-way easements, leasehold interests, and long-term or perpetual easements." *Id*. This policy comports with Congressional intent in FLPMA to ensure "the public interest will be well served" by the exchange, 16 U.S.C. § 1716(a), including the public's interest in the "enhancement of recreation opportunities and public access." 36 C.F.R. § 254.3(b)(1).

The landowners insist releasing an easement interest on National Forest trails is not giving up an *interest in federal land* or property, since the underlying land the trail traverses remains in private ownership. But basic principles of property law tell us that an easement interest is an interest in real property. *Leisnoi, Inc. v. United States*, 170 F.3d 1188, 1191 (9th Cir. 1999). The two trails are National Forest trails that were built by the Forest Service and maintained, managed, and signed for public and administrative use by the agency for nearly a century. Doc. 80 at ¶¶ 10–13; Doc. 79-15 at 3. The Forest Service thus correctly asserted it owns a legally valid property (easement) interest in the trails themselves, even though this interest is separate and distinct from the underlying private property it traverses. This is why the

18

Federal Management Regulations, 70 Fed. Reg. 67786 (Nov. 8 2005),

treat easement interests as "real property" and why the Forest Service

had to dispose of such interests pursuant to its real property

regulations. AR 4996 (citing 41 C.F.R. §§ 102.75.936–938).

As such, when the Forest Service released its easement interests

in the two trails for the Ibex project it did not – as the landowners'

assert – dispose of private land or interests in private land. Nor could it.

The Federal Management Regulations cited in the official "Easement

Release" for the Ibex project, 41 C.F.R. § 102.75.936–938 (AR-4996),

only apply to Federal property interests the derive from the Federal

Property and Administrative Services Act, 40 U.S.C. §§ 101, 541–545.

AR-4913. The Forest Service may only dispose of "surplus" federal

property (including easements) by sale, transfer, lease, permit, or

exchange pursuant to this statute, AR-4913, and did so in this case. AR-

4996.

The landowners rely heavily on *U. S. Forest Serv. v. Cowpasture

Preservation Ass'n*, 140 S. Ct. 1837 (2020), but that case was different.

*Cowpasture* involved whether the Forest Service (as the underlying

property owner) could approve a pipeline 600-feet below an already

19

existing right-of-way managed by the National Park Service. *Id.* at
1844. The Court recognized the Forest Service retained its approval
authority for the pipeline because it retained ownership of the
underlying federal lands. *Id.* at 1846–47. In so holding, the Court
merely reiterated the basic principles of property law (that an easement
or right-of-way is different from the underlying land it traverses) and
reviewed the right-of-way agreement and National Trails System Act at
issue in that case. *Id.* at 1846. Here, Plaintiffs are not challenging or
questioning the landowner's authority to conduct activities on their
private lands that have no effect on the Forest Service's easement
interests in the two trails. Nor are Plaintiffs questioning the
landowners' private property interests in the land underlying the
National Forest trails.

**B.    The Ibex project was never evaluated and analyzed in a
NEPA document.**

The Ibex project involves four parts: (1) construction of a new
trail; (2) acquiring new easements from landowners to access the new
trail; (3) releasing the Forest Service's easement interests on large
portions of existing trails; and (4) closing and obliterating large portions
of the existing trails. Doc. 80 at ¶152. The Forest Service now insists

the 2006 travel plan EIS and 2009 EA were "complete and thorough" in analyzing the environmental effects of and alternatives to this four-part Ibex project. The Forest Service is wrong.

### 1.    The Ibex project is not discussed or analyzed in the 2006 EIS.

*Nowhere* in the 2006 travel plan EIS or related decision does the Forest Service analyze, let alone discuss, the four-part Ibex project or its potential effects (direct, indirect, and cumulative) or a reasonable range of alternatives to the project. This is why in its response, the Forest Service does not cite a single page of the travel plan EIS where its analysis of effects and alternatives must be found. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998).

Instead, the Forest Service cites language from pages 6, 52, and 53 of the travel plan decision, but no analysis of effects or discussion of the Ibex project exists on these pages either. Page 6 merely talks about the history of the area and checkerboard lands. AR-5224. And pages 52 and 53 of the decision merely describe the agency's interests in providing motorcycle opportunities in this region (which the travel plan does by authorizing such use on the Porcupine Lowline trail (No. 267)) and its interests in looking for ways to reroute trails in the area. AR-

21

5270-5271. There is no discussion of the Ibex project itself or analysis of its potential effects in the travel plan or related EIS.

## 2. The Ibex project is not discussed or analyzed in the 2009 EA.

The Forest Service's reliance on the 2009 EA is equally unavailing. The purpose of the 2009 EA was to analyze the environmental consequences of road and trail "improvement work" outlined in the 2006 travel plan. This is why nothing in the 2009 EA changes the effects already disclosed or analyzed in the 2006 EIS. There "are no proposed changes to the amount, type, or general location of recreation activities [already] provided by the travel plan decision." AR-1056. On its face, therefore, the 2009 EA cannot evaluate and analyze the effects of the Ibex project.

For support, the Forest Service relies on a single paragraph in the 2009 EA referencing potential work in the "Porcupine Area." Here, the 2009 EA states that its previous travel plan decision focused on providing "opportunities for motorcycle, mountain bike, stock and foot use" on the Porcupine Lowline trail (No. 267). AR-3845. The 2009 EA also states that this trail currently "passes through large portions of private lands and fences, gates, past harvest and road building and

22

*needs to be remarked and reconstructed.*" *Id.* (emphasis added). The Forest Service does mention contemplating shifting some portions of the trail to the east and onto National Forest lands but no details (besides a general vicinity map, AR-934) are provided and its plans were purely aspirational in nature: "*Some* portions of the trail *may* be shifted onto National Forest land to the east." *Id.* (emphasis added).

This is the only reference to something remotely relevant to one part of the Ibex project (the trail re-route) – i.e., an aspirational plan to potentially shift the location of a trail at some future date. In fact, in response to comments, the Forest Service explained that it does not intend to begin any upgrades, relocations, or construction on a future trail until all authorizations and agreements with the landowners are made. AR-192. Until that time, the Forest Service explains the Porcupine Lowline trail (No. 267) will be managed for its existing uses has it has in the past and in accordance with the travel plan. *Id.*

This is why there is no specific information on what portions of what trails will be moved, whether it includes both trails, and when or whether it will actually occur. Also missing from the 2009 EA is any analysis or specific information on where the trail will be located

23

(besides a general vicinity between two points), its design, or its designated uses.

The Forest Service says it identified a "narrow corridor" for the possible future trail reroute but this "narrow" corridor (AR-934) is an over two-mile wide swath of public and private land that encompasses a wide range of elevations and diverse flora, fauna, and environmental conditions (*see* Doc. 7-18 at 11), and no specific or details about the work to be completed in this area is provided. For support, the Forest Service relies on *Te-Moak Tribe of W. Shoshone of Nevada v. U.S. Dep't of Interior,* 608 F.3d 592, 600 (9th Cir. 2010), but in that case the Ninth Circuit noted that having the specific details of a project – i.e., what it entails, where it will occur, and when it will be implemented – is required in order to properly analyze environmental effects under NEPA. *Id.* at 600. The only exception is for mineral exploration projects where its "activities cannot reasonably be ascertained until sometime after the project is approved." *Id.* Such projects inherently involve uncertainties: "if mining companies knew the precise location of mineral deposits before drilling, exploration would not be required." *Id.* BLM may therefore approve an exploration project "without knowing the

exact locations of drill sites and other project activities" so long as the agency analyzes the impacts of all project activities in all parts of the project area and imposes effective avoidance and mitigation measures. *Id.*

Unlike *Te-Moak*, this case does not involve a mineral exploration project and the Forest Service did not analyze all aspects of the Ibex project in all areas affected. This is true even though the Forest Service knows what the project entails, including the location of the new trail re-route, easement exchange, and trail obliteration work. AR-434. There is thus no reason why the Forest Service could not have done an environmental analysis (EIS or EA) on the *entire* project once it had finalized its agreement with the landowners on the easement exchange and acquired more specific information on the trail relocation, especially when the Trails Easement Agreement expressly contemplated such an analysis. AR-5484.

In response, the Forest Service maintains it adequately analyzed the potential effects of the Ibex project on fisheries, wildlife (big game, listed species, wolverine), plants, and other resources. The Forest Service also maintains it evaluated a reasonable range of alternatives

to the project and considered mitigation measures. But all of the pages in the 2009 EA cited in support of this effects and alternatives analysis are not for the four-part Ibex project or even the trail re-route.

For example, the Forest Service relies on pages 3-22 to 3-24 of the 2009 EA for its "analysis" of impacts to fisheries, aquatic species, and wetlands. But these pages refer to the impacts of the general "improvement" projects throughout the Gallatin, not the Ibex project. *See* AR-3889–91. The same is true for wildlife impacts. The Forest Service relies on a "general wildlife" analysis and discussion that has nothing to do with the Ibex project. *See* Doc. 82 at 21 (citing Doc. 83 at ¶18 which references AR-3896, AR-5299-5300, and AR-3903). The Forest Service also insists the 2009 EA analyzed the impacts on listed species and other resources but cites eleven pages that have nothing to do with the Ibex project or even the "narrow" two-mile wide corridor where its impacts will be felt. *See* Doc. 82 at 22. This is equally true for the Forest Service's discussion of mitigation efforts and design criteria. *Id.* at 22, 24 (citing Doc. 83 at ¶¶ 19, 33). This information pertains to general or typical mitigation measures and designs, not the four-part Ibex project.

The Forest Service also says it evaluated a reasonable range of alternatives by comparing two: an action alternative and a no action alternative. But neither of these two alternatives include the Ibex project or even the trail re-route. *See* AR-3839–62. As such, the Forest Service never compared and contrasted various alternatives for the Ibex project itself, including alternative designs, locations, and uses for the new trail; alternatives to obliterating and removing existing trails from the travel plan; or alternatives that would preserve historic access rights on existing trails while simultaneously protecting private property rights.

Further, even if one assumes, *arguendo,* that sufficient details and analysis about the trail re-route is provided in the 2009 EA, this analysis only pertains to one aspect of the Ibex project. Missing is any environmental analysis of acquiring new easements, releasing existing easements, and obliterating the existing trails. This is a major oversight because these are not just connected, similar or cumulative actions that need to be addressed in a single NEPA document, 40 C.F.R. § 1508.25, they are part of *the same agency action* (the Ibex project) itself. Doc. 80 at ¶152. Notably, the need to evaluate and analyze all four-parts of the

27

Ibex project under NEPA exists irrespective of whether or not the easement agreement for the Ibex project is classified as a FLPMA "exchange" or not. Either way, an environmental analysis for the Ibex project was required but never completed.[8]

### 3.   There was no decision and no claims to exhaust.

The Forest Service and landowners maintain Plaintiffs are "seeking to reverse" the 2006 travel plan EIS and 2009 EA and have failed to exhaust these claims. But just the opposite is true: the 2006 travel plan and 2009 EA designate the two trails as public National Forest trails (Doc. 80 at ¶¶ 54-60) so Plaintiffs are seeking *compliance* with these earlier decisions, not reversal of them. There would be no reason for Plaintiffs to challenge a decision they agree with.

Further, there was nothing to challenge in 2006 or 2009 because merely contemplating moving "some portions" of a trail at some future date does not qualify as a "final agency action" subject to judicial review under the APA. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The only reason these earlier NEPA analyses are implicated in this case is

---

[8] This Court should reject any attempt by the Forest Service to rely on post-decisional environmental surveys, assessments or analyses (referenced in Doc. 83 at ¶ 34) done for the trail re-route *after* it approved the Ibex project and after it chose to forgo NEPA review.

because the Forest Service is relying on them for its NEPA compliance. But as previously noted, the four-part Ibex project is nowhere found or mentioned in these previous NEPA analyses. Nor could it be. The Forest Service was still working through the issues and negotiating the terms of the easement exchange and trail relocation for the Ibex project with the landowners in 2017 and early 2018 – nearly ten years *after* signing the 2009 EA. AR-424, 428, 431.

The Forest Service maintains it initiated scoping in 2018 to evaluate whether supplementation of the 2009 EA was required due to "changed circumstances or new information." But this wrong and merely an attempt to mislead this Court. *See* AR-261, 424, 425, 428, 431–35. The Forest Service initiated scoping for the Ibex project in accordance with 36 C.F.R. § 220.4(e) and 40 C.F.R. § 1501.7 to evaluate whether to prepare an EIS, EA, or CE. AR-435; *see also* AR-437 (defining scoping); AR-438 (chart depicting options). Under NEPA, scoping is only done to evaluate proposed actions; not to evaluate new information or circumstances (this is what a supplemental information report (SIR) is for, *see Idaho Sporting Congress v. Alexander*, 222 F. 3d 562, 566 (9th Cir. 2000)).

Here, the issue is not whether new information or circumstances warrant supplementing the 2006 travel plan or 2009 EA because the Ibex project was never discussed, analyzed, or approved in the earlier NEPA documents. The four-part Ibex project was an entirely new proposal. This is why, in accordance with NEPA (AR-437), the Forest Service initiated scoping instead of preparing an SIR. AR-439. This is also why *all* public comments received during scoping focused on the newly proposed Ibex project (not supplementation). Doc. 80 at ¶¶ 167–82. The suggestion, therefore, that Plaintiffs failed to exhaust their administrative remedies back in 2008-2009 – nearly ten years before scoping was initiated – deserves little attention. There was nothing to exhaust in the 2009 EA. *See Alliance for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034 (9th Cir. 2018) (rejecting exhaustion defense due to agency's previous failure to disclose all aspects of project).

Further, after scoping was initiated, Plaintiffs immediately attempted to participate in and exhaust the administrative process at that time but the Forest Service abruptly cancelled the NEPA process. The agency chose to forgo preparing an EA or even issuing a lesser CE.

One issue raised during scoping was the Northern Pacific railway

deeds which reserved an "easement in the public" for any public roads "heretofore laid or established and now existing over and across" odd sections of land directly implicated by the Ibex project, including Section 15. Doc. 80 at ¶183. These types of public easements are generally interpreted to extend to all types of public rights-of-way, including public highways, roads, and trails. *See, e.g.,* Doc. 9-4 at ¶ VI; Doc. 9-5 at 2 (memorandum defining public highway). Members of the public presented this issue to the Forest Service (Doc. 80 at ¶183) but the agency ignored it, conceding in earlier briefing that it never considered the railway deeds when approving the Ibex project. Doc. 30 at 28; Doc. 30-8 at ¶ 8.

Paradoxically, the Forest Service now maintains Plaintiffs failed to provide enough evidence about the railway deeds. Evidence in the record, however, reveals portions of the two trails released by the Forest Service were likely "public roads" on the landscape at the time the railway deeds were conveyed. Doc. 80 at ¶ 10-12; AR-591 (describing history of trail). As explained by the Forest Service, the 1937 map for the Crazies "clearly shows this public travel route, as well as the historic guard stations it connected." Doc. 29-6 at 1.

The Forest Service and landowners now maintain the Ibex project only released the Forest Service's interests in the trails, not the public's which was reserved by the railway deeds. But as the Forest Service previously explained, the United States' easement interests in the trails is "on behalf of the public." Doc. 79-15 at 3. The "public is the beneficiary of this right of access and the Forest Service defends and maintains that right." *Id.*

The landowners also question the validity of the railway deeds on the grounds that "subject to" does not create an easement interest. Doc. 86 at 22–23.  But in Montana an "easement expressly reserved for the public" is valid. *State By & Through Montana State Fish & Game Comm'n v. Cronin*, 179 Mont. 481, 486, 587 P.2d 395, 399 (1978). The landowners rely on *Wild River Adventures, Inc.*, but in that case the court recognized that such language may leave undisturbed existing easements "the grantor wishes to exclude from warranties of title." 248 Mont. at 401. The landowners' six-year statute of limitations argument is also misplaced (because there was no Ibex project decision to challenge in 2006 or 2009).

**C.    The Ibex project violates the travel plan (which amended and replaced the forest plan).**

The 2006 travel plan amended the Gallatin forest plan by removing its travel planning components and replacing them with new travel planning direction. AR-5223. This is undisputed. Doc. 84 at 37. The 2006 travel plan also designated the Porcupine Lowline trail (No. 267) and the Elk Creek trail (No. 195) as public National Forest trails open for a variety of uses. Doc. 80 at ¶¶ 54–55, 59–60.

The Ibex project violates the travel plan – and by extension, the amended forest plan and NFMA, 16 U.S.C. § 1604 (i) – because it removes large portions of these two trails from the travel plan, the landscape itself (they will be obliterated) and all visitor use maps, including the MVUM. *See* Doc. 80 at ¶ 152. Instead of an emphasized use of mountain biking and hiking, the trails will be obliterated and all Forest Service (and public) easement interests in the trails released. Doc. 80 at ¶ 152. These changes occurred without first amending or modifying the travel plan, without any environmental analysis, and without any public review and input as required by NEPA, NFMA, 16 U.S.C. § 1604 (f)(4), and the travel rule, 36 C.F.R. § 212.54.

In response, the Forest Service and landowners insist NFMA does

33

not apply to National Forest trails that cross privately-owned lands. But this is a red herring: The issue is not whether a travel plan establishes a "use right across private property" or even whether NFMA applies to private lands. As the Forest Service previously explained, the travel plan "in and of itself, does not establish or perfect access rights" and is subject to "valid rights and privileges held by private landowners . . . ." Doc. 79-15 at 2, 5. The travel plan, however, does reflect and depict those National Forest trails where the Forest Service asserts it has valid property interests. *Id.* at 3. The Forest Service manages the trails and included them in the travel plan because it "believes the United States has an 'easement interest' in this trail system" and, as such, "has a responsibility to manage this trail system under the Forest's Travel Management Plan." *Id.* at 4.

A case on point is the Forest Service's successful defense of the 2006 travel plan in *Montana Wilderness Ass'n*. In that case, the Forest Service defended its travel plan from a claim that the agency violated NFMA and the travel rule, 36 C.F.R. § 212.55(d), by depicting National Forest trails across private lands, including the landowners' lands at issue in this case. Doc. 80 at ¶¶ 73–79; *see also Montana Wilderness*

34

*Ass'n*, CV-07-39-DWM, 2008 WL 11348231, (D. Mont. 2008) (Doc. 48-2 at 9) (Forest Service brief). The Court rejected the landowner's claims and held that the Forest Service was well within its authority to designate and manage these trails across private land as National Forest trails. Doc. 80 at ¶ 78; *see also Wonder Ranch*, 2016 WL 6237196 at *8-9 (recognizing Forest Service authority to manage National Forest trails across private property).

   As a fallback, the Forest Service maintains there is no duty to manage the trails as directed to do so by the travel plan because no "standards" apply. The travel plan, however, includes specific components (goals, objectives, guidelines) and route-tables directing how these two trails are to be managed. Doc. 80 at ¶¶46–51, 57–60. In the Ninth Circuit these types of components cannot be summarily ignored and discarded by the agency as they were here. *See Alliance for the Wild Rockies v U.S. Forest Service*, 907 F. 3d 1105, 1110, 1113–14 (9th Cir. 2018). This is particularly true when the Forest Service's travel plan direction includes specific "route-by-route" management direction for the trails, *see* Doc. 80 at ¶59 and Doc. 7-12 at 3, and when

the Forest Service expressly commits to follow its travel plan direction in its final decision. AR-5353–5354.

Indeed, this commitment is why the agency said removing all travel direction in the existing forest plan (and replacing it with the travel plan) was a "non-significant" NFMA amendment not requiring additional NEPA analysis. AR-5353–54. As explained by the Forest Service, the forest plan included broad direction that, though removed, will be replaced by new "direction" in the travel plan that "identifies specifically how each road and trail on the Forest would be managed." AR-5354. Even though the forest plan and travel plan are stand-alone documents, the forest plan is "connected" to travel plan "decisions for management of specific roads and trails." AR-5355.

In other words, the travel plan now determines "which routes will be open and which have restrictions . . . [and] adopts a series of goals, objectives, standards, and guidelines that limit potential increases in motorized uses." *Id*. The Forest Service therefore stated in a sworn declaration that it has a duty to follow its own travel plan: "[t]he Forest Service has *a responsibility* to manage this trail system under the Forest's Travel Management Plan." Doc. 79-15 at 4 (emphasis added).

36

The Forest Service insists a "responsibility to manage" the trails in accordance with the travel plan does not equate to a duty to do so, but this is a distinction without a difference. A responsibility to act is a duty, obligation, or burden to act. *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005) (citations omitted). These commitments are sufficient to impose a duty on the Forest Service to follow its own travel plan. *See Friends of Animals v. Sparks*, 200 F. Supp. 3d 1114, 1123–24 (D. Mont. 2016) (agency must comply with decision).

Lastly, the Forest Service maintains that even if the Ibex project amended the travel plan, no public notice and comment or additional process and analysis is required for doing so. The problem, however, is that – as discussed above – the travel plan was technically never amended or modified by the Forest Service, so the Ibex project directly conflicts with the existing plan. And, if the travel plan was amended by the Ibex project (without any documentation), that decision should have been subject to public review and comment and environmental analysis under NEPA, NFMA, 16 U.S.C. § 1604 (f)(4), and the travel rule, 36 C.F.R. § 212.54.

The Forest Service correctly notes that NFMA's public

participation provision only pertains to forest plans (not travel plans), but this case is unique: the travel plan amended and replaced the forest plan's travel direction so the two are intertwined and connected. Doc. 84 at 37. This case is thus unlike *Bitterroot Ridge Runners v. U.S. Forest Service*, 329 F. Supp. 3d 1191, 1203 (D. Mont. 2018). The Forest Service also maintains sufficient notice and comment and analysis for the Ibex project were provided in 2006 and 2009 and then again in 2018 through scoping. But, as previously explained, the Ibex project was not discussed in these earlier NEPA documents and in 2018 the Forest Service only initiated scoping and then abruptly cancelled the NEPA and public review process altogether.

**D.    The Forest Service is failing to protect public access on the two east-side trails as required by the travel rule, travel plan, and the agency's own policies.**

The Forest Service does not dispute that it has effectively handed over management of its two east-side trails – the Sweet Grass trail (No. 122) and East Trunk trail (No. 115) – to the private landowners. Nor does the Forest Service dispute that these actions have harmed and continue to harm Plaintiffs' interests in using the two trails. Instead, in an extra-record declaration (Doc. 83-3), the Forest Service explains that

it has been meeting with a group and third-party facilitator since early 2017 to try and resolve the dispute. Doc. 82 at 37. The agency's attempt to rely on this effort, however, to demonstrate compliance with its own travel rule and travel plan is misplaced.

The Forest Service certainly has the discretion (and is encouraged) to engage in such collaborative efforts but not at the expense of abandoning the two trails for public access during the nearly four-year negotiation process – a failure that now threatens to undermine the public's easement interests in the historic National Forest trails themselves. *See* Doc. 79 at 43-47. In fact, the Forest Service previously said its travel plan gives it the "direction" to do both: "protect existing access rights *and* . . . cooperate with landowners to meet mutual transportation needs." AR-5247 (emphasis added).

In response, the Forest Service maintains there is no mandatory duty to protect and manage the two National Forest trails for public access during its negotiations. The Forest Service acknowledges that under its own travel rules public use and access on such trails "shall be permitted for all proper and lawful purposes," 36 C.F.R. § 212.6(c), but maintains such "proper and lawful purposes" *do not* including

managing the trails in accordance with its own travel rule, travel plan or internal policies. Doc. 82 at 39. But this is incorrect.

The "proper and lawful" purposes referenced in 36 C.F.R. § 212.6 are those that are subject to "the rules and regulations governing the lands and the roads and trails to be used," *id.* at §§ 212.6(b),(c), which include the travel rule itself and, by implication, the travel plan implementing the rule. *See, e.g.*, *United States v. Smith & Dew, Inc.*, No. 7:16-CV-00334, 2018 WL 2670067, at *8 (W.D. Va. June 4, 2018) (Doc. 20 at 3) (referring to 36 C.F.R. part 261) *United States v. Tellstrom*, 2013 WL 1499491, at *9 (E.D. Cal. Apr. 11, 2013) (referring to 36 C.F.R. part 251).

The Forest Service's counsel also maintains the agency has no property interests in such trails, but as previously noted, this is a post hoc rationalization squarely contradicted by the record. The Forest Service already determined it had valid easement interests in these and other National Forest trails, which is why they are both depicted in the travel plan. *See supra* section A.3; Doc. 80 at ¶¶ 61-63. In a 2017 Briefing Paper, for example, the Forest Service explained that the East Trunk trail (No. 115) was constructed by the agency to connect two

40

historic guard stations and it was depicted on Forest Service maps "dating back to at least 1925." Doc. 80 at ¶ 14; Doc. 29-7. Based on this and nearly a century of public and administrative use, management, and maintenance, the Forest Service "made clear its view that the [Forest Service] retains a prescriptive easement on the trail, which is shown on [Forest Service] maps and served as a connecting trail between two historic [Forest Service] guard stations." Doc. 29-7 at 2; Doc. 80 at ¶¶ 136–38.

The Forest Service also insists the travel plan creates no "mandatory duty" because the travel plan only includes an unenforceable guideline, not standard. The mandatory duty in this case, however, includes the agency action required by regulation instructing that the Forest Service "shall" protect public access on National Forest trails subject to proper and lawful purposes, 36 C.F.R. § 212.6(c), and the travel rule and travel plan which specifies what those proper and lawful purposes are for each trail. *See* Doc. 79 at 40–42. Both the East Trunk trail (No. 115) and Sweet Grass trail (No. 122) are to be managed for the emphasized uses of hiking and stock use. Doc. 80 at ¶¶ 61–63. The travel plan decision and direction also states that public access

41

rights on these trails will be protected. AR-5247; Doc. 80 at ¶ 50. This is consistent with agency policy. *See* Doc. 79-10 at 8; Doc. 29-12 at 13. The Forest Service also said in the decision approving the travel plan that it would follow the direction in the travel plan (as it replaced the forest plan travel direction), *see supra* section C, and the agency repeated this commitment in a sworn declaration. Doc. 79-15 at 4. These commitments are enough to create a mandatory duty. *Friends of Animals*, 200 F. Supp. 3d at 1123–24.

The Forest Service's reliance on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), is also misplaced. That case involved a broad statutory "non-impairment" mandate and statement of priorities in a general land use plan, *id.* at 66–72, and not a specific duty imposed by regulation or a directive imposed by a site-specific travel plan. *See Friends of Animals*, 200 F. Supp. 3d at 1125 (discussing and distinguishing the broad directive not enforceable in *Norton*).

Additionally, in holding that broad statements in land use plans are not a medium for enforcing agency action, *Norton* expressly recognized that exceptions exist, including "those required by regulation, such as designating . . . areas, roads, and trails." *Id.* at 70 n.

42

4. (citing BLM's travel rule). This is the issue here: Plaintiffs are challenging the Forest Service's failure to manage two specific trails as directed to do so by its own regulations and by its own travel plan, which includes specific direction for these two specific trails. The Forest Service insists protecting public access on National Forest trails is "inherently discretionary" but Plaintiffs are not asking this Court to direct the agency to take specific action – just reasonable steps within its discretion to protect and restore public access rights on the two trails. *See Norton*, 542 U.S. at 66 (recognizing mandatory duty may exist even if agency retains discretion regarding how to comply with it).

## CONCLUSION

For these reasons, Plaintiffs request this Court grant its motion for summary judgment and the relief requested.

Respectfully submitted this 18th day of June, 2021.

/s/ Matthew K. Bishop
Matthew K. Bishop

/s/ Michael Kauffman
Michael Kauffman

*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record, hereby certify that this brief is proportionally spaced, has a typeface of 14 points or more, and contains less than 9,000 words in accordance with this Court's order (Doc. 73 at 2). I relied on Microsoft Word to obtain the word count.

/s/ Matthew K. Bishop
Matthew K. Bishop