IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| FRIENDS OF THE CRAZY MOUNTAINS, a public land organization, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>MARY ERICKSON, in her official capacity as Forest Supervisor for the Custer Gallatin National Forest, *et al.*,<br><br>Defendants. | CV 19-66-BLG-SPW-TJC<br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiffs Friends of the Crazy Mountains, *et al.*, brought this action against Mary Erickson, in her official capacity as Forest Supervisor for the Custer Gallatin National Forest; Leanne Marten, in her official capacity as Regional Forester, Region One, for the U.S. Forest Service; Vicki Christiansen, in her official capacity as chief of the U.S. Forest Service; the United States Forest Service ("Forest Service"), a federal agency; and the United States Department of Agriculture, a federal department ("Federal Defendants"); and M Hanging Lazy 3, LLC, and Henry Guth, Inc. ("Landowners") (collectively, "Defendants"), challenging the Forest Service's management of four trails in the Crazy Mountains in southcentral Montana.

1

Presently before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 78), Federal Defendants' Cross-Motion for Summary Judgment (Doc. 81), and Landowners' Cross-Motion for Summary Judgment (Doc. 85). The motions are fully briefed and ripe for the Court's review.

Having considered the parties' submissions, the Court recommends that Plaintiffs' Motion for Summary Judgment be **DENIED**, Federal Defendants' Cross-Motion for Summary Judgment be **GRANTED**, and Landowners' Cross-Motion for Summary Judgment be **GRANTED**.

## I.    Factual Background

This case concerns a longstanding dispute regarding public access to trails in the Crazy Mountains. The Crazies are made up of a checkerboard of state, federal, and private land. At issue here are four trails that traverse that checkboard landscape as part of the Gallatin National Forest (the "Forest"). Two of the trails are located on the west side of the Crazies, and two are on the east side.

On the west side of the Crazies are the Porcupine-Lowline trail (No. 267) and the North Fork Elk Creek trail (No. 195), both of which travel through public and private property. The trails have been depicted on National Forest maps since the early 1900s, and the Forest Service believed it had a prescriptive easement interest in those portions of the trails that passed through private property. But the Forest Service has never secured a perfected easement interest in the trails, and

private landowners have long disputed Forest Service access rights to these trails on private property.  By 2002, landowners along the Porcupine-Lowline trail began blocking public access to portions of the trail by installing fences and gates and posting "private property, no trespassing" signs.  In an effort to resolve the access dispute, the Forest Service and landowners began meeting in 2004 to try and negotiate public access to Forest lands.

During this same period of time, the Forest Service began the process of creating a draft environmental impact statement ("EIS") and Travel Management Plan for the Gallatin National Forest, which included Forest Service lands in the Crazies.  The Final EIS and Travel Plan were completed in 2006 ("2006 Travel Plan").  The 2006 Travel Plan identified opportunities for public recreational use and access using the Forest road and trail system.  The Travel Plan made note of the "checkerboard ownership pattern" of lands in the Forest, "with alternating sections of public and private land." (A.R. 5224.)  It also stated an objective for the Porcupine-Lowline trail to "secur[e] easements through private land on roads and trails designated for public use" to provide motorcycle opportunity on the trail and to gain better access to National Forest lands in the travel planning area. (A.R. 5271.)

The 2006 Travel Plan was subsequently implemented through a site-specific Road and Trail Environmental Analysis ("2009 EA").  The purpose of the 2009

3

EA was to analyze the potential environmental effects of several road and trail projects on the Forest.  With respect to the Porcupine-Lowline trail, the 2009 EA set forth the following proposed reroute of the trail:

> **Porcupine Area** (Crazy Mountain Range, Map CRZ-1)
>
> In the Porcupine area portions of the Porcupine-Lowline Trail #267 between the Ibex and Porcupine trailheads would be relocated to correspond with final rights-of-way.  Some portions of the trail may be shifted onto National Forest land to the east.  Currently, the trail passes through large portions of private lands with fences, gates, past harvest and road building and needs to be remarked and reconstructed.  Under the decision for the Gallatin Travel Plan this trail is to provide opportunities for motorcycle, mountain bike, stock and foot use (Travel Plan Decision, page II-111).  Work would involve about 5.2 miles of new trail construction, 2.6 miles of reconstruction and 3.0 miles of maintenance.

(A.R. 16-17.)  Because the Forest Service was still negotiating with the landowners, it did not know the precise location of the trail reroute.  Nevertheless, two maps were distributed during scoping and attached to the 2009 EA, which showed the area of the proposed reroute.  One map fixes the beginning and end points of the reroute, and states: "Relocate portions of Porcupine Trail onto final rights-of-way between these points." (A.R. 4040.)  The other map shows a red oval around the area of land where the trail would be re-routed, thus designating the area of "National Forest land to the east" where the Forest Service would seek to relocate the trail. (A.R. 4039.)  The oval generally encompasses a section of National Forest land and an adjacent section of private land, designating placement of the trail within that private/public corridor.

4

In 2018, the Forest Service and Landowners came to a tentative agreement for a reroute of the Porcupine-Lowline trail.  Under the agreement, the Landowners would grant an easement across their property to access Forest lands, and the Forest Service would relinquish any potential interests it had across the historic Porcupine-Lowline and North Fork Elk Creek trail routes.

The Forest Service initiated scoping and public comment on the proposed reroute, called the Porcupine-Ibex trail (the "Ibex project").  The Forest Service made clear that, based on the information received in scoping, if there was any uncertainty as to whether the reroute would have a significant effect on the environment, the Forest Service would prepare an environmental assessment. Comments were received both in support and against the trail reroute.  After reviewing the comments, the Forest Service did not identify any significant, unanalyzed environmental impacts, and thus, determined the Ibex project was consistent with the 2009 EA.  The Trail Easement Agreement ("Easement Agreement") was finalized in September 2019.  (*See* A.R. 5885-97; 5976-78; 5979-88.)

This action also challenges the Forest Service's management of two trails on the east side of the Crazy Mountains, the East Trunk trail (No. 115, later No. 136) and the Sweet Grass trail (No. 122).  Similar to the west side trails, these trails had long been depicted on National Forest maps.  But, like the west side trails, the

5

Forest Service does not have a recorded interest in all portions of the east side trails that pass through private property, and landowners along the trails dispute the public's right to use the trails.  The Forest Service is currently negotiating with landowners for public access.  In the meantime, the landowners have obstructed public access to the trails, and Plaintiffs allege the Forest Service has failed to intervene and manage the trails for public use.

On June 10, 2019, Plaintiffs, a coalition of local organizations, filed this action for declaratory and injunctive relief to enjoin Federal Defendants from constructing the Ibex project.  (Doc. 1.)  Judge Watters denied the motion, finding, *inter alia*, that Plaintiffs did not demonstrate a likelihood of success on the merits. (Doc. 10.)

Subsequently, Plaintiffs filed an Amended Supplemental Complaint.  (Doc. 77.)  There, Plaintiffs allege that the Forest Service violated: (1) the Federal Land Policy Management Act ("FLPMA") with its Easement Agreement with the Landowners; (2) the National Environmental Policy Act ("NEPA") by failing to analyze the environmental impacts of the Ibex project; and (3) the National Forest Management Act ("NFMA") by failing to comply with the 2006 Travel Plan.  (*Id.*) Plaintiffs also contend the Federal Defendants' failure to manage the east side trails for public use violates NFMA, the 2006 Travel Plan, and Forest Service policy.  (*Id.*)

6

Plaintiffs request that the Court declare the Forest Service has violated FLPMA, NEPA, and NFMA; vacate the Forest Service's approval of the Ibex project and void the Easement Agreement; and direct the Forest Service to restore, repair, reinstall, and manage the trails for public use.

## II.   Legal Standards

Because FLPMA, NEPA, and NFMA do not provide their own standard for judicial review, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, governs review of federal agency action.  5 U.S.C. § 706.

Under the APA, the reviewing court must determine whether the agency action is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The "arbitrary and capricious" standard is narrow, and the court may not substitute its judgment for that of the agency.  *Id.*  Agency action is presumed valid "if the agency considered the relevant factors and articulated a rational connection

between the facts found and the choices made." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1224 (9th Cir. 2011) (internal quotations and citations omitted). The reviewing court, therefore, must consider whether the agency considered the relevant factors or made a clear error of judgment. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (9th Cir. 1989).

## III.   Discussion

### A.   Federal Land Policy Management Act

Plaintiffs first allege that the Easement Agreement between the Forest Service and the Landowners, in which the Landowners granted the Forest Service an easement across their property to allow for construction of the Ibex project in exchange for the Forest Service relinquishing any easement interests in the Porcupine-Lowline and North Fork Elk Creek trails, violates FLPMA.

FLPMA permits land exchanges of "public land or interests . . . [or] a tract of land or interests therein within the National Forest System" so long as "the public interest will be well served" by the exchange. 43 U.S.C. § 1716(a). In considering the public interest, the Secretary of the Interior must "give full consideration to better Federal land management and the needs of State and local people." *Id.* This exchange authority allows the Secretary to "accept title to any non-Federal land or interests therein in exchange for such land, or interests therein which he finds proper for transfer out of Federal ownership." 43 U.S.C. § 1716(b).

Here, Plaintiffs acknowledge that the Forest Service has land exchange authority under Section 1716(a), but argue that the Easement Agreement between the Forest Service and Landowners violates FLPMA because the Forest Service did not consider the public's interest in the exchange, appraise or value the exchange, conduct an environmental analysis, or provide public notice. Plaintiffs contend that the Forest Service has a legally valid property interest in the Porcupine-Lowline and North Fork Elk Creek trails through decades of trail management, maintenance, and public use. Plaintiffs assert that the Forest Service, thus, owns a property interest in the trails that is "separate and distinct from the underlying private property it traverses." (Doc. 89 at 18.)

The Forest Service does not dispute that it believed, and has maintained, that it had an easement interest in the trails, but argues that it never established a legally valid easement where the trails cross private property. At most, the Forest Service asserts it had an unperfected property interest by prescriptive easement. According to the Forest Service, because it never legally owned an interest in the trails, it could not "exchange" easements with the landowners, and thus, FLPMA does not apply.

Similarly, the Landowners argue that FLPMA does not apply because the Forest Service held no property interest in the Landowners' land. Further, even if

9

the Forest Service did have a property right, the Landowners assert FLPMA would

not apply because Section 1716 applies only to Federal, not private, land.

The Court agrees with the Defendants.  The Forest Service plainly believed

it had a valid easement interest in the Porcupine-Lowline and North Fork Elk

Creek trails.  The trails had been on National Forest maps for decades.  It was also

included in the 2006 Travel Plan, although the Travel Plan acknowledged the need

to "secur[e] easements through private land on roads and trails designated for

public use" in the Porcupine area.  (A.R. 5271.)  But private landowners have long

disputed the Forest Service's interest and, by 2002, began blocking public access.

This conflict continued until 2018, when the Forest Service and Landowners came

to a tentative agreement that was finalized in the Easement Agreement.

At no time prior to the Easement Agreement did the Forest Service establish

a prescriptive easement in the portions of trails that cross the Landowners' private

property.  To establish a prescriptive easement under Montana law, the Forest

Service would have been required to show, by clear and convincing evidence, that

use of the trails were "open, notorious, exclusive, adverse, continuous and

uninterrupted for the complete statutory period" of five years.  *Heller v. Gremaux*,

53 P.3d 1259, 1263-64 (Mont. 2002).  In addition, because the Landowners

disputed and blocked public access for many years, the Forest Service would have

also been required to show that any prescriptive easement had not been

10

extinguished by "reverse adverse possession." *See Letica Land Co., LLC v. Anaconda-Deer Lodge Cty.*, 362 P.3d 614, 622 (Mont. 2015).  In Montana, a prescriptive easement is extinguished by acts that evidence "a distinct and positive assertion of a hostile right to the public's claimed prescriptive easement," such as through locked gates and no trespassing signs, for the statutory period of five years. *Letica Land Co.*, 362 P.3d at 622-23 (internal quotations and citations omitted).

In short, the Forest Service did not possess any kind of fee interest or hold an established, recorded easement where the west side trails crossed private property.  FLPMA applies to "tract[s] of public land or interests therein," 43 U.S.C. § 1716(a), and defines "public lands" as "any land and interest in land owned by the United States."  43 U.S.C. § 1702(e).  The United States did not own any interest in the portions of the west side trails that crossed private property.

Plaintiffs assert, however, that this case is similar to *Wonder Ranch, LLC v. United States*, 2016 WL 6237196 (D. Mont. Oct. 24, 2016).  In *Wonder Ranch*, the Forest Service sought to establish a prescriptive easement over portions of a trail crossing private property.  2016 WL 6237196, at *1.  The earliest record of the trail was in 1888 and records of Forest Service management dated back to the 1950s.  *Id.* at *1, 3.  The Forest Service never secured a recorded easement from property owners, but decided to file a "Statement of Interest" with the county clerk

11

and recorder, giving notice that it claimed an easement across the Wonder Ranch property. *Id.* at *7-8. It then established its easement interest in a quiet title action. But, although the Court in *Wonder Ranch* found that a prescriptive easement existed, the case certainly does not stand for the proposition that a mere claim, or belief, that an easement exists equates to a legally valid interest.

In this case, the Forest Service believed it had easement interests in the west side trails. Unlike in *Wonder Ranch*, however, the Forest Service decided not to file a statement of claim or pursue a quiet title action, and instead, negotiated a permanent easement with the Landowners. This appears well within the agency's discretion. Plaintiffs have provided no authority requiring the Forest Service to pursue a quiet title action for every trail across private land in which it may have a colorable claim for a prescriptive easement.

Consistent with the Forest Service Manual, the Forest Service made a policy decision to negotiate with the Landowners and were successful in doing so. (*See* A.R. 4980) ("Where access across non-Federal land or over a non-Federal road or trail is necessary and advantageous to the Government, make every reasonable effort to negotiate a satisfactory easement on equitable terms.") Here, regardless of whether a prescriptive easement existed, or was extinguished, the fact remains that the Forest Service did not pursue that course of action. At most, the Forest Service possessed a potential easement interest in private segments of the

12

Porcupine-Lowline and North Fork Elk Creek trails. A potential easement interest in private land is not "a tract of land or interests therein within the National Forest System." Therefore, FLPMA does not apply and Plaintiffs' claim necessarily fails.

### B. National Environmental Policy Act

Plaintiffs next allege that the Porcupine-Ibex trail project has never undergone an appropriate NEPA analysis. Plaintiffs argue that the Forest Service "started but then abruptly ended the NEPA process for the Ibex project," without preparing an environmental impact statement ("EIS"), environmental assessment, or categorical exclusion. (Doc. 79 at 22.) The Forest Service counters that pertinent NEPA analysis was conducted in the 2009 EA, which adequately addressed the trail reroute.

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It is a procedural statute with two over-arching goals. *Baltimore Gas and Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); 40 C.F.R. § 1500.1(b). First, it requires Federal agencies "to consider every significant aspect of the environmental impact of a proposed action." *Baltimore*, 462 U.S. at 97. Second, it ensures that the agency informs the public it has considered environmental concerns in its decision-making process. *Id.*

NEPA does not prescribe substantive environmental standards, rather it "establishes 'action-forcing' procedures that require agencies to take a 'hard look'

at environmental consequences." *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (internal citations omitted). In doing so, "[t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).

To accomplish these goals, NEPA requires federal agencies to prepare an EIS "on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). Some actions are categorically excluded and do not require an EIS or environmental assessment. 40 C.F.R. § 1501.4(a)(2). If the proposed action is not categorically excluded and is not one that normally requires an EIS, the agency must prepare an environmental assessment to determine whether an EIS is needed. 40 C.F.R. § 1501.4(a)-(c). If the environmental assessment reveals that the proposed action will not have a significant effect on the environment, the agency is not required to prepare an EIS, and the agency may issue a finding of no significant impact explaining why an action will not have a significant effect on the environment. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002); 40 C.F.R. § 1508.9, 1508.13.

As a procedural statute, "NEPA does not mandate particular results, but simply provides the necessary process." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (internal quotations omitted). *See also*

*Inland Empire Pub. Land Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) ("NEPA exists to ensure a *process*, not to ensure any result.") (emphasis in original).  In reviewing an agency decision under NEPA, courts are, thus, "limited to the question of whether the agency took a 'hard look' at the proposed action." *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008).

As discussed above, the Forest Service issued the 2006 Travel Plan for managing public use and access of the Forest's roads and trails.  The purpose of the Travel Plan was to specify the types (motorized, horseback, biking, hiking, skiing, et cetera) and seasons of public use that would be permitted on various roads and trails within the Forest. The Travel Plan included a Final EIS and a Record of Decision ("ROD").  (*See* A.R. 1869-2676, 3695-3823, 5219-5362.)

As noted above, the ROD addressed the Ibex Travel Planning Area, including the Porcupine-Lowline trail, and specified the permitted uses for this area.  Further, it recognized the need to secure easements in the area through private land on roads and trails designated for public use to provide access to National Forest lands.  (A.R. 5270-71.)

The 2006 Travel Plan did not, however, include an analysis of the environmental effects of the road and trail improvements.  That analysis occurred through the 2009 EA, as part of the implementation of the Travel Plan.  In the 2009

EA, the Forest Service conducted a Road and Trail Improvement Projects Environmental Assessment to examine the potential environmental consequences of the proposed work to roads and trails in the Forest.  (A.R. 1-209.)  Therefore, while the 2006 Travel Plan specified the types of uses appropriate for the roads and trails, the work proposed in the 2009 EA was "designed to provide adequate facilities to accommodate the designated uses and provide for other resource protection."  (A.R. 6.)  The proposed work included construction, reconstruction, and restoration of the roads and trails to accommodate uses as identified in the 2006 Travel Plan.  (A.R. 7.)

In compliance with NEPA, 40 C.F.R. § 1501.7, the Forest Service determined the issues that needed to be addressed through scoping and public comment.  (A.R. 10.)  The Forest Service received and responded to the public comments, which were included in the 2009 EA.  (*See* A.R. 188-209.)  Based on the 2006 Travel Plan and public comments, the Forest Service identified the issues that may affect the work proposed to the roads and trails.  In addressing the contemplated impacts, the 2009 EA compared two alternatives: (1) the Proposed Action; and (2) No Action.  (A.R. 10-37.)

The 2009 EA further specified the standard operating procedures to be used in carrying out the proposed improvements, mitigation measures to be used to protect the environment, and monitoring measures to be used.  (A.R. 26-33.)  It

also included an extensive analysis of the environmental consequences of the road and trail improvements, and potential impacts of the two alternatives, to the Forest. (A.R. 38-178.)  Specifically, the 2009 EA examined the affected environment and analyzed the direct, indirect, and cumulative effects with respect to biodiversity, fisheries, general wildlife, grizzly bear, invasive weeds, lynx, migratory birds, roadless areas, water quality, wolverine, rare plants, and sensitive wildlife species.

The Proposed Action, or Alternative 1, also specified the anticipated action for the Porcupine-Lowline trail and explained that the Porcupine-Lowline trial would be relocated to correspond with the final rights-of-way.  (A.R. 16.)  The 2009 EA recognized that the trail passed through large portions of private land with fences and gates, and contemplated shifting some portions of the trail to the east onto Forest lands.  (*Id.*)  It also specified that the work would involve construction of approximately 5.2 miles of new trial, 2.6 miles of reconstruction, and 3.0 miles of maintenance.  (A.R. 17).

In addition, the Forest Service provided two maps indicating the location of the proposed trail reroute, though the Forest Service did not know the precise location of the route at the time.  (*See* Docs. 83 at ¶ 14; 90 at 9-10; A.R. 4039-40.) But the maps identified the starting point and end point for the reroute, and established a corridor for rerouting the trail that encompassed an area wide enough to incorporate adjoining public and private sections of land.

17

On April 15, 2009, the Forest Service issued a Decision Notice and Finding of No Significant Impact adopting Alternative 1 to implement the projects proposed in the 2009 EA, including the Ibex project as it was described in the EA. (A.R. 1516, 1519, 1525.)

In 2018, the Forest Service reached a tentative agreement with the Landowners.  On March 1, 2018, the Forest Service initiated scoping to determine whether the precise location of the reroute would change the 2009 EA's environmental analysis.  Scoping for this purpose is addressed in the Forest Service Handbook, which notes that the Forest Service has broadened the concept of scoping to apply to all proposed actions.  (Doc. 93-1 at 4-5.)  The Handbook also provides that a new decision regarding a proposed action may not be necessary if a valid decision already exists.  (*Id.* at 8.)

Accordingly, a public scoping packet and frequently asked questions for the proposed Porcupine-Ibex trail were issued, and the Forest Service accepted comments for thirty days.  (A.R. 424-27.)  An updated scoping packet with additional frequently asked questions was provided on March 18.  (A.R. 431-40.)  Over the ensuing 30-day period, the Forest Service received approximately eighty public comments.  (*See* A.R. 282-423.)  After reviewing the comments received, the Forest Service determined the project would not pose any unforeseen risks to the environment, and thus, was consistent with the 2009 EA.  On August 15, 2018,

the Forest Service sent a letter to interested parties advising of its decision to

proceed with the trail reroute.  (A.R. 627-28.)

Plaintiffs challenge the sufficiency of the Forest Service's environmental

analysis under NEPA.  Since the environmental impacts of the proposed action

were not addressed in the 2006 Travel Plan or after scoping was initiated in 2018,

Plaintiffs' NEPA claim depends on whether the 2009 EA provided sufficient

analysis of environment impacts.  Plaintiffs argue that the 2009 EA generally

addressed impacts and mitigation measures of the improvement projects

throughout the Forest, but did not specifically examine the impacts of the Ibex

project.  The Forest Service contends that the 2009 EA did analyze environmental

impacts of all proposed actions throughout the Forest, including the trail reroute.

Although the precise location of the trial reroute was unknown at the time, the

Forest Service knew the reroute would be within the corridor designated on the

maps, and that some portions may be moved east, off private property onto

National Forest land.

Again, the Court agrees with the Forest Service.  Critically, while Plaintiffs

assert that the 2009 EA was insufficient, they do not allege any specific

deficiencies within the EA's analysis.  Beyond claiming general insufficiency,

Plaintiffs do not direct the Court to any environmental consideration that was not

given a "hard look" by the Forest Service, or point to any environmental issue raised during scoping and public comment that was not addressed.

In general, Plaintiffs are critical that the environmental analysis was conducted for the improvement projects throughout the Forest, and not specifically for the Ibex project.  But that was the purpose of the 2009 EA; to analyze the effects of all projects identified in the EA, including the Porcupine reroute. Additionally, where appropriate, the 2009 EA did address effects in the Porcupine area.  For example, the 2009 EA listed the Porcupine area in a table that denoted trails involving new construction proposals.[1]  (A.R. 45 and 46.)  The Porcupine area was also noted in the fisheries section.  There, the Forest Service provided a table indicating aquatic species presence, potential aquatic issues, and necessary mitigations.  (A.R. 60.)  The Forest Service noted the presence of Yellowstone cutthroat trout, a sensitive aquatic species; potential issues involving stream crossing and wetlands; but found no additional mitigation concerns.  (*Id.*)  Next, in the sensitive wildlife species section, the Porcupine area was noted to be an optimal habitat for the black-backed woodpecker and a suitable habitat for the flammulated owl.  (A.R. 168-69.)  The Forest Service determined that

---

[1] Table 2 provides: "Description of routes and activities considered in this Travel Plan implementation projection.  These routes will [be] surveyed for rare habitats prior to construction.  Proposed projects are presented by Travel Planning Area and Mountain Range."  (A.R. 44.)

implementation of the 2006 Travel Plan may, but is not likely to, significantly impact individual black-backed woodpecker habitat and would have no impact on the flammulated owl. (*Id.*)  Last, the Forest Service responded to public comments regarding the Porcupine area.[2]  In sum, while the 2009 EA was conducted on a Forest-wide level, contrary to Plaintiffs' assertions, it did address effects to the Porcupine area.

Plaintiffs also contend the Forest Service failed to consider or evaluate railway deeds from the early 1900s, which Plaintiffs believe may establish a public easement in certain parcels in the Crazy Mountains.  Plaintiffs frequently mention the railway deeds but fail to establish that these deeds are connected to any parcel of land at issue in this matter.  Plaintiffs have also not explained how the railroad deeds would be relevant to the agency's environmental analysis of the proposed action.

Accordingly, Plaintiffs have failed to show that the Forest Service did not take a "hard look" at the environmental impacts of the Ibex project.  Therefore,

---

[2] For example, one comment expressed concern regarding the taking of private property rights, to which the Forest Service responded and explained that construction and relocation of the Porcupine-Lowline trail would not begin until an agreement was reached with landowners. (A.R. 192.)  Another comment provided, "[a]ny new crossings related to the relocation of the trail should not negatively impact the streambed and/or banks and should not be a sediment source.  The preferred alternative is a bridge that spans the stream and its immediate banks."  The Forest Service responded that bridges and drainage would be used, and substandard bridges replaced. (A.R. 201.)

Plaintiffs' NEPA claim must be denied.  Because the Court has determined that the Forest Service complied with NEPA, it need not address the Forest Service's alternative argument that Plaintiffs failed to exhaust their administrative remedies.

### C.    National Forest Management Act

Plaintiffs final challenge relating to the west side trails is the Forest Service's compliance with the National Forest Management Act.

NFMA requires forest planning and management by the Forest Service at two levels: the forest level and the project level.  *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729-30 (1998); 16 U.S.C. § 1604.  Once the Forest Service adopts a Forest Plan, "NFMA prohibits any site-specific activities that are inconsistent with the Forest Plan."  *Lands Council v. Powell*, 395 F.3d 1019, 1032-33 (9th Cir. 2005).  While site-specific actions must be consistent with the Forest Plan, "the Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference."  *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012).  Agency decisions will only be found to violate NFMA if they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A).

Plaintiffs argue that the Forest Service violated NFMA by failing to protect the public's existing access rights as directed by the 2006 Travel Plan.  Plaintiffs cite to Guideline B-5 of the Travel Plan, which provides, "[i]n situations where

22

continued use of an historical road or trail access route is challenged or closed, take actions necessary to protect the existing access rights to NFS lands." (Doc. 7-12 at 14.) Plaintiffs, therefore, assert that the Forest Service failed to follow the Travel Plan when it approved the Ibex project because the approval resulted in trail closures and the relinquishment of public access rights.

Plaintiffs' argument fails for two reasons. First, the Travel Plan guidelines are not binding, but are instead "preferable or advisable" limits on management activities. (*See* Doc. 7-12 at 2.) Second, and more importantly, Plaintiffs' NFMA claim has the same defect as the FLPMA claim—NFMA governs management on federal, not private, lands. 16 U.S.C. § 1604(a) ("[T]he Secretary shall develop, maintain, and as appropriate, revise land and resource management plans for units of the National Forest System . . . ." As both the Forest Service and Landowners point out, neither the Travel Plan nor Forest Plan purports to give the Forest Service public access rights or management authority over private property.[3] As established above, the Forest Service did not seek to establish its potential easement interest by prescription, but instead chose to negotiate an easement

---

[3] In the Order denying Plaintiffs' motion for preliminary injunction, Judge Watters provided: "[t]he Forest Service cannot enforce its Travel Management Plan over private property. Although the Forest Service has a potential easement interest in portions of the trails, it has decided as a matter of policy to pursue a mutually agreeable resolution with private landowners to secure permanent public access to that area of the Gallatin National Forest instead of litigating the potential easement interest in those portions." (Doc. 10 at 18.)

agreement with the Landowners, and thus, has no legally valid interest in the portions of trails that cross private land.  Because the NFMA does not apply to management of private land, Plaintiffs' argument must fail.

### D.    Eastside Trails

Last, Plaintiffs assert that the Forest Service's failure to manage the trails on the east side of the Crazies violated the NFMA, the 2006 Travel Plan, and Forest Service travel regulations and policy.  Plaintiffs argue that the Forest Service has failed to manage the East Trunk and Sweet Grass trails by failing to protect and maintain the trails for public use by allowing landowners to block the trails with barriers and locked gates, place "no trespassing" signs, and remove National Forest trail signs and markers.  Plaintiffs seek to compel the Forest Service to protect and restore public access on these trails.  The Forest Service asserts it continues to negotiate with landowners on the east side to secure permanent public access.

Under Section 706(1) of the APA, federal courts have the power to "compel agency action unlawfully withheld or unreasonably delayed."  This grant does not give courts the unfettered ability to "compel agency action" based on the courts' own judgment, but instead, "is carefully circumscribed to situations where an agency has ignored a specific legislative command." *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 932 (9th Cir. 2010).  The Supreme Court has explained that "a claim under § 706(1) can proceed only where a plaintiff asserts

24

that an agency failed to take a *discrete* agency action that it is *required to take*."

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

Plaintiffs argue that the Forest Service has failed to manage the east side trails as directed by Forest Service policy, travel regulations, and the 2006 Travel Plan.  First, Plaintiffs cite to 36 C.F.R. § 212.6(c), which provides that "use of existing National Forest System roads and trails shall be permitted for all proper and lawful purposes subject to compliance with rules and regulations governing the lands and the roads or trails to be used."  According to Plaintiffs, because the Forest Service mapped the trails and included them in the Travel Plan, the Forest Service must ensure that public use of the trails is permitted.

Next, Plaintiffs cite the 2006 Travel Plan, which permits mountain biking, stock, hiking, and snowshoeing use on the East Trunk trail (No. 115) and stock, hiking, and snowshoeing use on the Sweet Grass trail (No. 122).  (Doc. 7-12 at 24.) Plaintiffs argue that the Forest Service has failed to maintain the trail for these purposes in violation of the Travel Plan's guideline that directs the Forest Service "to protect existing access rights."  (Doc. 79 at 41.)  But Plaintiffs do not complete the sentence which, in full, directs the Forest Service "to protect existing access rights and to cooperate with landowners to meet mutual transportation needs." (A.R. 5246-47.)  The paragraph continues: "[i]t should be noted that adoption of this direction is not a final agency decision to pursue access in specific locations.

25

Historically, we have obtained needed access in cooperation with the private landowners as opportunities arise." (*Id.* at 5247.)

Again, the fatal flaw to Plaintiffs' argument is that there are no existing established rights for the Forest Service to protect. The Forest Service did not establish a valid legal interest in its potential easement interests. Hence, the Forest Service has not established that public use of the portions of trail crossing private property was a "proper and lawful purpose."

Further, the directives cited by Plaintiffs are non-binding guidelines, not non-discretionary duties. *See Norton*, 542 U.S. at 71 ("Quite unlike a specific statutory command requiring an agency to promulgate regulations by a certain date, a land use plan is generally a statement of priorities; it guides and constrains actions, but does not (at least in the usual case) prescribe them."). Indeed, Plaintiffs ask the Court not "to direct the agency to take specific action – just reasonable steps within its discretion to protect and restore public access rights on the two trails." (Doc. 89 at 52.) But this is precisely what the Supreme Court proscribed in *Norton*. 542 U.S. at 66 ("The principal purpose of the APA limitations we have discussed . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.").

Here, Plaintiffs seek to compel a general agency policy, in which the Forest Service has discretion as to how it will accomplish the policy objective. "[A]lthough plaintiffs may not approve of the way it has done so," the Forest Service has, in its discretion, decided to negotiate with landowners in an attempt to remedy the longstanding dispute threatening public access to the eastside of the Crazies. *Hells Canyon*, 593 F.3d at 932.

Because Plaintiffs have failed to identify a discrete agency action the Forest Service was required to take, they have failed to state a claim under § 706(1).

## IV.   Conclusion

Based on the foregoing, **IT IS RECOMMENDED** that:

1.     Plaintiffs' Motion for Summary Judgment (Doc. 78) be **DENIED**.

2.     Federal Defendants' Cross-Motion for Summary Judgment (Doc. 81) be **GRANTED**; and

3.     Landowners' Cross-Motion for Summary Judgment (Doc. 85) be **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies

27

served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 18th day of February, 2022.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge